**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DAVINO WATSON, | ) |
| | ) |
| *Plaintiff*, | ) |
| | ) |
| v. | ) Case No. 1:14-cv-06459-JBW-VVP |
| | ) |
| JUAN ESTRADA, MICHAEL ORTIZ, | ) **Jury Trial Demanded** |
| TIMOTHY GUNTHER, JOHN DOES 1-8, and | ) |
| the UNITED STATES | ) |
| | ) |
| *Defendants*. | ) |
| | ) |

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS, OR IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

On September 17, 2002, Plaintiff Davino Watson's father, Hopeton Ulando Watson, became a naturalized citizen of the United States. On that same day, as the legitimated minor child of a U.S. citizen, Plaintiff also automatically derived U.S. citizenship. Five years later, despite having all of the evidence of Plaintiff's U.S. citizenship, Defendants nonetheless arrested Plaintiff and placed him in removal proceedings. Defendants subjected Plaintiff to mandatory detention under 8 U.S.C. § 1226(c), stripping the immigration judge of jurisdiction to review Plaintiff's custody. At that juncture, Plaintiff's sole recourse was to challenge his removal, an administrative process which can ultimately be reviewed only by a Court of Appeals. 8 U.S.C. § 1252(b)(9); *see* 8 U.S.C. § 1226(e) (stripping judicial review of Defendants' custody determinations). During this time, Defendants failed to acknowledge the straightforward evidence of Plaintiff's U.S. citizenship or affirmatively to investigate Plaintiff's repeated claims of U.S. citizenship, despite four Immigration and Customs Enforcement (ICE) directives that require ICE officers to investigate such claims. After finally investigating Plaintiff's claim to

U.S. citizenship for the first time on or around November 2, 2011, Defendants immediately released him from custody.  In total, Defendants wrongfully imprisoned Plaintiff for 1,273 days (approximately 3.5 years).  Nevertheless, following Plaintiff's release from custody, Defendants did not terminate Plaintiff's removal proceeding. Instead, although Defendants realized their error with regard to Plaintiff's U.S. citizenship claim, they left him destitute for another 755 days (over 2 years) and did nothing to communicate their error to Plaintiff or otherwise provide Plaintiff with proof of his U.S. citizenship so he could obtain employment or exercise his rights. The Board of Immigration Appeals (BIA) finally terminated Plaintiff's removal proceedings on January 24, 2013.

Defendants argue that they had probable cause to arrest, detain, and prosecute Plaintiff for removal based on the Board of Immigration Appeals' (BIA) decision *Matter of Hines*, 24 I. & N. Dec. 544 (BIA June 4, 2008); however, *Matter of Hines* had not even been issued at the time of Plaintiff's initial detention on May 8, 2008, one month prior to *Matter of Hines* being issued. More importantly, Plaintiff derived U.S. citizenship on September 17, 2002 when there can be no dispute that *Matter of Clahar* was the applicable BIA precedent. 18 I. & N. Dec. 1 (BIA 1981). Defendants do not have authority to arrest, detain or seek removal of U.S. citizens from the United States. *Woodby v. INS*, 385 U.S. 276 (1966); Compl., Dkt. # 1, ¶¶ 41-44, Ex. J.  To give retroactive effect to *Matter of Hines*, as Defendants have recognized, would serve to strip Plaintiff of his U.S. citizenship, an act with no basis in law. Compl., Dkt. # 1, ¶¶ 27-30 n. 2, 60-61, Ex. P; Def.'s Statement of Material Facts and Declaration, Dkt # 19-20, at ¶ 49, Ex. C. at Watson CAR 00052-58.

Defendants now seek to shield themselves from liability by invoking a variety of defenses in an attempt to strip this court of jurisdiction.  These defenses are without matter, and

this Court should deny Defendants' Motion to Dismiss and in the alternative Summary Judgment.

## STATEMENT OF THE CASE

Plaintiff Davino Watson was born in Jamaica on November 17, 1984. Compl., Dkt. # 1, ¶ 24.  While Plaintiff's parents were not married at the time of his birth, under the Jamaican Status of Children Act of 1976 Plaintiff was legitimated from birth. Pl.'s Answer to Def's Statement of Facts (Dkt. # 19), at ¶ 2.  Plaintiff entered the United States in 1998 as a lawful permanent resident (LPR) based on a petition by his father. *Id.*  As part of Plaintiff's LPR application, the former Immigration and Naturalization Service (INS) (now incorporated into United States Citizenship and Immigration Services (USCIS)) determined Plaintiff to be his father's "child" in accordance with 8 U.S.C. § 1101(b)(1), which includes the legitimation provision decided in *Matter of Clahar*, 18 I. & N. Dec. 1 (BIA 1981).[1]  *Id.*

Plaintiff derived U.S. citizenship on September 17, 2002 through his father's naturalization on that same day.  Compl., Dkt. # 1, ¶¶ 27- 30, Exs. A & E.  On that day, Plaintiff satisfied the last material condition to derive citizenship under the Child Citizenship Act of 2000 (CCA), codified at 8 U.S.C. § 1431. *Matter of Rodriguez-Tejedor*, 23 I. & N. Dec. 153, 163 (BIA 2001) (stating "[I]n determining whether an individual derived citizenship by naturalization, the law in effect when the last material condition (naturalization, age, residence) is met is generally controlling."); *Ashton v. Gonzales*, 431 F.3d 95, 97-98 (2d Cir. 2005) (applying the legal principle established in *Rodriguez-Tejedor*).  Also on September 17, 2002, *Matter of Clahar* was the BIA's binding case law interpreting what it meant to be legitimated under Jamaican law for

---

[1] Notably, the legitimation provision in 8 U.S.C. § 1101(b)(1)(C) is substantively identical to 8 U.S.C. § 1101(c)(1), which is the legitimation provision applicable to derived citizenship under the Child Citizenship Act of 2000, codified at 8 U.S.C. § 1431, and unlike the legitimation provision considered in *Matter of Hines*, former 8 U.S.C. § 1432(a)(3) (former INA § 321(a)(3)).

purposes of 8 U.S.C. § 1101(b)(1) (applicable to LPR status), a provision substantively identical to 8 U.S.C. § 1101(c)(1) for purposes of derivative citizenship under the CCA, 8 U.S.C. § 1431.

In spring 2008, Defendant Estrada conducted a cursory investigation into whether Plaintiff was removeable from the United States. Defendant Estrada claimed to have reviewed Plaintiff's father's immigration file ("alien file" or "A-file") and to have found no record of Plaintiff's father's naturalization. Compl., Dkt. # 1, at ¶ 36, Ex. D. Yet, had Defendant Estrada actually reviewed the Department of Homeland Security's (DHS) Alien file or electronic records, he would have discovered multiple copies of Plaintiff's father's certificate of naturalization dated September 17, 2002 and an electronic notation to the same effect. *Id.* at ¶ 36, Ex. E. Nevertheless, on April 10, 2008, Defendants Estrada and Michael Ortiz claimed to have probable cause of Plaintiff's alienage and prepared a Notice to Appear (NTA) (the charging document for removal proceedings) and an administrative warrant (without judicial approval) in order to arrest Plaintiff. *Id.* at ¶ 37, Ex. F. The Defendants defend their actions by relying on a case which had not even been decided at the time of their illegal actions—*Matter of Hines*, 24 I. & N. Dec. 544 (BIA June 4, 2008). It was not published for another 56 days.

On May 8, 2008, Defendants arrested Plaintiff on the administrative warrant upon his successful completion of the New York Shock Incarceration Program—a diversionary, therapeutic program for young non-violent offenders. *Id.* at ¶ 39. Plaintiff repeatedly claimed to Defendants that he was a U.S. citizen from the moment of his arrest, including providing documentation proving his citizenship, namely, a copy of his father's naturalization certificate. *Id.* On May 23, 2008, Immigration and Customs Enforcement (ICE) issued its first of four directives that established affirmative obligations on Defendants to investigate detainees' claims to U.S. citizenship ("May 23 USC directive"), which memorialized the longstanding precedent

4

that the federal government cannot exert its civil immigration enforcement authority against U.S citizens. Compl., Dkt. # 1, ¶¶ 41-44, Ex. J; *Woodby v. INS*, 385 U.S. 276 (1966).  Defendants failed to comply with the May 23 USC directive, as well as the three subsequent directives. *Id.* at ¶¶ 45-57.

After detaining Plaintiff for 19 days, Defendants initiated removal proceedings on May 27, 2008, and 49 days elapsed before Plaintiff had his first hearing *pro se* before the immigration judge on June 25, 2008. Pl.'s Answer to Def's Statement of Facts (Dkt. # 19), at ¶ 17.  Plaintiff remained *pro se* and detained at a rural detention center throughout his administrative proceedings until his case reached the Second Circuit. *Id.* at ¶ 20.  Because  Defendants failed to acknowledge that Plaintiff was a citizen refused to investigate evidence of his citizenship, Plaintiff was held subject to mandatory detention under 8 U.S.C. § 1226(c), which stripped the Immigration Judge (IJ) of jurisdiction to review Defendants' detention. *See Demore v. Kim*, 538 U.S. 510 (2003) (holding mandatory detention of certain "criminal aliens" constitutional); Def.'s Memo in Support of its Motion to Dismiss and Summary Judgment ("Def.'s Memo"), Dkt. # 18, at 24-25. For individuals in Plaintiff's circumstance, there is neither a "probable cause" hearing in immigration court nor a right to a bond hearing.  Plaintiff's only recourse at that juncture was to challenge his removal through the administrative proceedings and seek review via a Petition for Review before the Court of Appeals. *See* 8 U.S.C. §§ 1252(b)(9) & (d); 8 U.S.C. § 1226(e) (stripping judicial review of Defendants' custody determinations); *Johnson v. Whitehead*, 647 F.3d 120, 124-25 (4th Cir. 2011) (citizenship claim arising in removal proceedings cannot be challenged by writ of habeas corpus but only by petition of review to the Court of Appeals pursuant to a removal order).

Defendants' argument throughout the administrative proceedings was that *Matter of Hines* (issued June 4, 2008) could be applied retroactively to Plaintiff; thus, effectively reaching back to strip Plaintiff of his citizen status.  This position ignored that Plaintiff had derived U.S. citizenship five years earlier on September 17, 2002 under clearly established legal precedent (*Matter of Rodriguez-Tejedor* and *Matter of Clahar*).  As the Defendants and BIA subsequently acknowledged, *Matter of Clahar*, decided in 1981, controlled in Plaintiff's case.  Indeed, the holding in *Matter of Hines* related to an altogether different statutory provision. More importantly, to apply *Matter of Hines* in Plaintiff's case had the impermissible result of stripping Plaintiff retroactively of his U.S. citizenship.  There is no precedent in statute or law for such an action, absent fraud in obtaining citizenship, which is not alleged in this case. Compl., Dkt. # 1, ¶¶ 27-30, n. 2; 8 U.S.C. § 1451.

It was only on remand to the BIA from the Second Circuit that Defendants meaningfully investigated Plaintiff's claim to U.S. citizenship for the first time (in accordance with the fourth USC directive). *Id.* at ¶¶ 58-61. In a memorandum prepared on or around November 2, 2011, Defendants from both ICE and USCIS concluded:

<u>CONCLUSION AND RECOMMENDATION</u>

Following further discussion with OPLA HQ, USCIS counsel, and DHS/OGC, it is concluded that Watson has provided probative evidence of United States citizenship based on <u>Clahar</u>.  It is recommended that he be immediately released from DHS custody.

*Id.* at ¶ 60, Ex. P.  Plaintiff was released that same day. *Id.* at ¶ 61.  There was no new evidence or any unresolved issue of law that lead to this conclusion.  ICE and USCIS had the information needed to conclude that Plaintiff was a citizen on the day they detained him; yet, it took them three and one half years to make that determination.

On November 25, 2011, the Government filed its brief on remand of Plaintiff's case to the Board of Immigration Appeals.  Pl.'s Answer to Def's Statement of Facts (Dkt. # 19), at ¶ 49; *see* Def.'s Statement of Facts and Declaration, Dkt # 19-20, at ¶ 49, Ex. C.  In that brief, the Government all but concedes that Plaintiff is and was a U.S. citizen since September 17, 2002 for multiple reasons, including that *Matter of Clahar* was the operative law at the time Plaintiff derived U.S. citizenship. *Id.*   Defendants, however, neither moved to terminate Plaintiff's removal proceeding, nor did they take any action to correct their error in denying Plaintiff's N-600 application for a Certificate of U.S. Citizenship. Pl.'s Answer to Def's Statement of Facts (Dkt. # 19), at ¶¶ 25, 30, 49, 51; Compl., Dkt. # 1, at ¶¶ 60-66.  Plaintiff's removal proceedings were not terminated for another 14 months when the BIA finally terminated proceedings on January 24, 2013. Pl.'s Answer to Def's Statement of Facts (Dkt. # 19), at ¶¶ 49-50.  Defendant USCIS did not correct its error in denying Plaintiff's N-600 application for a Certificate of U.S. Citizenship until Plaintiff reopened his case, and the agency finally issued the certificate on November 26, 2013. *Id.* at ¶ 51; Compl., Dkt. # 1, at ¶ 66. In the interim, Plaintiff had no lawful proof of his immigration status and was not able to work.  DHS did not update its electronic records to reflect Plaintiff's U.S. citizenship until December 2014. Pl.'s Answer to Def's Statement of Facts (Dkt. # 19), at ¶ 53.

On October 30, 2013, Plaintiff filed his administrative tort (SF-95) claim, within two years of his release from Defendants' custody and nine months after termination of his removal proceedings.  He filed even before Defendants issued his certificate of U.S. citizenship. Pl.'s Answer to Def's Statement of Facts (Dkt. # 19), at ¶¶ 52-53.  Plaintiff filed his complaint in the current action on October 31, 2014, within three years of his release from Defendants' custody and two years of termination of his removal proceedings. *See* Compl., Dkt. # 1. Plaintiff claims

that the individual Defendants violated his rights under the Fourth and Fifth Amendments to the U.S. Constitution and seeks redress pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971). Plaintiff further seeks redress against the United States, through its agents at ICE and USCIS, under the Federal Tort Claims Act (FTCA), 28 U.S.C. § 2671, *et seq.,* for false imprisonment, malicious prosecution, and negligence.

## STANDARD OF REVIEW

### A.  Fed. R. Civ. P. 12(b)(6) Standard

When deciding a motion to dismiss under Rule 12(b)(6), a court is required to review and construe the complaint broadly and liberally, "accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002).  In practical terms, "[t]he issue is not whether a plaintiff will ultimately prevail but whether the [plaintiff] is entitled to offer evidence to support the claims."  *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir.1995).  To this end, the court's role in deciding a Rule 12(b)(6) motion is "not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." *Festa v. Local 3 Int'l Bhd. of Elec. Workers*, 905 F.2d 35, 37 (2d Cir.1990).  It is well settled that "[w]hen a motion to dismiss is brought prior to an answer and discovery, a court is loath to grant the motion." *Felix-Torres v. Graham*, 521 F. Supp. 2d 157, 162 (N.D.N.Y. 2007) (*citing Lugo v. Senkowski*, 114 F. Supp. 2d 111, 113 (N.D.N.Y. 2000)).

### B.  Fed. R. Civ. P. 12(b)(1) Standard

"The standard for reviewing a [Rule] 12(b)(1) motion to dismiss is essentially identical to the 12(b)(6) standard, except that a plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Friedlander v. Port Jewish Center*, 588 F. Supp. 2d 428, 430 (E.D.N.Y. 2008) (*citing Makarova v. United States*, 201 F.3d 110, 113

8

(2d Cir. 2000)). When considering a motion to dismiss pursuant to Rule 12(b)(1), a court "may consider affidavits and other materials beyond the pleadings to resolve the jurisdictional question." *Friedlander*, 588 F. Supp. 2d at 430.

### C. Summary Judgment Standard

Summary judgment is only appropriate "if, construing the evidence in the light most favorable to the non-moving party, no genuine issue of material fact remains to be resolved by a jury." *Kronisch v. US*, 150 F. 3d 112, 126 (2d Cir. 1998). In the Second Circuit, district courts may grant summary judgment only "if *after discovery*, the nonmoving party has failed to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof." *Sexton v. Franklin First Financial, Ltd.*, 2009 WL 1706535, *15 (E.D.N.Y. 2009) (emphasis in original) (*citing Celotex Corp. v. Catrett*, 477 US 317, 322 (1986)). "The nonmoving party must have had the opportunity to discover information that is essential to his opposition to the motion for summary judgment." *Sexton*, 2009 WL 1706535 at *15. Furthermore, courts have long recognized that summary judgment is a "drastic device, since its prophylactic function, when exercised, cuts off a party's right to present his case to the jury." *Heyman v. Commerce & Industry Ins. Co.*, 524 F.2d 1317, 1320 (2d Cir. 1975).

### ARGUMENT

### I. All of Plaintiff's Claims Are Well Within the Applicable Statutes of Limitation

#### A. Plaintiff's *Bivens* Claims Are Within the Statute of Limitation Under the Applicable Standard Articulated in *Heck v. Humphrey*.

Plaintiff does not dispute that the statute of limitation for *Bivens* actions arising in New York state is three years and that federal law determines when the claim accrues. Def.'s Memo., Dkt. # 18, at 9. Plaintiff filed the instant action on October 31, 2014 within three years of his release from Defendants' custody and termination of his removal proceedings. Defendants'

assertion that Plaintiff's *Bivens* claims are time-barred ignores Plaintiff claims under the Fifth

Amendment, which covers the initial arrest and any imprisonment beyond the initiation of legal

process, in addition to his Fourth Amendment claim. *Heck v. Humphrey*, 512 U.S. 477, 484

(1994) (analogizing a Fifth Amendment *Bivens* claim to the civil tort of malicious prosecution).

> In *Heck*, Justice Scalia in the majority opinion states:
>
> We hold that, in order to recover damages for allegedly unconstitutional
> conviction or imprisonment, or for other harm caused by actions whose
> unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff
> must prove that the conviction or sentence has been reversed on direct appeal,
> expunged by executive order, declared invalid by a state tribunal authorized to
> make such determination, or called into question by a federal court's issuance of a
> writ of habeas corpus, 28 U.S.C. § 2254. A claim for damages bearing that
> relationship to a conviction or sentence that has *not* been so invalidated is not
> cognizable under § 1983.

512 U.S. at 486-87.  Since *Heck* was decided, the Second Circuit has extended its rationale to the

accrual of *Bivens* claims. *Tavarez v. Reno*, 54 F.3d 109, 110 (2d Cir. 1995).  In *Heck*, the

petitioner filed a § 1983 action in federal court while his conviction was pending on appeal in

state court, which if successful would have had the effect of collaterally attacking the validity of

the conviction on appeal. *Heck*, 512 U.S. at 484-86.  The Court expressed grave concerns at

"expand[ing] opportunities for collateral attack" and concluded, "[w]e think the hoary principle

that civil tort actions are not appropriate vehicles for challenging the validity of outstanding

criminal judgments applies to § 1983 damages actions that necessarily require the plaintiff to

prove the unlawfulness of his conviction or confinement . . . ." *Id.* at 484-85.  Accordingly, the

Court concluded that a § 1983 claim simply does not accrue until the underlying conviction or

sentence has been "reversed, expunged, invalidated, or impugned by the grant of a writ of habeas

corpus." *Id.* at 489.

Like in *Heck*, had Plaintiff filed his *Bivens* claims within three years of his initial arrest on May 8, 2008, as Defendants propound, the *Bivens* action would have had the disfavored effect of collaterally attacking his still on-going removal proceedings. Pl.'s Answer to Def's Statement of Facts (Dkt. # 19), at ¶¶ 16-50.  Accordingly, Plaintiff's *Bivens* claims did not accrue until the BIA terminated his removal proceedings on January 24, 2013, making his Complaint filed on October 31, 2014 well within the three year statute of limitations.  Defendants' argument is simply wrong.

Defendants' cited cases are distinguishable because they address only Fourth Amendment *Bivens* claims and where the only constitutional violation was the initial arrest.  In *Wallace v. Kato*, petitioner brought a § 1983 claim seeking damages for a false arrest, which resulted in a coerced confession that was ultimately suppressed and criminal charges were dropped. 549 U.S. 384 (2007).  The Court held that the statute of limitation for petitioner's false arrest claim under the Fourth Amendment accrued once he became detained pursuant to legal process. *Wallace*, 549 U.S. at 391.  In *Wallace*, the Court distinguished its ruling from *Heck* by noting that at the termination of the unconstitutional Fourth Amendment actions by the arresting officers, it was speculative that it would lead to a prosecution. *Id.* at 393; *see Rudaj v. Treanor*, 522 F. App'x 76 (2d Cir. 2013) (Fourth Amendment *Bivens* claim based on unconstitutional search accrued at the time of search not the subsequent later use of unlawfully obtained evidence to obtain conviction); *Barone v. United States*, 2014 WL 4467780, at *13, *16 (S.D.N.Y. Sept. 10, 2014) (plaintiff's *Bivens* false arrest claim accrued once his arrest was subject to judicial review of probable cause and a bond hearing).

Unlike *Wallace*, Plaintiff here also brings Fifth Amendment *Bivens* claims. *See Heck*, 512 U.S. at 484 (analogizing a Fifth Amendment *Bivens* claim to a malicious prosecution claim

where a "plaintiff may recover, in addition to general damages, 'compensation for any arrest or imprisonment, including damages for discomfort or injury to his health, or loss of time and deprivation of the society.'" (internal citation omitted)).  Plaintiff was served with the NTA (the charging document for removal proceedings) immediately upon his arrest, and it was Defendants Estrada and Ortiz's decision to initiate removal proceedings.  Unlike *Wallace*, there was nothing speculative about Defendants' unconstitutional detention and attempt to remove Plaintiff from the United States through removal proceedings.

Defendants make much of the distinction between removal proceedings, which are civil in nature, and criminal proceedings, noting that *Heck* dealt with the latter.  Indeed, *Heck* examined the recovery of damages under 42 U.S.C. § 1983 by a prisoner in state criminal custody; nonetheless, the principles and reasoning of *Heck*, in which the Court expressed its disinclination to "expand opportunities for collateral attack," *Heck* 512 U.S. at 484-85, applies with equal – if not more – force in removal proceedings.  The basis of Petitioner's Fourth Amendment "false arrest" *Bivens* claim and Fifth Amendment "malicious prosecution" *Bivens* claims were inextricably tied together in his removal proceedings.  Defendants subjected Plaintiff to mandatory detention, 8 U.S.C. § 1226(c), which stripped the immigration judge of jurisdiction to review his custody—including through a prompt "probable cause" hearing or bond hearing. *Demore v. Kim*, 538 U.S. 510 (2003) (holding pre-removal order mandatory detention for "criminal aliens" constitutional); *see* 8 U.S.C. § 1226(e) (stripping judicial review of Defendants' custody determinations); *Johnson v. Whitehead*, 647 F.3d 120, 124-25 (4th Cir. 2011) (citizenship claim arising in removal proceedings cannot be challenged by writ of habeas corpus but by petition of review to the Court of Appeals pursuant to a removal order).  Accordingly, Plaintiff's detention never became subject to legal process and was inextricably

tied up with termination of his removal proceedings (unless Defendants act unilaterally to release Plaintiff, as they did on November 2, 2011). Plaintiff's only recourse was to challenge his removal through the administrative proceedings and seek review via a Petition for Review before the Court of Appeals, a statutory removal scheme that encompasses requirements of finality and exhaustion. *See* 8 U.S.C. §§ 1252(a)(5), (b)(9) & (d).

Against this context, the principle expressed in *Heck* requiring exhaustion and finality before an individual can seek monetary damages based on unlawful conduct in the prosecution of the case, remains equally binding to Plaintiff's case.  Plaintiff's *Bivens* claims did not accrue until the BIA terminated removal proceedings, in accordance with *Heck v. Humphrey*.  Thus, Plaintiff's claims are timely.

### B. Plaintiff's FTCA Claims Are Within the Statute of Limitations Under the Applicable Standards.

As Defendants note, under the FTCA, a claimant needs to file an administrative tort (SF-95) claim to the appropriate federal agency within two years of the claims accrual, subject to equitable tolling.  Def.'s Memo., Dkt. # 18, at 10-11; *United States v. Wong*, 135 S.Ct. 1625 (2015) (holding that courts can toll FTCA's statute of limitations).   Plaintiff filed his administrative tort claim on October 30, 2013, within two years of his release from custody, nine months after termination of his removal proceedings and before Defendants issued him a certificate of U.S. citizenship. Pl.'s Answer to Def's Statement of Facts (Dkt. # 19), at ¶¶ 52-53.

### 1. False Imprisonment

Defendants argue that a claim for false imprisonment accrues at the time plaintiff is detained pursuant to legal process. Def.'s Memo., Dkt. # 18, at 10-11.  In this case, however, Plaintiff was not subject to legal process for purposes of his false imprisonment claim.  As long as Defendants DHS and ICE subjected Plaintiff to mandatory detention (8 U.S.C. § 1226(c)) and

removal proceedings – and ignored or denied his citizenship claim – Plaintiff could only challenge his false imprisonment by litigating the question of his removability, a question that needed to be exhausted and subject to final judicial review only at the court of appeals. See *supra* Argument, Section I.A.

When Plaintiff appeared before an Immigration Judge for the first time on June 25, 2008—49 days after his arrest—the judge had no jurisdiction to review Plaintiff's custody and did not even have legal authority to declare Plaintiff a U.S. citizen. *In re Acosta Hidalgo*, 24 I. & N. Dec. 103, 108 (B.I.A.2007).  Plaintiff was not entitled to a prompt "probable cause" hearing or bond hearing.  Accordingly, for purposes of his detention, Plaintiff was never held subject to legal process, such that Plaintiff's false imprisonment claim accrued only upon his release from Defendants DHS and ICE's custody on November 2, 2011.

Even assuming, *arguendo*, that Plaintiff's alleged mandatory detention was technically subject to legal process as of June 25, 2008, the circumstances of Plaintiff's case make equitable tolling appropriate. *Avalos-Palma v. United States*, 2014 WL 3524758, at *5-6 (D. N.J. July 16, 2014) (granting equitable tolling of Plaintiff's FTCA administrative tort claims because he was deported but diligently continued to litigate his removal proceeding and pursue his return to the United States).  Courts have found the federal governments' incarceration or creation of other obstacles that prevent meaningful access to the courts as grounds justifying equitable tolling. *See, e.g., Alvarez-Machin v. United States*, 96 F.3d 1246 (9th Cir. 1996) (finding foreign nationals FTCA claims warrant equitable tolling due to federal government's detention); *United States v. Midgley*, 142 F.3d 174, 179 (3d Cir. 1998) (citing *Alvarez-Machin* holding approvingly); *Avalos-Palma*, 2014 WL 3524758, at *5-6.  As discussed above, Defendants contended that Plaintiff was subject to mandatory detention, such that Plaintiff had no

14

mechanism for release during his removal proceedings.  Upon his initial arrest, Defendants transferred Plaintiff first to the Allegany County Jail (Allegany, NY) and then to the Buffalo Federal Detention Center (Batavia, NY) both in rural areas of upstate New York—approximately 325 miles and 360 miles, respectively. from Plaintiff's family in Brooklyn, New York.  Despite being a U.S. citizen, Plaintiff was not entitled to appointment of counsel during his removal proceedings. 8 U.S.C. § 1229a(b)(4)(A); Pl.'s Answer to Def's Statement of Facts (Dkt. # 19), at ¶ 20.  Moreover, the immigration judge did not advise him of his right to file an FTCA administrative claim and the law library at the Buffalo Federal Detention Center (where Plaintiff was detained) was not required to provide any information on FTCA administrative claims or provide copies of Standard Form 95 (SF-95) for administrative tort claims. Def.'s Decl., Dkt. # 20, Ex. A, A-file at 000125-31; ICE Performance-Based Detention Standards 2008, Standard 36, "Law   Libraries   and   Legal   Material,"   *available   at   http://www.ice.gov/detention-standards/2008/#wcm-survey-target-id* (last visited June 9, 2015).

It was only upon his release on November 2, 2011 that Plaintiff would have had the opportunity to submit an administrative tort claim.  Even after his release, Defendants DHS and ICE forced Plaintiff to fight his removal proceeding for another 14 months and denied him proof of his U.S. citizenship for another two years.  Nevertheless, Plaintiff filed his FTCA administrative tort claim before Defendants even publicly acknowledge that he was a U.S. citizen (through a certificate of citizenship) and within two years of his release from custody and nine months after termination of his removal proceedings.

Under the circumstances of Plaintiff's case, equitable tolling of the FTCA's two-year statute of limitation for filing an administrative tort claim for false imprisonment is appropriate, and Plaintiff's October 30, 2013 claim should be deemed timely.

## 2. Malicious Prosecution

Under *Heck*, Plaintiff's malicious prosecution claim did not accrue until termination of removal proceedings on January 24, 2013. 512 U.S. at 486-87; *See supra* Argument, Section I.A.[2]  In *Heck*, the Court analogized malicious prosecution principles to develop its accrual standard to require the underlying conviction or sentence to be "reversed, expunged, invalidated, or impunged" before a claim accrues in order not to expand the ability to collaterally attack a still-outstanding conviction or confinement. *Id.* at 486, 489.  The *Heck* accrual principle squarely applies to Plaintiff's malicious prosecution claim.

Defendants distort dicta in a footnote from *El Badrawi v. DHS* to cast doubt on *Heck*'s applicability to civil immigration proceedings. 579 F. Supp. 2d 249 (D. Conn. 2008); Def.'s Memo., Dkt. # 18, at 13.  The simple proof is that the text of *El Badrawi* decision associated with the footnote states, "[t]he court will assume that *Heck* is also properly extended to FTCA claims in the immigration context" and the court proceeds to apply *Heck*.  579 F. Supp.2d at 273-74.  In *El Badrawi*, the government claimed that *Heck* barred the plaintiff's FTCA claims related to his post-removal proceeding's detention, because plaintiff had not had the judgment of the immigration court reversed, expunged, invalidated or impunged. *Id.*  The *El Badrawi* court cast doubt that the *Heck* accrual rule (i.e., requiring a decision be reversed, expunged, invalidated, or impunged) could bar Mr. El Badrawi's FTCA claims because unlike in the criminal context, civil

---

[2] Defendants do not dispute that the accrual rule in *Heck* should generally extend to tort claims under FTCA. While the Second Circuit has not yet addressed the issue, several other Courts of Appeals and district courts in this circuit have applied *Heck* to FTCA claims. *See Erlin v. United States*, 364 F.3d 1127, 1132 (9th Cir.2004); *Ramming v. United States*, 281 F.3d 158, 162 (5th Cir.2001) (per curiam); *Parris v. United States*, 45 F.3d 383, 385 (10th Cir.1995); *Dare v. United States*, 264 Fed.Appx. 183, 185 (3d Cir.2008); El *Badrawi v. DHS*, 579 F. Supp.2d 24, 273-74 (D. Conn. 2008); *Davis v. United States*, 430 F.Supp.2d 67, 75 (D. Conn. 2006);  *Scott v. City of White Plains*, 2012 WL 1267873, at *4 n. 5 (S.D.N.Y. Apr. 10, 2012); *Frontera v. United States*, 2009 WL 909700, at * 11 (W.D.N.Y. Mar. 31, 2009).

immigration proceedings do not have a habeas process that can reverse, expunge, invalidate, or impugn the immigration court's decision. *Id.*

Defendants next seem to make the argument that *Heck* somehow does not apply because removal proceedings are "civil nature" and the "judge's sole power is to order deportation; the judge cannot adjudicate guilt or punish the respondent." Def.'s Memo, Dkt. # 18, at 13. Defendants never explain why the civil nature of removal proceedings should caution against *Heck*'s application. *See supra* Argument, Section I.A.  Defendants' position seems particularly problematic in Plaintiff's case because deportation of a U.S. citizen is akin to punishment.

Finally, in a last-ditch effort to avoid a plain application of *Heck*, the Defendants accept *arguendo* that it applies to Plaintiff's malicious prosecution claim, but urge that Plaintiff was subject to "multiple removal proceedings" and that the court should adopt the date of the Second Circuit's remand of the case to the BIA (May 31, 2011) as the date the malicious prosecution claim accrued. Def.'s Memo., Dkt. # 18, at 13-14.  As Defendants are well aware, Plaintiff was subject to just one removal proceedings. Def's Statement of Facts, Dkt # 19, at ¶¶ 19-50; Def.'s Memo., Dkt. #18, at 32 (describing a "regular removal proceedings").  Moreover, Defendants continued to detain Plaintiff for another five months after the Second Circuit remand and never sought termination of removal proceedings until the BIA terminated the case on January 24, 2013.  The Government's proposed accrual date should be rejected.

### 3. Negligence

The federal government has a long standing obligation to establish probable cause of an individual's alienage before exerting civil immigration enforcement against him. *See Woodby v. INS*, 385 U.S. 276 (1966); Compl., Dkt. # 1, at ¶ 52, Ex. M, at 1 ("[a]s a matter of law, ICE cannot assert its civil immigration enforcement authority to arrest and/or detain a [U.S. citizen

(USC)]"); *Morales v. Chadbourne*, 996 F.Supp.2d 19, 35 (D.R.I. 2014) (observing that there are 17 million foreign-born U.S. citizens making plaintiff's foreign birth a justification for immigration detention constitutionally suspect).   As a consequence of this constitutional and statutory obligation for holding an individual in detention, Defendants DHS and ICE had a legal duty to investigate an individual's claim of U.S. citizenship, as articulated in four successive ICE directives on affirmative obligations to investigate detainees' claims to U.S. citizenship— including detainees already subject to removal proceedings. Compl., Dkt. # 1, at ¶¶ 42-61, Exs. J-M.   At a minimum, Defendants DHS and ICE had an on-going duty to comply with each of the four USC directives such that failure to do so was an on-going breach of their duty to investigate Plaintiff's repeated claims that he is a U.S. citizen causing the Plaintiff on-going injury of detention until November 2, 2011.   Once Defendants DHS and ICE finally complied with the final USC directive on or around November 2, 2011, they released Plaintiff immediately. Compl., Dkt. # 1, at ¶¶ 60-61, Ex. P & Q.   Accordingly, Plaintiff's administrative tort claim filed on October 30, 2013 was timely.

Moreover, as discussed above, because Plaintiff's negligence claim against DHS and ICE is inextricably linked to his malicious prosecution claim based on his detention and removal proceedings, the Court should apply *Heck* and hold that Plaintiff's negligence claim either accrued at the point of his release or termination of removal proceedings.   Defendants DHS and ICE's failure to investigate Plaintiff's claims of being a U.S. citizen directly led to the decision to mandatorily detain him and to pursue his removal for nearly five years, despite multiple directives ordering their on-going obligation to investigate his claim of U.S. citizenship, regardless of whether and individual is already subject to removal proceedings.   Had Plaintiff complied with Defendants' proposed accrual date and statute of limitations, Plaintiff would have,

18

in effect, been collaterally attacking his on-going removal proceedings—a result *Heck* prohibits. Accordingly, *Heck*'s accrual principle should equally apply to Plaintiff's negligence claim, such that his October 30, 2013 administrative tort claim was timely.

Finally, even assuming *arguendo*, that Plaintiff's negligence claim against DHS and ICE accrued at the point of his arrest on May 8, 2008, equitable tolling of the deadline to file Plaintiff's FTCA administrative tort (SF-95) claim for negligence is appropriate for the same reasons described above for his false imprisonment claim.  In addition, Plaintiff would not have been aware of Defendants' obligations under the 4 ICE U.S. citizen directives, as the directives were not available to him in detention.[3]  More importantly, Plaintiff was not reasonably aware of Defendants DHS and ICE's negligence until he received the response to his FOIA request in 2013 and 2014, which revealed the USC investigative memo attached as Exhibit P to his Complaint.  *See* Compl., Dkt. # 1, at Ex. P ( designated "ICE.2014FOIA 901.0022-25").  Accordingly, the deadline for Plaintiff's administrative tort (SF-95) claim for negligence against DHS and ICE should be equitably tolled and Plaintiff's claim should be deemed timely.

With respect to Plaintiff's negligence claim against Defendant USCIS, Defendants identify the incorrect dates for accrual of the claim. Def.'s Memo., Dkt. # 18, at 15.  As stated in the Complaint, Plaintiff alleges that Defendant USCIS had a duty to correct its error in denying Plaintiff's N-600 application when it realized the error on or around November 2, 2011 and determined Plaintiff to be a U.S. citizen. Compl., Dkt. # 1, at ¶¶ 63-66.  Instead, Defendant USCIS did nothing to provide Plaintiff with proof of citizenship or <u>any</u> legal status, leaving him unemployed and destitute for another 755 days (over two years).   Accordingly, because

---

[3] Notably, in the instant litigation, Defendants have withheld the July 18, 2008 USC directive, asserting a "Law Enforcement Sensitive" privilege. **Ex. A** (Privilege Log at 357-58, 381-82).

Plaintiff's negligence claim against Defendant USCIS would not have first accrued until November 2, 2011, Plaintiff's October 30, 2013 claim was timely.[4]

## II.    Plaintiff's Malicious Prosecution and Negligence Claims Have Private Analogues Under the Applicable Standard Established in *Liranzo v. United States* Such That Defendant United States Has Waived Sovereign Immunity.

### A.  Plaintiff's Malicious Prosecution Claim has a Private Analogue Based on *Liranzo* and New York law.

In a factually very similar case, the Second Circuit established a far more flexible "private analogue" standard (28 U.S.C. §§ 1346(b), 2674) than that propounded by Defendants and in so doing rejected the application of all of the principle cases upon which Defendants rely. *Liranzo v. United States*, 690 F.3d 78, 86-93 (2d Cir. 2012) (exhaustively discussing and rejecting application of *Caban*, *Akutowicz*, *Dalehite, Chen*); Def.'s Memo., Dkt. # 18, at 15-17.

In *Liranzo*, the plaintiff was a derivative U.S. citizen that ICE erroneously identified as an LPR, who had been convicted of a criminal offense that would render him removeable from the United States. 690 F.3d at 80-82.  Upon his release from state custody, ICE detained him and initiated removal proceedings. *Id.*  Once in removal proceedings, it was discovered that he was a U.S. citizen, and ICE released him from custody. *Id.*  After exhausting administrative remedies, Plaintiff brought an FTCA district court action alleging "false arrest and imprisonment," and other torts, but not claims for malicious prosecution or negligence. *Id.* at 82; *Liranzo v. United States*, Complaint, 2008 WL 3886798 (E.D.N.Y filed July 18, 2008).

The Second Circuit rejected the district court's holding that there were no private analogues for plaintiff's "intentional tort claims based upon the detention of plaintiff pending deportation proceedings and the process the immigration agents used to determine his citizenship

---

[4] Moreover, Plaintiff was not reasonably aware of Defendant USCIS's negligence until he received the response to his FOIA request in 2013.  Compl., Dkt. # 1, at Ex. R.

status." *Liranzo*, 690 F.3d at 94.   The Court emphasized that "the FTCA's statutory phrase 'under *like* circumstances' does not mean 'under the *same* circumstances' such that simply because the challenged action is one only the government does . . . does not necessarily mean that no private analogue exists." *Id.* at 94 (quoting the seminal case *Indian Towing Co. v. United States*, 350 U.S. 61, 64, 67 (1955); *United States v. Olson*, 546 U.S. 43, 46-47 (2005) ("'like circumstances' do not restrict a court's inquiry to the same circumstances, but require it to look further afield" and finding that holding the private analogue requirement did not bar claim for negligent inspection of a mine).   Based on the tort claims presented by the Plaintiff, the Second Circuit identified a private analogue of false imprisonment, because private entities could be held liable for such a tort based on a "so-called 'citizen's arrest.'" *Id.* at 95-96.

In so holding, the Second Circuit further observed that the plain language of the FTCA statute further lends support that there is a private analogue, because as to law enforcement officers (such as ICE agents) the statute "explicitly waives sovereign immunity for '*any* claims' based on the 'acts or omissions of investigative officers' 'arising . . . out of . . . false imprisonment [and] false arrest.'" *Id.* at 96 (quoting 28 U.S.C. § 2680(h)).   The Court rejected that its decision in *Akutowicz* was contrary because "in *Akutowicz* there was no detention." *Id.* (also rejecting that immigration detention is quintessentially federal such that there cannot be a private analogue)

While the Second Circuit in *Liranzo* did not have the opportunity to determine whether there is a private analogue for malicious prosecution, based on the Court's decision and New York law, there can be little doubt that the private analogue requirement is satisfied in the instant case.   Just as the plain language of the FTCA statute lends support to the existence of a private analogue for false imprisonment and false arrest, the same exact provision also explicitly waives

"any claims" based on the "acts or omissions of investigative officers" "arising . . . out of . . . malicious prosecution." 28 U.S.C. § 2680(h). Indeed, New York law has an entire state statute requiring licensing, liability insurance, and training for private security contractors and their employees—an analogous private actor. "Security Guard Act of 1992," N.Y. GEN BUS. LAW § 89-e, *et seq.* (McKinney 2015). New York requires private security companies to carry general liability insurance "for death and personal injury, which coverage shall include false arrest or false imprisonment, malicious prosecution, libel, slander, and violation of right of privacy." N.Y. GEN BUS. LAW § 89-g (McKinney 2015). Moreover, New York state courts have recognized malicious prosecution claims against private actors under analogous circumstances. *Hollender v. Trump Village Cooperative, Inc.* 448 N.E.2d 432 (N.Y. 1983). In *Hollender*, plaintiff was arrested and prosecuted at the behest of a private security guard for criminal trespass. 448 N.E.2d at 434. Plaintiff subsequently sued the private security guard for false imprisonment and malicious prosecution. *Id.* The New York Court of Appeals did not question that the private security guard was a proper defendant to a malicious prosecution claim but dismissed the claim on the grounds that plaintiff could not demonstrate that the criminal prosecution terminated in her favor. *Id.* at 435; *see Roman v. Comp USA, Inc.*, 38 A.D.3d 751 (N.Y. App. Div. 2007) (holding malicious prosecution claim against retail store is untimely because missed statute of limitations after favorable termination of criminal proceedings). In short, there is a clear private analogue under New York law for Plaintiff's malicious prosecution claim.

Defendants' reliance on *Akutowicz* and *McGowan* is misplaced. Def.'s Memo., Dkt. # 18, at 17. Unlike *Akutowicz*, which focused exclusively on the negligent exercise of the power to certify loss of citizenship, Plaintiff's malicious prosecution claim is focused on Defendants DHS and ICE's conduct in arresting, detaining, and prosecuting Plaintiff for removal from the United

States. *Compare Akutowicz v. United States*, 859 F.2d 1122, 1125 (2d Cir. 1988) *with Liranzo*, 690 F.3d at 96 (distinguishing *Akutowicz*).  In *Liranzo*, the Second Circuit rejected Defendants' defense in the instant action—that DHS and ICE's power to detain and place immigrants in removal proceedings are so uniquely a federal government power that there is no sufficiently similar private analogue. *Compare Liranzo*, 690 F.3d at 94-97 *with* Def.'s Memo, at 17.

Finally, Defendants' exclusive focus on the four USC directives to claim that the unpublished decision in *McGowan* bars Plaintiff's malicious prosecution claim is misplaced. Def.'s Memo., Dkt. # 18, at 17.  In *McGowan*, the court rejected a negligence claim (not a malicious prosecution claim), whose "sole basis for the existence of a duty and its breach" was a federal regulation that stated that BOP staff should not discipline inmates for publishing under a byline. *McGowan v. United States*, 2015 WL 1321673, at * 11 (E.D.N.Y. Mar 23, 2015).  Unlike the circumstances in *McGowan*, Plaintiff's malicious prosecution (or negligence claim) is not based exclusively on the four USC directives.  Rather, Plaintiff's claims are grounded in the recognized duty that Defendants had to have and maintain probable cause of alienage through Plaintiff's arrest, detention, and removal proceedings.  The four USC directives reflect that obligation and prescribe specific investigative steps to maintain that probable cause exists when DHS and ICE are confronted with a detainee who claims U.S. citizenship, including one in removal proceedings. Compl., Dkt. # 1, at Ex. K (July 18 USC directive: "It is imperative that [ICE] officers establish probable cause to believe that an individual is an alien before making an arrest for a charge of removeability." and citing federal cases); Ex. L  (Nov. 6 USC directive: " . . . [ICE] officers must ensure that s/he has [probable cause] that the individual to be arrested is in the United States in violation of a law or regulation governing admission, exclusion, expulsion or removal of aliens"); Ex. M (Nov. 19 USC directive: "As a matter of law, ICE cannot assert its

civil immigration enforcement authority to arrest and/or detain a USC.").  The "probable cause" requirement is not unique to malicious prosecution claims based an immigration arrest, detention, and removal proceedings but rather is a sacrosanct legal principle to all malicious prosecution claims, including against private actors.

### B. Plaintiff's Negligence Claims Against DHS, ICE, and USCIS Have Private Analogues Based on *Liranzo* and New York law.

### 1. Negligence Claim Against DHS and ICE

DHS and ICE's failure to investigate Plaintiff's U.S. citizenship resulting in his arrest, detention, and removal proceedings has a private analogue.  As already discussed above in relation to Plaintiff's malicious prosecution, the Second Circuit has rejected Defendants' arguments based on *Akutowicz* that "there are no private analog for plaintiff's immigration detention, including the quasi-adjudicative assessment of his claim to citizenship." *Compare* Def.'s Memo, Dkt # 18, at 18 *with Liranzo*, 690 F.3d at 94, 96 (rejecting district court's holding that there is no private analogue for plaintiff's "intentional tort claims [] based upon the detention of plaintiff pending deportation proceedings and the process the immigration agents used to determine his citizenship status" and distinguishing *Akutowicz* because it did involve detention).

New York law clearly contemplates private actors can be held liable for injuries caused by negligent investigations.  As described above, New York has a longstanding law requiring licensing, liability insurance, and training for private security contractors and their employees— an analogous private actor. N.Y. GEN BUS. LAW § 89-e, et seq. (McKinney 2015).  Under that law, private security guards are required to be licensed, indicating a special duty owed to individuals encountered in the course of employment, and to have received substantial law enforcement training. N.Y. GEN BUS. LAW  § 89-n; 9 NYCRR § 6027.1 *et seq.* (describing in

detail the minimum training requirements for private security officers) Moreover, the law requires private security companies to carry general liability insurance to cover their employees' tortious conduct.  N.Y. GEN BUS. LAW § 89-g (McKinney 2015). Similarly, New York requires private investigators to be licensed and secure a surety bond for tortious conduct.  N.Y. GEN BUS. LAW § 74.

Finally, Defendants cite a number of New York state cases for the proposition that New York tort law does not recognize Plaintiff's negligence cause of action against DHS and ICE, but they are all inapposite. Def.'s Memo., Dkt. # 18, at 19. All of Defendants' cited cases consist of tort claims against state or municipal officials not private actors. *Liranzo,* 690 F.3d at 95 ('[I]n *Olson,* the [Supreme] Court instructed that 'a court [must] look to the state-law liability of *private* entities, not to that of public entities, when assessing the Government's liability under the FTCA."); *Swinton v. City of New York,* 61 A.D.3d 557 (1st Dep't 2009); *Simon v. State of New York,* 12 A.D.3d 171 (1st Dep't 2004); *Boose v. City of Rochester,* 71 A.D.2d 59 (4th Dep't 1979).

### 2. Negligence Claim Against USCIS

Defendants misapprehend Plaintiff's claim against USCIS to assert that there is no private analogue. Def.'s Memo., Dkt. # 18, at 18-19.  Plaintiff does not contend that USCIS's cognizable negligence arose in its adjudication of Plaintiff's N-600 application in 2008, but rather when it became aware of its error on or around November 2, 2011 and did nothing to provide Plaintiff with proof of his citizenship or any legal status, leaving him unemployed and destitute for another 755 days (over two years) until he affirmatively sought reopening of his application. Compl., Dkt. # 1, at ¶¶ 5, 7, 63-66, 99, 101, 103.  Unlike *Akutowicz,* Plaintiff is not claiming negligence in USCIS's uniquely governmental decision-making of whether Plaintiff

was a U.S. citizen or not. Def. Memo., Dkt. # 18, at 19.  Nor is Plaintiff claiming he has a cognizable negligence claim for USCIS's application of the applicable citizenship law. Def.'s Memo., Dkt. # 18, at 19-20 (citing *McGowan*, 2015 WL 1321673 at *11).  Rather, Plaintiff claims that once USCIS discovered its error on or around November 2, 2011, it had a duty to correct its error (especially since it was the only entity empowered to correct the error) in order to prevent the reasonably foreseeable harm that Plaintiff would face with no proof of legal status to work and support himself, or ability to exercise his rights as a U.S. citizen.  USCIS's failure to act on or after November 2, 2011 is the negligence Plaintiff alleges.

New York courts recognize these types of "failure to act" negligence claims against private actors under analogous circumstances.  One common scenario is when Defendant has knowledge of a defect, owes a duty to plaintiff because of the known danger to plaintiff, and then fails to act to prevent the foreseeable injury to the plaintiff. *See, e.g.,  Singleton v. Bishop*,  19 A.D.2d 595 (1st Dep't 1963) (driver has duty to passenger from injury due to known defective brakes); *Troncoso v. Home Depot*, 258 A.D.2d 644 (2d Dep't 1999) (describing elements of "negligent entrustment" claim—when defendant owes a duty to warn or protect plaintiff due to special knowledge of a particular defect in a product);  *Slavinskas v. Clinton Warehouse, Inc.*, 40 A.D.2d 840 (2d Dep't 1972) (truck driver, who drove for four hours with knowledge of defective brakes, was negligent in his duty to protect plaintiff from injury); *Stafford v. St. Clair's Hospital*, 19 Misc.2d 710 (N.Y. Sup. Ct. 1959) (holding hospital liable for negligently failing to repair defective surgery lamp for many months which caused burns to patient); *see Morrow v. Ashley*, 3 A.D.3d 619 (3d Dep't 2004) (homeowner with actual or constructive knowledge of a home defect can be held  negligent to a painter for injuries caused by known defect).

26

III.    SUMMARY JUDGMENT SHOULD NOT BE GRANTED

    A.  **Plaintiff Has Pled A Valid False Arrest/Imprisonment Claim**

As Defendants acknowledge, arrest without probable cause forms the basis for a false arrest claim that rests on the Fourth Amendment.  Def.'s Memo., Dkt. # 18, at 20.  Mr. Watson, a U.S. citizen as of September 17, 2002, was arrested by Defendants on May 8, 2008 without probable cause. *See supra* "Statement of the Case."  Having been a U.S. citizen for nearly six years, Mr. Watson's citizenship was not an open question at the start, or at any time during his detention.  His arrest and detention was not reasonable, not in accordance with federal standards, and not otherwise privileged.  Plaintiff thus has a valid false arrest/imprisonment claim, as well as malicious prosecution and negligence claims, against the Defendants and Defendants Motion for Summary Judgment should be denied.

### 1. Plaintiff's Citizenship Was Not An Open Question

Defendants assert that Plaintiff's citizenship was an open question throughout his arrest and detention, and that as a result, Plaintiff's detention was privileged.  Whether Plaintiff's detention was privileged hinges on whether the ICE's actions were reasonable and in accordance with federal standards.  In contrast to the cases cited by Defendants, however, Plaintiff's citizenship was not an open question at the time of his arrest or any time thereafter.  Plaintiff became a citizen nearly six years before he was detained by ICE and all of the evidence establishing his citizenship was in Defendants' possession and readily accessible at the time of his arrest and detention.

### i.    The Circumstance of Plaintiff's Claims are Distinct from *Akran v. United States*

In *Akran v. United States*, a plaintiff brought claims against the United States under the FTCA alleging, *inter alia*, false imprisonment. 997 F.Supp.2d 197, 199 (E.D.N.Y. 2014).  As

cited by Defendants, the district court in *Akran* held that "at the time of his initial detention [plaintiff's] immigration records collectively did not establish his citizenship and that detention was not improper." *Id.* at 206.   In fact, during the pendency of plaintiff's immigration case, plaintiff's counsel even acknowledged that he was in the process of obtaining an affidavit to try to bolster plaintiff's citizenship claim. *Id.* at 201-202.   Because plaintiff's immigration records did not establish his citizenship, his detention was privileged and the United States' Motion to Dismiss plaintiff's FTCA false imprisonment claim was granted.

In *Akran*, the plaintiff claimed derivative U.S. citizenship (through his mother) under former 8 U.S.C. § 1432(a)(3) (former INA § 321(a)(3)), which in his case required proof that his father's paternity had **not been established by legitimation**, such that it was not disputed between the parties that the plaintiff still needed to proffer further physical, documentary evidence. *Id.*   Unlike in *Akran*, in the present case, Defendants had all the physical and factual evidence of Plaintiff's derivative U.S. citizenship in its files and electronic records from when he derived U.S. citizenship on September 17, 2002. *See supra* "Statement of the Case."   *Akran* and its holdings are simply inapposite to the facts and circumstances of Plaintiff's FTCA claims.

Notably, the *Akran* court compared Mr. Akran's situation to that of the plaintiff in *Nguyen v. United States*, 2001 WL 637573 (N.D. Texas 2011), where Nguyen's claim for false imprisonment by ICE officers under the FTCA was allowed to commence.   In contrast to *Akran*, in *Nguyen* the plaintiff's immigration file was complete at the time of his detention. "Critically…a review of Akran's immigration proceeding shows that it was far removed from *Nguyen*, where the government possessed *all* the information necessary to confirm Nguyen's citizenship yet continued to detain him." *Akran*, 997 F.Supp.2d at 206.   In *Akran*, "failure to look" was not the issue, because it was "indisputable that at the time of his initial detention Akran's

immigration records collectively did not establish his citizenship." *Id.*   Nguyen's claims were allowed to move forward because his immigration records, collectively at the time of his detention, established his citizenship.  *Id.*

As in *Nguyen*, Mr. Watson's immigration records collectively at the time of his detention plainly established his U.S. citizenship.   Throughout all of the 1,273 days of Mr. Watson's detention, no new evidence was submitted, discovered or added to Mr. Watson's file pertaining to his claim of citizenship.  The DHS and ICE's memorandum from November 2, 2011, the date of Mr. Watson's release, does not reference any new information relating to Mr. Watson's U.S. citizenship, yet concludes that he has provided probative evidence of his citizenship.  Defendants therefore had all of the information necessary to establish Mr. Watson's U.S. citizenship in their possession from the date of his arrest, yet they detained him for approximately three and a half years.  Such detention is distinct from *Akran*, directly in line with *Nguyen*, and, most importantly, is not privileged.

Defendants attempt to rely on Plaintiff's *pro se* removal proceedings to claim that Defendants' false imprisonment was privileged.  Def's Memo, Dkt. # 18, at 22-23.   First, Defendants seem to concede that Plaintiff's false imprisonment claim is inextricably linked to his removal proceedings (and thus his malicious prosecution claim), such that it accrued much later than then their claim of May 8, 2008. *See supra* Argument Sections I.A. & I.B.   Second, Defendants equate their failure to apply the proper legal standards in Plaintiff's case to the missing factual evidence in *Akran* that created the open question of citizenship.  Such a self-serving application of *Akran* must be rejected.  Finally, Defendants rely on their self-created issue of fact on remand to the BIA—whether Mr. Watson was legitimated under Jamaican law— to claim now that there was an open question of fact throughout Plaintiff's removal proceedings.

Def.'s Memo. & Decl., Dkt. # 18 & 20, at 23, Ex. C.   Ironically, Defendants brief on remand to the BIA was 41 pages of explanations of why *Matter of Hines* could not apply to Plaintiff and by implication that he was a U.S. citizen *as a matter of law* under *Matter of Clahar.*   Def.'s Decl., Dkt. # 20, at Ex. C.   There has never been a dispute of law or fact that Plaintiff was legitimate under Jamaican law, rather it was whether Plaintiff satisfied the definition of "child" under 8 U.S.C. § 1101(c)(1) at the time of his father's naturalization on September 17, 2002—a legal question conclusively decided under *Matter of Clahar* in 1981.   Defendants' fabricated open question of fact must be rejected.

> ### ii. Plaintiff Met His Burden to Prove U.S. Citizenship During His Removal Proceedings

Next, Defendants rely on an administratively-created, burden-of–proof procedural standard in removal proceedings to claim that their arrest and detention of Plaintiff was supported by probable cause and thus privileged. *See* Def.'s Memo., Dkt. # 18, at 23-24. Defendants again seem to concede that Plaintiff's false imprisonment claim is inextricably linked to his removal proceedings (and thus his malicious prosecution claim), such that it accrued much later than then their claim of May 8, 2008. *See supra* Argument, Sections I.A. & I.B. Defendants, however, confuse their obligation to have probable cause for arrest and detention, a decision for which they stripped the immigration judge of jurisdiction by claiming Plaintiff was mandatorily held under 8 U.S.C. § 1226(c), with a purely procedural standard that applies to the functioning of removal proceedings.   To decide that evidence of foreign birth is sufficient for probable cause to arrest and detain an individual would mean that the more than 17 million foreign born U.S. citizens and the 13 million lawful permanent residents (LPRs) could be constitutionally detained by DHS and ICE. *Morales v. Chadbourne*, 996 F.Supp.2d 19, 35 (D.R.I. 2014) (observing that there are 17 million foreign-born U.S. citizens making plaintiff's

foreign birth a justification for immigration detention constitutionally suspect); DHS, "Estimates of the Legal Permanent Resident Population in 2012" (July 2013), *avalaible at* https://www.dhs.gov/sites/default/files/publications/ois_lpr_pe_2012.pdf (last visited June 9, 2015).  Foreign birth is simply not the proper standard that would privilege Defendants' arrest and detention of Plaintiff.

Even under Defendants' dubious standard, Plaintiff proffered the evidence of his U.S. citizenship immediately.  Prior to Mr. Watson's arrest, Defendants had all of the evidence necessary to support Plaintiff's claim of citizenship. *See supra* "Statement of the Case."  Mr. Watson provided an additional copy of his father's naturalization certificate, on May 29, 2008— two days after initiation of removal proceedings and twenty-eight days before his first hearing— removing any doubt of his derivative U.S. citizenship before his proceedings began and before *Matter of Hines* was even issued. (Compl., Dkt. # 1, at Ex. H (fax received by DHS May 29, 2008)).

Defendants rely on the fact that "[t]he IJ, AAO, and BIA all initially found that [Mr. Watson] had not met his burden" to somehow justify their false imprisonment of Plaintiff. Def.'s Memo, at 24.  Again, Defendants subjected Plaintiff to mandatory detention and thus stripped the immigration court of jurisdiction to review custody.  It is telling that Defendants released Plaintiff on their own accord on November 2, 2011, fourteen months before removal proceedings were terminated, and not in reaction to any decision by the IJ or BIA. *See supra* "Statement of the Case."

It was not the production or discovery of additional evidence that led to Defendants' decision to release Plaintiff on November 2, 2011.  Rather, it was Defendants first meaningful

review of Mr. Watson's citizenship claim that lead them to conclude they did not have probable cause of alienage to detain him.

> ### iii. Defendants' Arrest and Detention Without Probable Cause During Plaintiff's Removal Proceedings Creates a False Imprisonment Cause of Action.

Defendants next rely on their initiation of removal proceedings to somehow privilege their false imprisonment. Def. Memo., at 24-25. Defendants make the incredible argument that Plaintiff's criminal convictions excused their need to establish and maintain probable cause of alienage before subjecting him to arrest and mandatory detention under 8 U.S.C. § 1226(c). Tellingly, Defendants released Plaintiff on their own accord on November 2, 2011, fourteen months before the BIA terminated removal proceedings in January 2013. *See supra* "Statement of the Case." Defendants were simply not required to hold Plaintiff in mandatory detention through removal proceedings and the immigration court had no jurisdiction over his detention.

Defendants' reliance on *Houghtaling v. State* is inappropriate because it stands for the proposition that law enforcement can rely on a court's probable cause determination even if the proffered evidence is insufficient cause for an arrest and detention. 175 N.Y.S. 2d 659, 668 (N.Y. Ct. Cl. 1958); Def.'s Memo., at 25. In Plaintiff's case, and for that matter every removal proceeding, there is never a probable cause determination supporting an individual's arrest or detention.

### 2. No Probable Cause Existed for Plaintiff's Detention

An immigration officer may arrest "any alien in the United States, if he has reason to believe that the alien so arrested is in the United States in violation of any [immigration] law or regulation." 8 U.S.C. § 1357(a)(2); *Polanco v. United States*, 2014 WL 795659, at *4 (E.D.N.Y. Feb. 27, 2014) (finding the "reason to believe" standard as requiring "probable cause").

"Officers may inquire about an individual's citizenship and immigration status, but the officer must have probable cause or consent to detain the individual." *Lyttle v. United States*, 867 F.Supp.2d 1256, 1280 (M.D. Georgia 2012) (citing *United States v. Brignoni-Ponce*, 422 U.S. 873, 881-81 (1975)). In evaluating whether probable cause existed for an arrest, courts "consider the facts available to the officer at the time of the arrest." *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 128 (2d Cir. 1997).

When all facts are considered in the light most favorable to Mr. Watson, as is required in a summary judgment evaluation, the evidence in Mr. Watson's case demonstrates that the Defendants did not have probable cause to arrest and detain Mr. Watson. Def.'s Memo., at 25-27. As detailed above, Defendants had all of the evidence necessary to affirmatively establish that Mr. Watson had been a U.S. citizen since 2002 from before he was taken into custody. Indeed, Defendants' purported probable cause for arresting, detaining, and initiating removal proceedings against Plaintiff was purportedly based on *Matter of Hines*, which was published after Defendants took these actions.[5]

Defendants allege that they had probable cause to place Mr. Watson in removal proceedings because of purported violations of §§ 237(a)(2)(A)(iii) and 237(a)(2)(B)(i) of the INA. Defendants again seemingly concede that Plaintiff's false imprisonment claim is inextricably linked to his removal proceedings (and thus his malicious prosecution claim), such that it accrued much later than then their claim of May 8, 2008. *See supra* Argument, Sections I.A. & I.B. Defendants' argument fails because § 237 of the INA applies only to "deportable aliens." Mr. Watson is not and was not an alien; he is, and was at the time of his detention, a

---

[5] On Page 26 of their memorandum, Defendants again claim the procedural burden-of-proof standard in removal proceedings excuses their need to have probable cause of alienage and removeability in order to arrest and detain Plaintiff. Defendants' position has no basis in Fourth Amendment jurisprudence. *See, e.g.,, Brignoni-Ponce*, 422 U.S. 873.

U.S. citizen. Defendants had full documentation of this at their disposal. Therefore § 237 does not apply to Mr. Watson.

Finally, Defendants argue that under Jamaican law, ICE, DHS, and USCIS officials had reasonable grounds to believe that Plaintiff should be removed. Def.'s Memo., at 27. Again, the issue was a legal question of U.S. immigration law, not Jamaican law. The legal question was whether Plaintiff's legitimation under Jamaican law satisfied 8 U.S.C. § 1101(c)(1)—a legal question that was unequivocally decided in the affirmative at the time of Mr. Watson's derivative citizenship in September 2002 under *Matter of Clahar*. Finally, the rest of the Government's arguments on page 27 of its memorandum can be simply ignored, as they are: 1) either aspects of the former 8 U.S.C. § 1432(a) (former INA § 321(a)), which are irrelevant to Plaintiff's derivative citizenship under 8 U.S.C. § 1431 (INA § 320)—*e.g.,* proof of "legal separation" giving sole custody of plaintiff to his father; 2) "factual issues" created by the BIA that were never in dispute by the proper fact finders—e.g., documentation that plaintiff was in the legal custody of his father; or 3) "factual issues" that are presented for the first time in the instant action—*e.g.,* no paternity tests or substantiating information presented to the IJ to establish plaintiff's parentage.

Therefore, Defendants never had probable cause of alienage to justify Mr. Watson's detention or removal from the country, as they had ample evidence to determine that he was a U.S. citizen before his arrest and at all times during his detention, as is evident from Defendants' memo on November 2, 2011.

### B. Plaintiff has a Valid FTCA Malicious Prosecution Claim

As noted by Defendants, the only elements of Plaintiff's malicious prosecution claim that are contested are: (1) that there was no probable cause for the proceedings against Plaintiff; and

(2) that the Defendants initiated the proceedings against Plaintiff out of actual malice.   As demonstrated above and detailed in the Complaint, there was no probable cause for Mr. Watson's arrest, detention, and removal proceedings.

Under New York law, "[a] lack of probable cause generally creates an inference of malice." *Boyd v. City of New York*, 336 F.3d 72, 78 (2d Cir. 2003).  Taking the evidence in the light most favorable to the Plaintiff, there was no probable cause for Plaintiff's arrest and detention.   There is thus an inference of malice under New York law, which has not been challenged by Defendants.   Plaintiff therefore has a legally cognizable claim for malicious prosecution under the FTCA.

### C.  Plaintiff has a Valid FTCA Negligence Claim

Defendants argue that Plaintiff's claim for negligence under the FTCA fails because: (1) determining whether a foreign-born person is a U.S. citizen is complex; and (2) the Defendants' actions with respect to Mr. Watson were reasonable.  Defendants DHS and ICE's first argument fails to establish or refute any FTCA negligence claim, let alone Mr. Watson's.  Regardless of the complexity of the task to determine an individual's U.S. citizenship, Defendants DHS and ICE had a duty to reasonably evaluate whether they had probable cause of alienage to arrest and detain Mr. Watson.  If Defendants' claim that it was too hard to determine whether Mr. Watson was a U.S. citizen, which Plaintiff rejects, then Plaintiff asserts that they did not have probable cause to arrest and detain him.  This is amply apparent because once Defendants DHS and ICE reasonably investigated Plaintiff's claim (in accordance with the last USC directive) on or around November 2, 2011, they released him immediately, even though they kept removal proceedings on-going.  Notably, their conclusion was: "Watson has provided probative evidence of United States citizenship based on <u>Clahar</u>.  It is recommended that he be immediately released

35

from DHS custody." Compl., Dkt. # 1, Ex. P. Defendants DHS and ICE did not determine he was a U.S. citizen, but rather they did not have probable cause of alienage to detain him. Defendants' reliance on Plaintiff's *pro se* administrative proceedings (and the Second Circuit's initial error based on the BIA's created issue of fact) does not cure Defendants DHS and ICE's failure to reasonably investigate Plaintiff's claim to U.S. citizenship (as memorialized in the four USC directives) and establish and maintain probable cause of alienage for arrest and detention. Indeed, Defendants entire defense relies on the case *Matter of Hines,* which post-dates their decision to arrest and detain him and a retroactive application that has no basis in law. Finally, Defendant USCIS's negligence, which accrued on or around November 2, 2011, post-dates the findings of the IJ, AAO, BIA, and Second Circuit, such that those administrative and judicial bodies' findings are immaterial to the analysis.

### D.  Plaintiff's *Bivens* Claims Should Not be Dismissed

#### 1. *Bivens* Should Apply in this Case

Despite Defendants' assertions to the contrary, a *Bivens* remedy is appropriate in the context of Mr. Watson's claims.  A *Bivens* cause of action is an implied one for a constitutional violation, where no statute or other provision of law provides a meaningful remedy. *Bivens v. Six Unknown Names Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 389-90 (1971).  The Supreme Court follows a two-step test for determining whether a *Bivens* remedy is appropriate. *Wilkie v. Robbins*, 551 U.S. 537 (2007).  The first step involves a determination by the Court "whether any alternative, existing process for protecting the interest amount to a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages."  551 U.S. at 550.  Next, even when there is no sufficient alternative remedy, the Court "must make the kind of

remedial determination that is appropriate for a common-law tribunal, paying particular heed, however, to any special factors counselling hesitation before authorizing a new kind of federal litigation." *Id*.

While the Supreme Court has not considered the application of *Bivens* remedies in the context of a U.S. citizen placed in removal proceedings, other courts have. Most recently, the Middle District of Georgia in *Lyttle v. United States* found that a U.S. citizen subject to removal proceedings could bring a cause of action under *Bivens* against those who wrongly detained and deported him. 867 F.Supp. 2d 1256 (M.D. Georgia 2014). The plaintiff, Mr. Lyttle, brought an action against the United States and individual ICE officers claiming that he had been detained without probable cause and then unlawfully deported to Mexico, *inter alia*, in violation of his rights under the Fourth and Fifth Amendments. *Id.* The Court held that the INA is not sufficiently comprehensive to preclude *Bivens* claims in the context of a U.S. citizen being subject to detainment and deportation, and that there were no factors counseling hesitation in allowing plaintiff's claims to proceed. *Id.* at 1276, 1278; *see El Badrawi*, 579 F. Supp.2d at 262-63 (stating in the context of a foreign national that "[t]he court doubts that the INA's remedial scheme provides adequate remedies to foreclose a *Bivens* claim. . . .").

As in *Lyttle*, there are no factors counseling hesitation and no adequate remedy elsewhere for Mr. Watson to pursue. Defendants request to dismiss Mr. Watson's *Bivens* claims should thus be denied.

### i.  No Special Factors Exist

Defendants argue that there is a comprehensive statutory remedial scheme in the present case, and that the scheme constitutes a special factor counseling hesitation. As

explained below, and as held in *Lyttle*, the INA is not a constitutionally adequate scheme to vindicate Mr. Watson's rights. Defendants attempt to use the existence of removal proceedings to satisfy both steps of the Supreme Court's two-part test should be rejected. The INA's administrative scheme does not constitute a "special factor" for purposes of a *Bivens* determination. Def.'s Memo., at 32 n. 4; *Arar v. Ashcroft*, 585 F.3d 559 (2d Cir. 2009) (not finding the INA's administrative scheme to be a "special factor"); *Lyttle*, 867 F.Supp.2d at 1278 (holding that use of the immigration process to detain and deport a U.S. citizen without additional constitutional protections is not a special factor to counsel hesitation of extending *Bivens*).

### ii. There is No Alternative Remedial Scheme

An alternative remedy "must be clearly constitutionally adequate for it to preclude additional remedies under *Bivens*." *Lyttle*, 867 F.Supp. 2d at 1276 (internal quotation omitted). Defendants in this case assert that the INA provides an adequate alternative remedy for Mr. Watson.

As described above, Defendants subjected Plaintiff to mandatory detention, 8 U.S.C. § 1226(c), which stripped the immigration judge of jurisdiction to review his custody. Despite Defendants' claims, Plaintiff did not have the right to seek a bond hearing or a writ of habeas corpus to address the issue of probable cause of alienage to justify his detention. *Demore v. Kim*, 538 U.S. 510 (2003) (holding pre-removal order mandatory detention for "criminal aliens" constitutional); *see* 8 U.S.C. § 1226(e) (stripping judicial review of Defendants' custody determinations); *Johnson v. Whitehead*, 647 F.3d 120, 124-25 (4th Cir. 2011) (citizenship claim arising in removal proceedings cannot be challenged by writ of habeas corpus but by petition of

review to the Court of Appeals pursuant to a removal order).[6]   Accordingly, Plaintiff's detention never became subject to legal process and was inextricably tied up with termination of his removal proceedings (unless Defendants acted unilaterally to release Plaintiff, as they did on November 2, 2011). Plaintiff's only recourse was to challenge his removal through the administrative proceedings and seek review via a Petition for Review before the Court of Appeals. *See* 8 U.S.C. §§ 1252(a)(5), (b)(9) & (d).   Plaintiff was not entitled to appointed counsel, 8 U.S.C. § 1229a(b)(4)(A), and had to defend himself *pro se* while being allegedly mandatorily detained at a rural detention facility in upstate New York.  The fact that Defendants' case crumbled in the months after the Second Circuit appointed Mr. Watson counsel is probative evidence that the INA's remedial scheme is wholly inadequate to address the rights of a U.S. citizen wrongfully subject to arrest, detention, and removal proceedings by Defendants.

The primary case cited by Defendants in support of this claim, however, is *Arar v. Ashcroft*, 585 F.3d 559 (2d Cir. 2009).   In *Arar*, the court declined to extend *Bivens* to cover a non-U.S. citizen's claims arising out of extraordinary rendition because of special factors, such as national security concerns. *Id.* at 573-74.  In doing so, the Second Circuit explicitly did not rule on whether the INA provided an adequate alternative remedy to a *Bivens* remedy. *Id.* Additionally, the plaintiff in Arar was not a U.S. citizen, whereas Mr. Watson is and has been since 2002 a U.S. citizen, meaning his rights and remedies in this country are distinct from Mr. Arar's. *Id.*

In contrast to *Arar*, the Court in *Lyttle* did address and rule on whether the INA provides an adequate alternative remedy to preclude extension of *Bivens* in the context of a U.S. citizen,

---

[6] Notably, on page 33 of their memorandum, Defendants indicate that the first instance in which Plaintiff could have sought a writ of habeas corpus was after the Second Circuit's decision on May 31, 2011—over three years after his detention.  It is unclear on what basis.

not a foreign alien, seeking damages for constitutional violations as a result of being subject to an immigration arrest, detention, and removal.  The *Lyttle* court found that cases "hold[ing] that the INA is sufficiently comprehensive and adequate to preclude *Bivens* claims for persons who are *not* citizens of the United States [are] inapposite" to the claims brought in *Lyttle*.  867 F.Supp. 2d at 1276.  "The persuasiveness of the rationale underlying these cases [including *Arar*] weakens considerably when extended to a citizen of the United States instead of an alien."  *Id.* "It is well established that immigrants' remedies for vindicating the rights which they possess under the Constitution are not coextensive with those offered citizens." *Mirmehdi v. United States*, 662 F.3d 1073, 1080 (9th Cir. 2011).  Further, "[i]t would be a startling proposition to suggest that a person's constitutional rights depend upon whether a government official identifies the person as a citizen or an alien regardless of whether their designation is accurate." *Lyttle*, 867 F.Supp. 2d at 1277.  The *Lyttle* court held that the INA is "constitutionally inadequate to avoid the wrongful detention and removal of a United States citizen and to remedy such constitutional violations after they occur." *Id.*

As in *Lyttle*, there were no adequate alternative remedies available to Mr. Watson for his claims.  The remedies proposed by Defendants are constitutionally inadequate, and he thus has a valid cause of action under *Bivens*.

### 2. Defendants Are Not Entitled to Qualified Immunity

Defendants Estrada, Ortiz and Gunther are not entitled to qualified immunity in this case. Defendants argue that they are entitled to qualified immunity because Plaintiff's constitutional rights were not violated, the Defendants' behavior was not objectively unreasonable, and the law surrounding Plaintiff's arrest and detention was not clearly established at the time of the alleged

violation. Def. Memo., at 34-37.  Each of these arguments fails, however, and Defendants are not entitled to qualified immunity.

Qualified immunity balances two interests:  "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties responsibly." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).  The doctrine exists so that "insubstantial claims against government officials will be resolved prior to discovery." *Anderson v. Creighton*, 483 U.S. 511, 526 (1985). In determining whether qualified immunity applies, as Defendants noted, a court must determine "whether the facts alleged by a plaintiff make out a violation of a constitutional right, and whether that right was clearly established at the time of the defendant's alleged misconduct." *Giraldo v. City of New York*, No. 10-CV-5754 (JG)(ALC), 2011 U.S. Dist. LEXIS 58282, *24 (E.D.N.Y. 2011) (citing *Pearson*, 553 U.S. at 232).

The issue of whether Mr. Watson's constitutional rights were violated during his unlawful arrest, three and a half years of detention, and nearly five years of removal proceedings, all the while being a U.S. citizen, has been discussed thoroughly above.  The violations of his constitutional rights are amply evident.

At the time the Defendants arrested and detained Mr. Watson, the law was clearly established that an arrest without probable cause to believe Mr. Watson was a removeable noncitizen violated the Fourth Amendment. *See Lyttle*, 867 F. Supp. 2d at 1281.  As in *Lyttle*, "it was also clearly established that an ICE officer did not have the authority to detain or deport U.S. citizens." *Id.* at 1281-82 (citing 8 U.S.C. §§ 1226-28, 1231, 1357(a)-(d) (granting ICE agents authority to arrest, detain and deport *aliens*)); Compl., Dkt. # 1, at Ex. M (Nov. 19 USC

directive: "As a matter of law, ICE cannot assert its civil immigration enforcement authority to arrest and/or detain a USC."). The *Lyttle* court's analysis provides significant guidance:

> An ICE officer is authorized to arrest and initiate deportation proceedings against persons who are in the United States illegally. Any ICE officer with this responsibility would know it is illegal and unconstitutional to deport, detain for deportation, or recommend deportation of a U.S. citizen. Thus, an ICE officer who actively participates in the detention and/or removal of a person who he knows to be a U.S. citizen, or upon minimal investigation would discover is a U.S. citizen, would be deemed to know that such conduct clearly denies that person liberty without due process of law. Consequently, any such officer would not be entitled to qualified immunity.

867 F. Supp. 2d at 1283-84 (internal citations omitted).

The *Lyttle* analysis is identical to the analysis at issue in this case. The individually named Defendants, either knew, or upon minimal investigation would have known, that Mr. Watson had been a U.S. citizen since 2002. As explained in detail above, the *Matter of Hines* case that allegedly created confusion as to Mr. Watson's citizenship did not even exist at the time of his arrest, detention, and initiation of removal proceedings. Furthermore, and also as detailed above, Defendants had all of the evidence needed to determine Mr. Watson was a citizen in their possession at the time of his arrest and throughout his detention and removal proceedings. Moreover, Defendants' defense that *Matter of Hines* could be applied to Mr. Watson's case in order to retroactively strip him of U.S. citizenship has no basis in law. The Defendants were thus ICE officers who actively participated in the detention of a person they knew or upon minimal investigation would have discovered is a U.S. citizen. They are thus deemed to know that such conduct clearly denied Mr. Watson liberty without due process of law and should not be protected by qualified immunity. Mr. Watson's claims are not insubstantial burdens to the government, as qualified immunity was designed to shield against, but rather his claims arise out of egregious constitutional violations that must be remedied.

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants' Motion to Dismiss, or in the Alternative, for Summary Judgment.

Dated: June 10, 2015                          HOLLAND & KNIGHT LLP

                                              By:    _s/ Mark A. Flessner_____

                                                     Mark A. Flessner
                                                     Laura E. Atherstone
                                                     Holland & Knight LLP
                                                     131 S. Dearborn Street, 30th Floor
                                                     Chicago, IL 60603
                                                     Telephone: (312) 715-5882
                                                     Facsimile: (312) 578-6666
                                                     Mark.flessner@hklaw.com

                                                     Christopher G. Kelly
                                                     Robert Burns
                                                     Holland & Knight LLP
                                                     31 West 52nd Street
                                                     New York, NY 10019
                                                     Telephone:  (212) 513-3200
                                                     Facsimile:  (212) 385-9010
                                                     Christopher.Kelly@hklaw.com
                                                     Robert.Burns@hklaw.com

                                                     Mark Fleming
                                                     NATIONAL IMMIGRANT JUSTICE CENTER
                                                     208 South LaSalle Street, Suite 1300
                                                     Chicago, Illinois 60604
                                                     Telephone: (312) 660-1328
                                                     Facsimile: (312) 660-1505
                                                     mfleming@heartlandalliance.org


                                              *Attorneys for Plaintiff Davino Watson*

#35825558_v2