1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - X
                                :
DAVINO WATSON,                  : 14-CV-6459 (JBW)
                                :
          Plaintiff,            :
                                :
                                : United States Courthouse
     -against-                  : Brooklyn, New York
                                :
                                :
                                : Thursday, August 20, 2015
JUAN ESTRADA, MICHAEL ORTIZ,    :
TIMOTHY GUNTHER, JOHN DOES      :
1-8, and the UNITED STATES,     :
                                :
          Defendant.            :


- - - - - - - - - - - - - - - X

TRANSCRIPT OF CIVIL CAUSE FOR HEARING
BEFORE THE HONORABLE JACK B. WEINSTEIN
UNITED STATES SENIOR DISTRICT COURT JUDGE


A P P E A R A N C E S:

For the Plaintiff:    HOLLAND & KNIGHT LLP
                         31 West 52nd Street
                         New York, New York 10019
                      BY: MARK A. FLESSNER, ESQ.
                          ROBERT J. BURNS, ESQ.


For the Defendant:    UNITED STATES DEPARTMENT OF JUSTICE
                         271 Cadman Plaza East
                         Brooklyn, New York  11201
                      BY: JOSEPH A. MARUTOLLO, ESQ.
                          GAIL A. MATTHEWS, ESQ.
Court Reporter:  Richard W. Barry, RPR
                 Official Court Reporter
                 E-mail: rwbarrycourtreporter@gmail.com

Proceedings recorded by computerized stenography.
Transcript produced by Computer-aided Transcription.

1        THE COURT:  Call the case, please.

2        COURTROOM DEPUTY:  Civil cause for evidentiary

3    hearing, Watson versus Juan Estrada, et al..

4        Counsel note your appearances, please for the

5    plaintiff.

6        MR. FLESSNER:  Mark Flessner and Bob Burns on behalf

7    of Mr. Watson who is present.

8        THE COURT:  For the defendant?

9        MR. MARUTOLLO:  For the defendant, Joseph Marutollo

10   and with me is Assistant United States Attorney Gail Matthews.

11       MS. MATTHEWS:  Good to see you.

12       THE COURT:  You are the plaintiff?

13       MR. WATSON:  Yes.

14       MR. BURNS:  Robert Burns from Holland & Knight.

15   DAVINO WATSON , having been first duly sworn, testified as

16   follows:

17       THE COURT:  This is a hearing on equitable tolling?

18       MR. FLESSNER:  Yes, sir.

19       THE COURT:  You have the burden?

20       MR. FLESSNER:  Yes.  On this part of it, yes.

21       THE COURT:  Do you wish to go forward?

22       MR. FLESSNER:  Yes, sir.

23       THE COURT:  Call your witness, please.

24       MR. MARUTOLLO:  Your Honor, may the parties or the

25   Government make an opening statement just to brief, give an

- Proceedings -                                        3

1    overview as to what the evidence will show in this hearing?

2              THE COURT:  All right.  Do you want to make one too?

3              MR. FLESSNER:  Sure.

4              THE COURT:  All right.

5              MR. FLESSNER:  I hadn't contemplated it, but I will.

6              I think we have two theories going on here, one is

7    that the case was filed within the statute of limitations

8    under the Supreme Court case, Heck.  And, that that determines

9    when the statute begins to run.  You saw it in our filing,

10   there is a chart which shows when the statutes run for each of

11   the separate causes of action.  So we think that the equitable

12   tolling argument is not even necessary.

13             But if the Court were to find that Heck does not

14   control, which we think it clearly does, that Mr. Watson, was

15   detained for three and a half years without legal process

16   because he was in a detention facility.  He did not have a

17   right to counsel, he did not have a right to a bond hearing.

18   He did not have access to habeas corpus.

19             The Federal Courts were divested of jurisdiction to

20   hear, under -- I will give you the precise statute, which will

21   assist you, under 8 U.S.C. 1503, that statute strips the

22   Federal Court to review claims of citizenship, once someone is

23   placed in removal proceedings.

24             So, Mr. Watson was in a-- in the Batavia Buffalo

25   Detention Center, he did not even have a high school education

- Proceedings -                    4

1   at the time.  He did not have access to attorneys because he

2   called all of the attorneys that were listed on the sheet

3   there, none of them would take the case.  He was not able to

4   pay them.

5              There were law students who would come in and give

6   presentations about know your rights, which were all regarding

7   immigration law, nothing with respect to filing administrative

8   or constitutional causes of action, against the government.

9              Mr. Watson because of his level of education, has no

10  legal training, was not even aware that this was a

11  possibility.

12             Also, while Mr. Watson during all this time believed

13  he was a United States citizen by virtue of his father, the

14  Government kept telling him he wasn't a naturalized United

15  States citizen.  So he could not have known that he had his

16  constitutional rights had been violated.

17             So because he did not have access to legal

18  materials, because he did not have access to attorneys,

19  because he was unconstitutionally detained for three and a

20  half years, and because the Government continually told him

21  that he did not, that he was not a United States citizen, and

22  because that he did not have legal process with respect to his

23  detention, because it was prohibited under the immigration act

24  and other federal statutes.

25             That we think that it would be unjust for the

- Proceedings -                                          5

1    statute of limitations to expire, and so we are asking it be

2    equitably tolled, until various -- there are various options

3    that we have given the Court in our chart.  One is when he was

4    released, one is when the removal proceedings were terminated,

5    which was two years later and one is when the-- the DHS issued

6    his certificate of citizenship which was again, about 735 days

7    later.  Leaving him over two years without being able to work.

8           The Government continually has argued various

9    things, one thing that they-- just factually in error argued,

10   that the statute started to run when the Second Circuit

11   remanded the case to the BIA.  The Second Circuit remanded the

12   case for the BIA to make the determination, whether or not Mr.

13   Watson should be released.  The Second Circuit did not remand

14   the case holding that he was a citizen and should be released.

15          So that Second Circuit ruling is really not a-- is

16   not a definitive ruling at all because of the BIA, the one

17   that terminated removal proceedings is the one that ultimately

18   made the decision.

19          THE COURT:  Now, what theory are you requesting

20   damages?  What theories?

21          MR. FLESSNER:  We have Bivens and FTCA.

22          THE COURT:  Bivens and Federal Tort Claims Act.

23   Those are the two?

24          MR. FLESSNER:  Correct.

25          If the Court would--

- Proceedings -                                    6

1      THE COURT:  Excuse me, not any independent claim for

2   constitutional violation?

3      MR. FLESSNER:  I will-- here it is.

4      There is a Bivens claim, there is false

5   imprisonment, malicious prosecution and negligence.  This is

6   on page nine of our supplemental briefing.

7      THE COURT:  Now, if I should find that your claims--

8   any claim can go forward, we have the jury problem.  In

9   general, a jury could decide whatever issues, are jury issues,

10  before the Court decides.

11     Now, we could expedite it and simplify it somewhat,

12  if you went forward on non jury theories.

13     Which one of your theories do not require a jury?

14     MR. FLESSNER:  I think the law is before a verdict

15  is returned, that the plaintiff has to make a choice of causes

16  between the Bivens and the FTCA claim.  And we have decided,

17  although in most likelihood, we would go with the FTCA, we

18  have not-- since we are not forced to make that decision yet.

19     THE COURT:  Well, the FTCA is a bench trial.

20     MR. FLESSNER:  Correct.

21     THE COURT:  So.

22     MR. FLESSNER:  Bivens would not be.

23     THE COURT:  Bivens would be jury?

24     MR. FLESSNER:  Correct.

25     THE COURT:  So your proposal is, that we hear the

- Proceedings -                                          7

1   bench and the jury trial together?

2              MR. FLESSNER:  Yes.

3              THE COURT:  That is awkward, because that would

4   allow in evidence in the bench trial that would not be in the

5   jury trial.

6              MR. FLESSNER:  I have seen it done.  It is doable,

7   but you are right.

8              THE COURT:  What is the advantage of you going on

9   both Bivens and Federal Tort Claims?

10             MR. FLESSNER:  What is the advantage?  Because we

11  think we have causes of action in each case.

12             But again, I think the law is that we have to make a

13  choice before the verdict is returned as to which theory we

14  are going on.

15             And we have not, since we are not forced to make

16  that decision yet, we have not reached that.

17             THE COURT:  I don't want to bring in the entire

18  machinery of a jury trial in which I will have to, if I'm

19  simultaneously trying the Federal Tort Claim Act, excuse the

20  jury from time to time, in order to hear evidence which would

21  be appropriate in a bench trial but not in a jury trial.

22             What I am wondering is, what advantages are there to

23  you, in what you have to prove in a Federal Tort Claims as

24  against a Bivens.

25             The damages are the same, aren't they?  Essentially?

- Proceedings -                                        8

1          MR. FLESSNER:  Presumably they would be the same, if

2     the United States were indemnifying the individual agents.

3          THE COURT:  Well, they would, right?

4          MR. MARUTOLLO:  Right.

5          THE COURT:  So, that is out of the question.  They

6     are going to be.

7          So what different elements are there in the two

8     causes of action?  What different damages are there?

9          MR. FLESSNER:  Well, the elements would be different

10    depending on which cause of action we choose.  The evidence

11    for each --

12         THE COURT:  Well --

13         MR. FLESSNER:  Because there is false imprisonment,

14    malicious prosecution and negligence.  So, the elements would

15    be different depending on, you know-- the evidence is

16    different for each as well.

17         We just have not made that evaluation, this early in

18    the stage, as to, you know, what our strongest evidence is.

19         THE COURT:  Well, is there any objection to our

20    reversing the normal course by trying the Federal Tort Claim

21    Act first before the jury?

22         MR. FLESSNER:  Before we try the jury?

23         THE COURT:  Yes.

24         MR. FLESSNER:  To bifurcate it?

25         THE COURT:  Well, it is not a bifurcation exactly,

1   it is a separate trial on separate theories.

2              MR. FLESSNER:  I have not really thought through

3   that question.  I can't think of why other than it may be some

4   duplication of evidence.

5              THE COURT:  Well, if you win.

6              MR. FLESSNER:  We probably would not proceed.

7              THE COURT:  You would not go forward, if you lose, I

8   don't know what the--

9              MR. MARUTOLLO:  Your Honor, under 28 U.S.C. 2676,

10  the FTCA would bar the Bivens claim.

11             MR. FLESSNER:  Right.  That is right.  That is what

12  I just said.  We would have to make a decision.

13             MR. MARUTOLLO:  If we won and the case would be

14  over.

15             MR. FLESSNER:  Right.  I guess you are right about

16  that.

17             MR. MARUTOLLO:  Your Honor, either way, whoever wins

18  the FTCA trial would bar any Bivens action.  The case would be

19  over at that point.

20             MR. FLESSNER:  Because you are indemnifying, we have

21  the option of dismissing the FTCA and going forward on the

22  Bivens.  We don't have to make that choice right yet.  We

23  don't have to choose it and dismiss it, is what I'm saying.

24             I mean if Your Honor is suggesting that we should

25  think about proceeding on the FTCA and staying the Bivens and

1   to see what is going to happen with the FTCA, we will

2   certainly consider that.  I just do not have-- we have not

3   talked, I have not had time to think that through.

4              THE COURT:  What is your view?

5              MR. MARUTOLLO:  Well, first, I would clarify that

6   there is not any indemnification until after the Department of

7   Justice approves the judgment.

8              THE COURT:  I understand.  It is open, but it is

9   highly likely that they would indemnify, I would suppose.

10             MS. MATTHEWS:  It rarely happens though, Judge.

11             THE COURT:  What?

12             MS. MATTHEWS:  It rarely happens that there is a

13  Bivens judgment and the Department decides that that un-- that

14  finding of unconstitutional conduct, falls within the

15  interests of the Government and justifies indemnification.

16             That is the difference, the reason why Bivens is

17  carved out, unconstitutional conduct is carved out of the

18  FTCA.  Because in theory, unconstitutional conduct is never in

19  the interest of the United States.

20             THE COURT:  Excuse me?

21             MS. MATTHEWS:  Unconstitutional conduct is never in

22  the interest of the United States.

23             THE COURT:  Right.  You have not made a motion for

24  summary judgment, on Bivens?

25             MR. MARUTOLLO:  We have, Your Honor.  So, in our--

1    we moved on April 29th-- April 29th, Your Honor to.

2            THE COURT:  I'm sorry.

3            MR. MARUTOLLO:  Your Honor, we moved on April 29th

4    to dismiss, all of the claims are time barred.  We also argued

5    that there was no private analog for the plaintiff's FTCA,

6    malicious prosecution and negligence claims.

7            We also argued on the merits that the-- in the

8    alternative for summary judgment, that the Bivens claims and

9    the FTCA claims are-- should be dismissed.

10           THE COURT:  If I allowed the FTCA claim to go

11   forward, on what grounds could I dismiss the Bivens claim?

12   Because as I understand it, the claim is against-- if I went

13   forward on FTCA, allowed that to go through, I could, could I

14   not, dismiss the Bivens on your motion for summary judgment?

15           MR. MARUTOLLO:  Yes, Your Honor.

16           THE COURT:  What we have here is low level people,

17   guards essentially, who exercised no discretion whatsoever,

18   just did what their superiors told them to do, correct?

19           MR. MARUTOLLO:  That's correct, Your Honor.

20           THE COURT:  You are claiming that they can't be held

21   for constitutional violations for merely following orders.

22   They could be, but an underlining who is merely following

23   orders, certainly shouldn't be held to the same high standards

24   as somebody who is making decisions, right?

25           MR. MARUTOLLO:  Right.  And among-- among other

- Proceedings -                                           12

1   things, Your Honor, we argued that in our motion.

2              THE COURT:  That you argued that?

3              MR. MARUTOLLO:  Yes.

4              MR. FLESSNER:  Well, that is not exactly right.

5   Because the-- ICE agents have discretion whether or not to

6   hold an individual under mandatory detention or not.  It is

7   within their discretion to make that determination.

8              It was determined by these ICE agents that they--

9   that Mr. Watson had to be held in detention during the removal

10  proceedings.  That was not reviewable.

11             THE COURT:  But they are not knowledgeable about law

12  or anything like that.  They have a case where they are told

13  that he is not a citizen.  So it follows from their point of

14  view that he should be held.

15             MR. FLESSNER:  Well, they had an obligation, because

16  he claimed-- there is protocol when a detainee or somebody in

17  removal proceeding claimed citizenship, and they failed to

18  follow that protocol.  During the three and a half years

19  detained, DHS issued four directions what to do if an

20  individual is claiming citizenship and they failed to follow

21  them for three and a half years, until directed to do so, by

22  the BIA, on review from the Second Circuit.

23             THE COURT:  Are you still pressing your motion for

24  summary judgment on the claims against the jailers?

25             MR. MARUTOLLO:  Yes, Your Honor.

- Proceedings -                                        13

1          THE COURT:  All right.  I'm inclined to grant that

2   and cut the gordian knot, and go to the Federal Tort Claims

3   Act.

4          Because it is just too difficult to try the claims

5   together, and it is not procedurally efficient to try one

6   after the other.

7          So, I will get out a little opinion, but I'm going

8   to dismiss everything but the Federal Tort Claim Act.  We will

9   then go ahead on the Federal Tort Claim Act, if we are going

10  ahead on that, on the assumption that the statute of

11  limitations has been barred back, correct?

12         MR. MARUTOLLO:  That's correct, Your Honor.

13         THE COURT:  You understand that?

14         MR. FLESSNER:  I understand.

15         THE COURT:  That is what we are going to do.

16         I'm not going to be tied up by this procedural knot,

17  as interesting as it is.  I want to go forward and decide this

18  man's claims that have been pending now for so many years, get

19  the litigation behind us.

20         MR. FLESSNER:  If I may say, I think what maybe

21  better to do, would be to stay the Bivens action and allow us

22  to go forward on the FTCA action, and were we not to prevail

23  on the action.

24         THE COURT:  But there is-- there is an old opinion,

25  Byrd, B-Y-R-D or something like that, I have not looked at it

- Proceedings -                                    14

1    for years by Black.  Making it very clear that the equity--

2    the jury goes before the bench.

3            That is what I'm going to do anyway.  I think from

4    the Government's point of view, it is the easiest way to

5    proceed.  The Court's point of view, it is the easiest way to

6    proceed, and from the plaintiff's point of view, it is as a

7    practical matter, it is a sensible way to proceed, even though

8    you may not agree with me.  But that is where we are.

9            We are in a Federal Tort Claim Act, and that is all

10   we have.

11           MR. MARUTOLLO:  Your Honor, may I also add the

12   agents' conduct was in the course of their employment, so that

13   is why the FTCA claim, you know, would be more appropriate

14   than Bivens here.

15           Your Honor, may I just go back, I guess to this

16   hearing.  May the Government make an opening statement?

17           THE COURT:  So, we are dealing with FTCA.  I made

18   that decision, I will issue a little opinion, but that is

19   where we are.  We are on an FTCA case.

20           Go ahead, please.

21           MR. MARUTOLLO:  Your Honor, the evidence will show

22   that May 8th, 2008, was the date plaintiff was first detained

23   by ICE officers.  Plaintiff knew that he was a citizen on

24   May 8th, 2008, and as such, plaintiff knew he was injured from

25   that moment.  Therefore, his FTCA claims, that accrued on May

1   8th, 2008 and are time barred.

2         The evidence will show in the hearing that the

3   plaintiff does not meet his burden for establishing equitable

4   tolling of the relevant limitations period.  The plaintiff

5   must prove that he has been pursuing his rights diligently and

6   that some extraordinary circumstances stood in his way.

7         Here the evidence will show that the plaintiff

8   cannot meet his burden with respect to either prong.

9         First, plaintiff's ignorance of the law does not

10  excuse his failure to diligently pursue his FTCA claims.

11        Plaintiff will tell you that he did not know he

12  needed to file a standard form 95, within a certain period of

13  time.  But you will hear however, Your Honor, that while in

14  federal detention the plaintiff was a prolific legal filer,

15  filed a number of motions, briefs, Petitions for review

16  related to his immigration proceeding.  You will learn from

17  the plaintiff, that he exhausted all avenues available to him,

18  except he did not exhaust his administrative remedies pursuant

19  to the FTCA, despite the many resources at the Buffalo Federal

20  Detention Facility.

21        You will learn that the Buffalo Federal Detention

22  Facility where the plaintiff spent approximately 96 percent of

23  his detention is a nationally accredited facility that serves

24  as a model for other facilities.  You will meet three

25  employees of the Buffalo Federal Detention Facility, who will

- Defendant's Opening -                    16

1    be testifying today.  Library recreation specialist Matthew

2    Buck and Michael Finnigan; and supervisory detention officer

3    Scott Schrader.  These witnesses will explain a large number

4    of resources available to detainees, including Mr. Watson.

5           You will hear that legal books and manuals were

6    among the major resources available to the plaintiff.

7           The evidence will show that Buffalo Federal

8    Detention Facility law library has approximately 1,023

9    volumes.

10          So the library, contains 1,023 volumes including the

11   Federal Rules of Civil Procedures, treatises and casebooks on

12   torts, and the federal rules.  One of the more popular books,

13   published by the Columbia Law Review is called the Jailhouse

14   Lawyers Manual, provides useful summaries, and explanations

15   about FTCA claims.

16          You will learn another resource available to the

17   plaintiff was the ability to research administrative claims on

18   the Internet.  The plaintiff was able to ask library staff to

19   search the Internet, to determine how to file a claim against

20   the Government, but again the plaintiff failed to take

21   advantage of that resource.

22          The evidence will show that the third major resource

23   at his disposal was LexisNexis.  The plaintiff had total

24   access to the LexisNexis program, provided with instructions

25   on how to use this tool, and you will learn that plaintiff had

1   the ability to take advantage of easy to access LexisNexis

2   research summaries which addressed issues related to FTCA

3   claims.

4           Interestingly, you will learn from the plaintiff

5   that on one hand he had no trouble using LexisNexis when

6   researching cases for immigration court, but on the other

7   hand, he argues that Lexis was insufficient for his FTCA

8   claims.

9           Fourth, the evidence will show plaintiff could have

10  accessed and printed commonly used printed forms, such as

11  blank SF-95s on the detainee computers and he had access to

12  mail, telephone, which he admits he used one to five times a

13  day, and visitors at the facility.

14          Ultimately the evidence will show that despite the

15  wide variety of resources, the plaintiff did not diligently

16  pursue the claim.  He will tell you, the plaintiff will tell

17  you, he did not educate himself while at the facility.

18          Next, no extraordinary circumstances prevented the

19  plaintiff from filing an FTCA claim in this case.  You will

20  learn that plaintiff did eventually obtain counsel in this

21  case from Gibson, Dunn law firm, on April 2011.  He also

22  retained counsel from National Immigrant Justice Center.

23  There is no dispute that plaintiff spoke to his attorneys at

24  least 20 times while in detention, and at least 20 times after

25  release.  He was not prevented in any way from contacting

- Defendant's Opening -                    18

1   these attorneys.

2         Most significantly the plaintiff had separate

3   conversations with both Gibson, Dunn attorneys and National

4   Immigrant Justice Attorney respectively regarding the filing

5   of an administrative relief claim related to detention.

6         Yet despite having counsel from a high profile law

7   firm, the National Immigrant Justice Center, despite having

8   conversations about filing an administrative claim, the

9   plaintiff will now argue that he did not even know he could

10  file a claim, until the case was actually filed, years after

11  the statute of limitations expired.

12        The evidence will show that the plaintiff's claims

13  strains credulity.

14        Moreover, the plaintiff will suggest that his

15  failure to timely file an administrative claim, was due to the

16  fact he was far away from friends and family.  But the

17  evidence will also show that when he was released from

18  custody, living with his family, he still didn't pursue these

19  claims, did not conduct any research.

20        As such the plaintiff cannot show that extraordinary

21  circumstances prevented him from filing his administrative

22  claims, and accordingly the defendant respectfully submits

23  that plaintiff's claims are time barred and not subject to

24  equitable tolling.

25        THE COURT:  Thank you.

1              Do you want to call witnesses?

2              MR. FLESSNER:  We will call Mr. Watson.

3              THE COURT:  The witness is already under oath.

4              MR. MARUTOLLO:  Yes, Your Honor.

5              THE COURT:  Okay.

6    DIRECT EXAMINATION BY MR. FLESSNER:

7    Q    Please state your name for the record.

8    A    Davino Watson.

9    Q    Mr. Watson, are you a United States citizen?

10   A    Yes, sir.

11   Q    When did you become a citizen?

12   A    On or about November 17th, 2002.

13             THE COURT:  Read that back.

14             (Testimony read.)

15   Q    Did you mean September 17th, 2002?

16   A    Yes, sir.

17   Q    Speak up, if you can.

18   A    Yes, sir.

19   Q    How did you become a United States citizen, under what

20   method?

21   A    My father became a -- he was naturalized, I got

22   citizenship through him.

23   Q    You were a minor at the time?

24   A    Yes, sir.

25   Q    You were living with him?

Watson - Direct - Flessner                    20

1    A    Yes, sir.

2    Q    Can you briefly describe for the Court your educational

3    background?

4    A    Well, I attended high school up to 11th grade, where I

5    dropped out.  I attained my GED in the year 2013.

6    Q    Are you currently taking any classes?

7    A    Yes, I am.

8    Q    What classes are you taking now?

9    A    I'm taking a class called, building maintenance

10   weatherization from a school --

11              THE COURT:  I can't understand you.

12   A    Sorry, I'm taking a trade school, called, building

13   maintenance and weatherization the Northern Manhattan

14   Corporation.

15   Q    What are you being trained to do?

16   A    I'm trained to do light electric work, plumbing,

17   carpentry, masonry work.

18   Q    Do you have any form of legal training?

19   A    No, sir.

20   Q    Other that this case, have you ever been involved in any

21   lawsuit?

22   A    No, sir.

23   Q    Describe for the Court-- do you know approximately when

24   you received your certificate of citizenship?

25   A    I think around maybe May of 2013, I'm not sure.

1          THE COURT:  I'm sorry, what did you say?

2          THE WITNESS:  Approximately around like May of 2013,

3    sir.

4    Q    Could it have been November of 2013?

5    A    Yes.

6    Q    Describe your employment history since receiving your

7    certificate of citizenship?

8    A    I have worked for three companies.  I worked for a

9    company called Akim Maintenance, I worked for another company

10   called Greenland Landscaping, and I worked for another company

11   called Horizon Construction.

12   Q    Tell the Court what you were doing for the companies?

13   A    Basically, I worked under a carpentry helper and also a

14   laborer.

15   Q    Prior to receiving your certificate of citizenship, were

16   you able to work?

17   A    No, sir.

18   Q    Why not?

19   A    I didn't have any documents, I didn't have any

20   identification to get a job.

21   Q    Turning your attention to May 8th, of 2008, do you

22   remember that day?

23   A    Yes, sir.

24   Q    Were you detained by immigration, custom enforcement on

25   that day?

1    A    Yes, sir.

2    Q    And, where were you just prior-- when you were detained

3    on May 8th?

4    A    I was at a Lakeview Shock Incarceration Facility, a state

5    program.

6    Q    What is a state program for?

7    A    Basically a military based program that trained men and

8    women to be better individuals, they are given a lesser

9    sentence than, you know, what they originally were sentenced

10   for.  Which in this case would be six months.

11   Q    And what were you convicted of?

12   A    I was convicted of attempt sale of controlled substance.

13   Q    How --

14        THE COURT:  Say that again.

15        THE WITNESS:  I was convicted of attempt sale of

16   controlled substance.

17   Q    And, how long were you in Lakeview?

18   A    I was in Lakeview for up to a period of eight months.

19   Q    How did that experience effect your life?

20   A    It impacted my life very well.  My drill instructor, Mr.

21   Smith, he worked with me closely.  It was a lot of physical

22   training as well as mental training.  There I got to reinvent

23   myself and what I wanted to do in life and I was on my way to,

24   you know, become a better person.

25   Q    Would you say that Lakeview turned your life around?

1  A    It did, sir.

2  Q    When you were taken into custody by the ICE agents, where

3  did they take you?

4  A    They took me to a facility called Allegheny County.

5  Q    Did the ICE agents tell you why they were detaining you?

6  A    They said that I was not a citizen, that I was illegally

7  here, they have a warrant for my arrest.

8  Q    What did you tell them?

9  A    I told them I was a citizen, I believe I'm a citizen.

10 Q    When you told them that you are a United States citizen,

11 what did they say to you?

12 A    They told me that if I were indeed a citizen, I would see

13 the Judge in 24 hours and I would be released.

14 Q    Did you see a Judge within 24 hours?

15 A    No, sir.

16 Q    When is the-- did you see a Judge at all in the Allegheny

17 County Jail?

18 A    No, sir.

19 Q    How long were in the Allegheny County Jail?

20 A    Approximately a month, a month, little over a month, I

21 think, sir.

22 Q    And, do you recall approximately when you first saw a

23 Judge, how long it was?

24 A    I saw the Judge, June 25th of 2008.

25 Q    So approximately six weeks after you were detained?

1   A    Yes, sir.

2   Q    And where did you see this Judge?

3   A    I saw the Judge at Buffalo Federal Detention Facility.

4   Q    That is in Batavia, New York?

5   A    Correct.

6   Q    You had been transferred there?

7   A    Yes, sir.

8   Q    Did you give the ICE agents, after you were detained, any

9   proof that you were a United States citizen?

10  A    Yes, sir.

11  Q    What did you give them?

12  A    I gave them my father, naturalization certificate, as

13  well as my legal mother, naturalization certificate.

14  Q    And what did they say to you when you gave them these

15  documents?

16  A    Well, they didn't say anything.  They said that they

17  would submit it.  That is the only thing.

18  Q    They would submit it?

19  A    Yes.

20  Q    Do you know if that ever happened?

21  A    I believe, no.

22  Q    Did you have access to a law library when you were in the

23  Allegheny County Jail?

24  A    I was never aware that there was a law library there at

25  Allegheny County Jail.

1   Q     Would you describe for the Court, how your arrest by the

2   DHS, Department of Homeland Security affected you emotionally.

3            MR. MARUTOLLO:  Objection, Your Honor.  This is

4   outside of the scope of this hearing.  A question pertaining

5   more to damages and not as to whether or not the plaintiff

6   timely filed an administrative claim with the Government.

7            THE COURT:  His emotions may have effected his

8   ability to think clearly.  I will allow it.

9   A     It effected me dramatically.  I mean, working hard in the

10  program, going through the different classes that they have

11  installed, you know, I was ready to just begin life.  My

12  parole was approved, and when that happened, I was devastated.

13  I was confused and I didn't know what was going on, I became

14  depressed.

15  Q     Were you ever treated for your depression?

16  A     Not while being incarcerated, no, sir.

17  Q     Have you subsequently been treated for your depression?

18  A     Yes, sir.

19  Q     Did anyone ever tell you why you were transferred from

20  Allegheny to the Buffalo Detention Center?

21  A     That I would be able to see the Judge.

22  Q     Did they tell you why it took so long, why it took

23  six weeks before they could get you there?

24  A     No, sir.

25  Q     Do you remember a man by the name of Mr. Scott Schrader?

1    A    Yes, sir.

2    Q    Who is Scott Schrader?

3    A    Scott Schrader was one of the deportation officers that

4    was assigned to my case.

5    Q    Was Mr. Schrader helpful to you?

6    A    I would say, no.

7    Q    Did Mr. Schrader-- did you tell Mr. Schrader that you

8    were a United States citizen?

9    A    Yes, sir, I did.

10   Q    Did you tell anyone else at the Buffalo Detention Center

11   that you were a United States citizen?

12   A    All of the deportation officers that were assigned to my

13   case, that I told them the same thing over and over.  That I

14   was indeed a United States citizen.

15   Q    How did Mr. Schrader react when you told him you were a

16   United States citizen?

17   A    Well, it has been awhile, I can't recall.  I believe that

18   the information that I got that the Judge would decide that.

19   Q    Was he helpful to you in any way in your legal-- with

20   your legal issues?

21   A    No, sir.

22   Q    Did any attorney represent you before the immigration

23   Judge?

24   A    No, sir.

25   Q    Why not?

1   A     I could not afford one.

2   Q     Did you try to find an attorney?

3   A     Yes, sir.

4   Q     How did-- what did you do, explain to the Court?

5   A     Well, I had got a paper with a bunch of attorney names.

6   Q     Where did you get that?

7   A     The Judge gave it to me.

8   Q     And, did you call those attorneys?

9   A     I did, sir.

10  Q     And, tell the Court what happened?

11  A     Well, when I called-- I have called all of them.  They

12  told me that they were-- I cannot attain them because they

13  weren't free lawyers, basically.  They only take free pro bono

14  cases throughout the year, so they could not represent me in

15  my case.

16         THE COURT:  Before you ask the next question, I want

17  it stipulated that any evidence given at this hearing may be

18  used on the bench trial, on the Federal Tort Claims Act so we

19  don't have to take it again.

20         MR. MARUTOLLO:  Okay, Your Honor.

21         MR. FLESSNER:  Okay.

22  Q     Did you contact anybody at the Volunteer Lawyers Project?

23  A     Yes, I did.

24  Q     Did you ask them to represent you?

25  A     Yes, I did.

1  Q    What did they say?

2  A    They said that they are just volunteer-- they are

3  basically training, that they are not real lawyers, and that

4  they could not assist me in my case.

5  Q    So you represented yourself during the entire immigration

6  proceeding?

7  A    Yes, sir, correct.

8  Q    How many times did you appear approximately before the

9  immigration Judge?

10  A    Five times, I believe.

11  Q    And, did the immigration Judge order you to be removed?

12  A    Yes, sir.

13  Q    Do you know what an N-600 form is?

14  A    Yes, sir.

15  Q    Did the immigration Judge give you a form to-- so you

16  could file for an N-600?

17  A    Yes, sir.

18  Q    Tell the Judge what an N-600 is?

19  A    An N-600 is a citizenship application.

20  Q    A certificate of citizenship?

21  A    Yes, sir.

22  Q    Did you apply for that?

23  A    Yes, sir.

24  Q    Did you receive that?

25  A    No, sir.

1    Q    After the immigration Judge ordered you removed, did you

2    appeal that decision?

3    A    Yes, sir.

4    Q    Did it go before the board of immigration appeals?

5    A    Yes, sir.

6    Q    Was that decision affirmed?

7    A    No, sir.

8    Q    Meaning, did the immigration-- board of immigration

9    appeals agree you should be removed?

10   A    Yes.

11   Q    Did you appeal that decision as well?

12   A    Yes, sir.

13   Q    Did you do all that yourself?

14   A    No, sir.

15   Q    Who helped you?

16   A    Another detainee, a friend of mine.

17   Q    Another person at the detention center?

18   A    Yes, sir.

19   Q    Was he a lawyer?

20   A    No, sir.

21   Q    Did the information you received about how to handle a

22   removal proceeding, did you obtain that information from the

23   law library?

24   A    Excuse me, say that again.

25   Q    The information that you learned about how to appeal your

1   immigration case, did you learn that information from the law

2   library?

3   A    I would say, no and yes, sir.

4   Q    Well, explain that for us.

5   A    Well, the Judge gave me majority of the forms to fill out

6   and my friend, he also assisted me with that help.

7   Q    So the advice you were getting from your friend and from

8   the immigration Judge, was that all relating to your

9   immigration case?

10  A    Yes, sir.

11  Q    What was your legal focus while you were detained for

12  three and a half years unconstitutionally?

13              MR. MARUTOLLO:  Objection.

14              THE COURT:  I will allow it.

15  A    My sole concern, sir, was to terminate the removal

16  proceeding and getting out of immigration custody.

17  Q    Did you have any knowledge about filing a lawsuit against

18  the United States?

19  A    No, sir.

20  Q    Did you even know that was possible?

21  A    No, sir.

22  Q    Did anyone-- any of the library-- recreation specialists

23  or the agents at the detention center, did anyone say, you

24  know, you have a case against the United States?

25  A    No, sir.

```
                   Watson - Direct - Flessner                   31
```

1  Q    Did you even know before filing this case what an SF-95

2  was?

3  A    No, sir.

4  Q    Had you ever seen one?

5  A    No, sir.

6  Q    Did you have access to one?

7  A    No, sir.

8  Q    Did you even know what it means to have your

9  constitutional rights violated?

10 A    No, sir.

11 Q    Eventually did the Second Circuit appoint attorneys to

12 help you in your removal proceeding?

13 A    Yes, sir.

14 Q    And, do you remember the names of those attorneys?

15 A    One, Mark Door, I believe, from Gibson & Dunn.

16 Q    And, did you have to pay them?

17 A    No, sir.

18 Q    What was your understanding about what the attorneys at

19 Gibson & Dunn were going to assist you with?

20 A    My BIA appeal decision.

21 Q    I want to show you what is in this Exhibit V, in this

22 book of exhibits.  Do you have it in front of you?

23 A    Yes, sir.

24 Q    Turn to Exhibit V, please.

25 A    Yes.

1  Q     Turn to the second page of that.

2           Do you recognize that-- those letters?

3  A     Yes, sir.

4  Q     Turn to the second page, please.

5  A     Yes, sir.

6  Q     What are these letters?

7  A     This is the letter that Gibson, Dunn send me as a

8  retainer.

9  Q     Is this the letter telling you what they agreed to do for

10  you?

11  A     Yes, sir.

12  Q     If you will look at the second paragraph of the letter

13  dated April 26th, of 2011.  I want you to read the first three

14  sentences of that paragraph, please.

15  A     Okay.

16           "We have agreed to represent you on a pro bono,

17  no-fee basis, as set forth in the terms of retention.  You are

18  retaining us to provide legal services to you in connection

19  with your Petition for review, Watson versus Holder, from a

20  Board of Immigration Appeals, February 5th, 2009, audit

21  removal.  This will confirm that our engagement is limited to

22  the matter just described and that we have not been retained

23  generally, or for other matters."

24  Q     Okay.

25           So, is it your understanding that Gibson & Dunn was

1    appointed to represent you in your immigration case?

2    A     Yes, sir.

3    Q     For no other reason?

4    A     Yes, sir.

5    Q     Did you visit the law library when you were at the

6    Buffalo facility?

7    A     Yes, sir.

8    Q     Tell us, describe for us the law library as you remember

9    it?

10   A     Well, it was very small and you had, I can't remember

11   correctly, I believe there were three computers there.  Maybe

12   about four typewriters.

13   Q     What kind of books were in there?

14   A     Regular text books of immigration laws.

15   Q     Did the books concern, as far as you know, just

16   immigration proceedings?

17   A     Yes, sir.

18   Q     Look at-- can you turn to Exhibit W?

19            THE COURT:  Now, I take it all these exhibits are in

20   evidence you don't object.

21            MR. MARUTOLLO:  We don't object to either Exhibit V

22   or Exhibit W.

23            THE COURT:  If you don't object, I will assume the

24   exhibit is in evidence.

25            MR. FLESSNER:  I don't need to move.

1              THE COURT:  No.

2              (So marked.)

3    Q    Do you recognize Exhibit W?

4    A    Yes, sir.

5    Q    What is it?

6    A    It is a sheet that shows the time that each unit is

7    assigned to go to the law library.

8    Q    Was there the capacity for the Buffalo Detention Center,

9    was it approximately 650 detainees?

10   A    I am not aware of that number, but there were possibly.

11   Q    There were several hundred?

12   A    Yes, sir.

13   Q    And, this schedule shows when each tier was allowed to go

14   to the library, correct?

15   A    Yes, sir.

16   Q    And, how many many people were allowed to go to the

17   library at any one time?

18   A    Well, from up to I believe twenty.

19   Q    Twenty people at a time?

20   A    Between-- yeah, up to twenty people.

21   Q    And, what was the method by which you could be allowed to

22   go to visit the library?

23   A    You have a sign-in sheet in the unit, and you would sign

24   your name and your bed number and you would go, at the

25   specific time.

1   Q    Do you ever remember seeing this document?

2   A    Yes, sir.

3   Q    On average, how many times a week did you go visit the

4   library?

5   A    I would say, on around three to four times.

6   Q    How long did you stay when you were at the-- in the

7   library?

8   A    We could only stay for an hour.

9   Q    Did you ever request additional time?

10  A    No, sir.

11  Q    Why not?

12  A    I never knew that I had that right to do so.

13  Q    Did anyone ever tell you you could request additional

14  time?

15  A    No, sir.

16  Q    What was the kind of work you were doing when you were at

17  the library?

18  A    Well, I was trying to find cases that could make up my

19  argument for the removal proceeding to prove that I was indeed

20  a United States citizen.

21  Q    So you could be released?

22  A    Yes, sir.

23  Q    Were you able to access the Internet on the library

24  computers?

25  A    No, sir.

1   Q    Were you able to access the Internet at any point while
2   you were detained?
3   A    No, sir.
4   Q    Did anyone ever tell you that there were people who would
5   do research for you if you wanted research done?
6   A    No, sir.
7   Q    Did you ever ask anyone to do research for you?
8   A    No, sir.
9   Q    Why not?
10  A    I wasn't aware of those things.  No one ever gave me
11  those types of information that that was a possibility.
12  Q    Did anyone ever tell you that there was a disc that was
13  entitled "legal forms, short cut"?
14  A    No, sir.
15  Q    Did you ever see that disc?
16  A    No, sir.
17  Q    Did anyone ever tell you that disc was available to you?
18  A    No, sir.
19  Q    How many hours a day were you confined to your cell on
20  average when you were at the Buffalo Detention Center?
21  A    Again, I cannot recall the hours, but I would say, my
22  fair guess about 18 hours.
23  Q    Were you able to take legal books out of the library to
24  your cell?
25  A    No, sir.

1   Q    So the legal books stayed in the library?

2   A    Yes, sir.

3   Q    Do you know what a detainee request is?

4   A    Yes, sir.

5   Q    What is it?

6   A    Detainee request is a form that you will fill out, a

7   detainee will fill out if you want to request anything from

8   the law library or any other actions.

9   Q    Did you ever request anything through a detainee request?

10  A    Yes, sir.

11  Q    Tell us what it was?

12  A    I requested printouts that were at the law library.

13  Q    What kind of printout?

14  A    Printouts, drafts that I had made to put in my motions

15  and my briefs that I didn't finish.  So I didn't have time to

16  print them out.  So I requested for them to be printed out.

17  Q    And, those were with respect to your immigration case?

18  A    Yes, sir.

19  Q    That is the only thing you were focused on?

20  A    Yes, sir.

21  Q    Do you know what a recreation specialist is?

22  A    Yes, sir.

23  Q    What is it?

24  A    Well --

25  Q    Who is it?

1   A    Recreation specialist is someone that, he takes the

2   detainees to the Gym, as far as I believe.

3   Q    Were they ever in the-- was there a recreation specialist

4   ever in the law library while you were there?

5   A    No, I can't recall that.

6   Q    Did they ever offer to help you with research?

7   A    No, sir.

8   Q    Did you know that they were able to do that for you?

9   A    No, sir.

10  Q    Did they ever tell you that?

11  A    No, sir.

12  Q    Were they helpful to you in your research?

13  A    No, sir.

14  Q    Or in your removal proceeding?

15  A    No, sir.

16  Q    Were the agents at the Buffalo Detention Center, were

17  they prohibited from giving you legal advice?

18  A    Say that again, sir.

19  Q    Were they prohibited from giving you legal advice?

20  A    Yes, sir.

21  Q    Did you ever ask them for help?

22  A    The detainee, sir?

23  Q    Did you ever ask any of the agents?

24  A    The agent, I'm sorry.

25       No, sir.

Watson - Direct - Flessner                         39

1  Q    Were they helpful to you?

2  A    No, sir.

3  Q    Did you ever attend any of the, know your rights,

4  presentation while you were detained?

5  A    Yes, sir.

6  Q    What rights were the presenters at those presentations

7  talking about?

8  A    Well, they would just generally talking about immigration

9  laws and to know your rights.  That was about it.

10 Q    Were they able to represent you?

11 A    No, sir.

12 Q    Were they lawyers?

13 A    No, they were not.

14 Q    Who were they?

15 A    They were students.

16 Q    Law students?

17 A    Yes, sir.

18 Q    At any point during the, know your rights presentations,

19 did anyone ever tell you that you were able to sue the United

20 States?

21 A    Absolutely not.

22 Q    At any point, while you were detained, did you learn from

23 anyone, or anyone in any way inform you, that you had a right

24 to sue the United States?

25 A    No, sir.

1   Q    Was there anyone in the law library that was there to

2   assist you?

3   A    There was a detainee that was assigned as the Law Clerk.

4   Q    What was the detainee Law Clerk's job?

5   A    To assist other detainees with their legal materials.

6   Q    Did they help you?

7   A    No, sir.

8   Q    What do the detainee law clerks do?

9   A    Well, generally, they are also finding their own cases,

10  and you know, personally, they didn't have time to help anyone

11  else.  They were more focused on their own case.  I believe

12  that they used the law library-- I believe that they used

13  their position as a law clerk to get more time so that they

14  could focus more on themselves.

15  Q    Did the detainee law clerks have any legal training?

16  A    No, sir.

17  Q    At some point, you were transferred out of the Buffalo

18  Detention Center, correct?

19  A    Yes, sir.

20  Q    And, where did you go then?

21  A    I was transferred to a facility in Louisiana, which I

22  can't remember the name.

23  Q    How long were you there?

24  A    I was there maybe about a week or two.

25  Q    And then where did you go?

1   A     I was then transferred to a facility in Alabama called

2   Etowah County.

3   Q     And, were there-- when you were transferred out of the

4   Buffalo Detention Center, did you have a filing that was due

5   with the Board of Immigration?

6   A     Yes, sir.

7   Q     Approximately how long before-- how long after you were

8   transferred was your filing due?

9   A     I believe-- I can't remember, but I believe about

10  four days or less.

11  Q     Did the DHS contact your attorneys at Gibson Dunn to tell

12  them where you were?

13  A     No, sir.

14  Q     Were they able to contact you when you were transferred?

15  A     No, sir.

16  Q     How did they finally find out where you were?

17  A     Well, upon arrival at Etowah County, about a week later,

18  I got a phone call.  I was able to make a phone call to a

19  cousin of mine that resided in Florida.  I called her to call

20  my immediate family in New York, to contact my lawyers, that

21  is how they knew where I was.

22  Q     The transfer out of the Buffalo Detention Center, did

23  that interfere with your ability to file your memo with the

24  Board of Immigration?

25  A     Yes, sir.

Watson - Direct - Flessner                    42

1    Q    When were you ultimately released?

2    A    I was released, I can't remember exactly, but I was

3    released, I believe May of 2011.

4    Q    Were you released on November 2nd of 2011?

5    A    Yes, sir.

6    Q    Describe for the Court what happened that day?

7    A    Well, as I was in my cell in the unit, two officers

8    approached me and said that to pack my stuff up immediately.

9    I asked, why.  I believed that I was being transferred to

10   another facility because this was the pattern that they were

11   using.

12          And I got down to the processing area and they said

13   to put on my clothes.  They gave me a paper with my picture on

14   it and they pushed me out the door, and that was it.  With no

15   explanation or nothing.

16   Q    What did you do?

17   A    Well, I didn't know what to do, but I immediately just

18   was confused.  I didn't know anyone in Alabama, the State of

19   Alabama, nor did I have a cellphone, nor did I have any money

20   to do anything.

21          I basically walked around, and I found a gas station

22   and there was this lady there, I asked her, politely, that I

23   explained my situation, that I was stranded and I need help.

24   Can I use her cellphone.  I used the cellphone, and I called

25   my cousin, where before I mentioned that resided in Florida.

1    She booked a hotel in the area, I stayed overnight.  My

2    parents then booked a Greyhound bus ticket for me to come to

3    New York the next day.

4    Q    And what was your sole concern while you were detained at

5    the-- while detained by DHS?

6    A    My sole concern was to prove that I was a citizen and

7    terminate removal proceedings.

8    Q    Other than your other detainee friend, did anyone teach

9    you anything about the law, provide you resources about the

10   law, while you were detained?

11   A    No, sir.

12   Q    Did the agents or the guards ever give you legal advice

13   or assist you?

14   A    No, sir.

15   Q    How much longer after you were released from the

16   detention-- were your removal proceedings ongoing, do you

17   recall?

18   A    Two years, I believe.

19              MR. FLESSNER:  No further questions.

20              THE COURT:  All right.  Take a short break.

21              MR. MARUTOLLO:  Sure, Your Honor, thank you.

22              (Recess taken.)

23              THE COURT:  Cross examination.

24   CROSS EXAMINATION BY MR. MARUTOLLO:

25   Q    Good morning, Mr. Watson.

Watson - Cross - Marutollo                    44

1    A     Good morning, sir.

2    Q     Mr. Watson, May 8th, 2008, was the date that you entered

3    into ICE custody, right?

4    A     Correct, sir.

5    Q     And instead of being released from the Lakeview

6    incarceration program, on May 8th, 2008, you were detained by

7    ICE agents; is that right?

8    A     Correct, sir.

9    Q     You were handcuffed by these ICE agents on May 8th, 2008?

10   A     Yes, sir.

11   Q     You were transported by these ICE agents in a van to the

12   Allegheny County Jail on May 8th, 2008?

13   A     Yes, sir.

14   Q     On May 8th, 2008, you knew you were being detained by the

15   Federal Government, correct?

16   A     Yes, sir.

17   Q     And according to you on May 8th, 2008, you immediately

18   told the ICE officers, that you were in fact a United States

19   citizen, right?

20   A     Yes, sir.

21   Q     You were certain that you were a United States citizen on

22   May 8th, 2008, right?

23   A     Yes, sir.

24   Q     And in your motion to terminate the removal proceedings

25   in the immigration court, you said that you were a citizen of

1    the United States, right?

2    A    Yes, sir.

3    Q    And you filed that motion on September 23rd, 2008?

4    A    I'm not sure, but I believe so, sir.

5    Q    And an additional immigration brief, you said that you

6    were a U.S. citizen pursuant to Section 320 of the act, that

7    is in Plaintiff's Exhibit H.  You made that statement, right?

8    A    Correct, sir.

9    Q    In your motion to reinstate your position for review, you

10   also said you were a citizen, a U.S. citizen as well, right?

11   A    Yes, sir.

12   Q    That is dated September 25th, 2009, that is Plaintiff's

13   Exhibit V?

14   A    I believe so, yes, sir.

15   Q    And, in this current case, in your August 10th, motion,

16   it is indicated that quote, when officials denied your

17   citizenship you went to great lengths to prove your

18   citizenship, right?

19   A    Say that again, sir.

20   Q    In the current brief, the supplemental brief in this case

21   dated August 10th, 2015, filed by your attorneys in this case,

22   the statement says, when officials denied your citizenship you

23   went to great lengths to prove your citizenship, right?

24   A    Correct, sir.

25   Q    And, according to this brief, it says you expeditiously

1    obtained a copy of your father's U.S. naturalization

2    certificate to verify your citizenship, right?

3    A    Yes, sir.

4    Q    And, when you were in Allegheny, you were able to give an

5    ICE officer, a copy of your father's certificate, right?

6    A    Yes, sir.

7    Q    And, when you were in Batavia at the Buffalo Federal

8    Detention Facility, you obtained copies of the certificate of

9    naturalization for your biological father, right?

10   A    Yes, sir.

11   Q    And according to your August 10th, 2015 brief, you didn't

12   give up after U.S.C.I.S. denied your application for

13   citizenship, right?

14   A    No, sir.

15   Q    You filed an appeal, right?

16   A    Correct, sir.

17             THE COURT:  An application for citizenship?

18             MR. MARUTOLLO:  To prove his citizenship that he

19   was.

20             THE COURT:  An application to prove it.

21             MR. FLESSNER:  There is a certificate you can get.

22   Q    Well, when the United States-- when the U.S.C.I.S. denied

23   application for citizenship, plaintiff in his brief said he

24   did not give up and timely filed an appeal.

25             MR. FLESSNER:  Excuse me, it is not an application

Case 1:14-cv-06459-JBW-PK   Document 56   Filed 08/31/15   Page 47 of 116 PageID #: 1454

1    for citizenship, application for certification of citizenship.

2              THE COURT:  I understand that.

3              MR. MARUTOLLO:  To be clear, I was reading from the

4    brief which indicates, application for citizenship.

5              THE COURT:  Right.

6    Q    On May 8th, 2008, Mr. Watson, you believed that you were

7    not supposed to be detained by ICE, right?

8    A    Yes, sir.

9    Q    And so ultimately Mr. Watson, May 8th, 2008, is according

10   to you, the date that you alleged your unlawful detention

11   began, right?

12             MR. FLESSNER:  Objection, that is a legal

13   conclusion.

14             THE COURT:  I will allow it.

15             If you can answer it, if you can't, don't answer it.

16   A    Can you restate the question again, sir.

17   Q    On May 8th, 2008, according to you, that is the date that

18   you alleged your unlawful detention began, correct?

19   A    Well, to be honest, I wasn't sure what was going on,

20   because I was told that I would see a Judge in 24 hours.  I

21   would be released. So, I would-- I would generally say, yes.

22             MR. MARUTOLLO:  Your Honor, may I provide, I don't

23   believe he has it there, a copy of his deposition transcript

24   for the witness.

25             THE COURT:  Yes, of course.

Watson - Cross - Marutollo                    48

1              (Handing.)

2    Q    Mr. Watson, you had your deposition taken on July 23rd,

3    2015, right?

4    A    Yes, sir.

5    Q    At that deposition, you were asked questions?

6    A    Yes, sir.

7    Q    You gave answers to those questions?

8    A    Yes, sir.

9    Q    You swore to tell the truth when answering those

10   questions, that is the same oath, in sum and substance you

11   took today?

12   A    Yes, sir.

13              THE COURT:  Excuse me, do you have another copy?

14              MR. MARUTOLLO:  Yes, Judge.

15              THE COURT:  Thank you very much.

16              It is marked in evidence --

17   Q    Turning your attention to page --

18              THE COURT:  -- as Court Exhibit 1.

19              (So marked.)

20   Q    Turning your attention Mr. Watson to page 19, lines 24

21   through page twenty, lines two.

22              Did you give the following answer to the following

23   question:

24              QUESTION:  "Was May 8th, 2008, the date you allege

25   your unlawful detention began?"

Watson - Cross - Marutollo                     49

1        ANSWER: "Yes."

2        Did you give that answer to that question?

3    A    Yes, sir.

4    Q    And Mr. Watson, you on November 23rd, 2004, you were

5    previously convicted of attempted robbery in the second degree

6    in Kings County, New York, right?

7    A    Yes, sir.

8    Q    On January 26th, you were sentenced to-- January 26th,

9    2005, you were sentenced to 30 days in jail and five years

10   probation in connection with that November 2004 conviction,

11   right?

12   A    Yes, sir.

13   Q    On February 22nd, 2006, you were sentenced to an

14   additional eight months incarceration for violation of

15   probation, right?

16   A    Yes, sir.

17   Q    And on September 18th, 2007, you were convicted of the

18   attempted criminal sale of cocaine in the third degree, in New

19   York County, Supreme Court; is that correct?

20        MR. FLESSNER:  Your Honor, can I just object.  I'm

21   not sure what any of this has to do with equitable tolling.

22        THE COURT:  Well, I suppose it relates, to some

23   extent to credibility.

24        MR. MARUTOLLO:  As well as his knowledge of

25   proceedings.

1          THE COURT:  All right.  I will allow it.

2    Q     Would you like me to repeat the question?

3    A     Please.

4    Q     So on September 18th, 2007, you were convicted of

5    attempted criminal sale of cocaine in the third degree,

6    pursuant to a judgement in the Supreme Court, New York County;

7    is that right?

8    A     Yes, sir.

9    Q     And you had a lot of experience with court proceedings

10   throughout your criminal history, right?

11          MR. FLESSNER:  Objection.

12   A     No, sir.

13          MR. FLESSNER:  Objection to the form of the

14   question.

15   Q     You appeared in court multiple times in connection with

16   your criminal proceedings, correct?

17   A     Yes, sir.

18   Q     So, Mr. Watson, going back, after being handcuffed by ICE

19   agents on May 8th, 2008, you're next transported to Allegheny

20   County Jail?

21   A     Yes, sir.

22   Q     You were in ICE custody at the Allegheny County Jail

23   between May 8th, 2008, and June 23rd, 2008; is that right?

24   A     Yes, sir.

25   Q     And while at the Allegheny County Jail, you never filed

1  any administrative claim related to your detention with any

2  Government agency, right?

3  A    No, sir.

4  Q    No you did not file any such claim?

5  A    Sir, I did not know anything about that.  I don't know

6  what-- an administrative claim was.  I didn't know anything

7  about what you are mentioning, sir.

8  Q    While at the Allegheny County Jail, you did not ask

9  anyone about how to file an administrative claim?

10  A    Again, sir, I didn't understand what was going on, I

11  don't have no knowledge.

12            THE COURT:  Just answer the question.

13            THE WITNESS:  Yes, sir, I'm sorry, sir.

14            THE COURT:  The answer is, you did not file,

15  correct?

16            THE WITNESS:  Yes, sir, I apologize.

17            THE COURT:  Thank you.

18  Q    And while at the Allegheny County Jail, you did not try

19  to file any claim pertaining to your ICE detention, correct?

20  A    No, sir.

21  Q    And no one prevented you in filing any claim pertaining

22  to your ICE detention while at the Allegheny County Jail,

23  right?

24  A    No, sir.

25  Q    And you were never denied access to using the mail at the

1   Allegheny County Jail, right?

2   A    No, sir.

3   Q    You were never denied access to using the telephone at

4   the Allegheny County Jail, right?

5   A    No, sir.

6   Q    On June 23rd, 2008, you were transferred from the

7   Allegheny County Jail to the Buffalo Detention Facility,

8   right?

9   A    Yes, sir.

10  Q    And you stayed at that Buffalo Federal Detention Facility

11  until October 24th, 2011; is that right?

12  A    Yes, sir.

13  Q    So the bulk of your detention was at the Buffalo Federal

14  Detention Facility, right?

15  A    Say that again.

16  Q    The bulk of your detention was actually at the Buffalo

17  Federal Detention Facility?

18  A    Correct, sir.

19  Q    So upon entering the Buffalo Federal Detention Facility,

20  you were given a copy of the Buffalo Federal Detention

21  Facility detainee handbook, right?

22  A    Yes, sir.

23  Q    The detainee handbook sets forth resources available at

24  the facility, right?

25  A    Yes, sir.

Case 1:14-cv-06459-JBW-PK   Document 56   Filed 08/31/15   Page 53 of 116 PageID #: 1460

1    Q    And, while at the Buffalo Federal Detention Facility, you

2    had access to the law library, right?

3    A    Yes, sir.

4    Q    You testified on your direct examination, that you

5    obtained some information from the law library, right?

6    A    Yes, sir.

7    Q    You also testified during your direct examination, that

8    you did not ask any staff for help; is that right?

9    A    Yes, sir.

10   Q    Now, you went to the law library at least twice a week,

11   over the course of your three plus years at the Buffalo

12   Federal Detention Facility?

13   A    I would say, three times, three to four times of out of

14   the week.

15   Q    So let's step back for a moment.  Talk about the

16   resources available at the Buffalo Detention, Federal

17   Detention Facility law library.

18           While at the Buffalo Detention Facility, you had

19   access to books in the law library, right?

20   A    Yes, sir.

21   Q    You read legal books in the law library, right?

22   A    Some of them, sir, yes.  Yes, sir.

23   Q    In fact you read about seven law books in the law

24   library?

25   A    I don't recall saying that, sir.

1  Q    Drawing your attention to your deposition, page 147,

2  lines four through 17.  Did you give the following answers to

3  the following questions:

4        QUESTION:  "Approximately how many law books were

5  available at the Buffalo Federal Detention Facility law

6  library?

7        ANSWER:  "I'm not sure available."

8        QUESTION: "About how many books did you observe at

9  the Buffalo Federal Detention Facility law library?"

10       ANSWER:  "I don't know, I went through, I read a few

11  of them."

12       QUESTION:  "Did you use more than ten law books

13  while you were at the Buffalo Federal Detention Facility?"

14       ANSWER:  "I looked into maybe about seven of them."

15       Did you give that testimony, Mr. Watson?

16  A    Yes, sir.

17  Q    And, there were legal manuals and federal rule books

18  available in the law library, right?

19  A    I believe so, sir.

20  Q    And no one prevented you from reading any of the books in

21  the Buffalo Federal Detention Facility, right?

22  A    No, sir.

23  Q    So let's turn to go to another resource at the Buffalo

24  Facility, computers, and LexisNexis.  So first, you had access

25  to computers in the Buffalo Detention Facility, right?

1   A     Yes.

2   Q     And also typewriters?

3   A     Yes, sir.

4   Q     And you had access to the research program LexisNexis, on

5   the computers, right?

6   A     Yes, sir.

7   Q     And, you conducted general searches on LexisNexis, right?

8   A     Yes, sir.

9   Q     You prepared filings for the Court, based on cases that

10  you found on LexisNexis, right?

11  A     Yes, sir.

12  Q     And in fact, your filings all argue that you were a

13  citizen, right?

14  A     Yes, sir.

15  Q     And that you shouldn't have been detained, right?

16  A     Yes, sir.

17  Q     And no one prevented you from using LexisNexis, right?

18  A     No, sir.

19  Q     And, as noted in your August 10th, brief, on page twelve

20  of your August 10th brief, during the immigration removal

21  proceeding, you asked the Immigration Judge, quote, is the law

22  available in the Lexis program they have here, because I would

23  like to look into it myself.

24        You gave that statement, correct?

25  A     Yes, sir.

1    Q    So let's turn to another resource.  While at the Buffalo

2    Detention Facility, you had ability to make requests to staff

3    members, right?

4    A    Yes, sir.

5    Q    And no one prevented you from making requests to staff,

6    right?

7    A    No, sir.

8    Q    And you actually completed eleven detainee requests to

9    staff while at the Buffalo Federal Detention Facility, right?

10   A    I do not recall that, sir.

11   Q    I have actually handed you, within that binder, that is

12   directly in front of you, Mr. Watson, there are a number of

13   exhibits.

14          Showing you, if you look at Exhibit N.

15          Mr. Watson, are you at Exhibit N?

16   A    Yes, sir.

17   Q    Does this refresh your recollection as to the fact that

18   you filed 11 detainee requests to staff?

19   A    Yes, sir.

20   Q    And you completed requests to staff only about your

21   immigration case, right?

22   A    Yes, sir.

23          MR. MARUTOLLO:  Your Honor, we move Exhibit N into

24   evidence.

25          THE COURT:  Yes.

1          MR. FLESSNER:  No objection.

2          (So marked.)

3   Q    Mr. Watson, to be clear, no one prevented you from making

4   requests to staff, right?

5   A    No, sir.

6   Q    While at the Buffalo Federal Detention Facility, Mr.

7   Watson, you spoke with detainees who worked in the law

8   library?

9   A    Yes, I did, sir.

10  Q    No one prevented you from speaking to detainees about

11  legal issues, right?

12  A    No, sir.

13  Q    Let's speak about a few more resources available in

14  Buffalo.  You were given access to paper, pens, envelopes,

15  correct?

16  A    Yes, sir.

17  Q    And, you while in the Buffalo facility, you mailed and

18  received letters, correct?

19  A    Yes, sir.

20  Q    And, while at the Buffalo Detention Facility, you were

21  never denied the use of mail, correct?

22  A    No, sir.

23  Q    While at the Buffalo Federal Detention Facility, you also

24  made telephone calls about one to five times a day, right?

25  A    Yes, sir.

1    Q    And you called your attorneys from the telephone at the

2    Buffalo Federal Detention Facility, right?

3    A    Yes, sir.

4    Q    So, let's be clear, while you were at the Buffalo Federal

5    Detention Facility, you had access to the following resources,

6    access to legal books, computers, LexisNexis, staff to whom

7    you could make requests, detainees who worked in the law

8    library, the use of mail, telephone calls, and your attorneys;

9    is that right?

10   A    Yes, sir.

11   Q    And despite all these resources, you claim you had no

12   access to information about filing an administrative claim

13   related to your detention, right?

14   A    Correct, sir.

15   Q    At the same time, you used these resources when filing

16   your many motions and briefs in connection with your

17   immigration proceedings, right?

18   A    Yes, sir.

19   Q    So let's just talk briefly about some of the legal

20   filings you did make with regard to your immigration

21   proceeding.

22           First, you filed an N-600 application with the

23   Federal Government, correct?

24   A    Yes, sir.

25   Q    And, you learned about filing the N-600 because according

1    to you, it was just common knowledge at the facility, Buffalo

2    facility, right?

3    A    Yes, sir.

4    Q    And according to you, Buffalo facility officials would

5    give papers with all the different forms, you could fill out;

6    is that right?

7    A    Yes, sir.

8    Q    And, there is also a wall at the Buffalo facility of

9    commonly used forms; is that right?

10   A    Yes, sir.

11   Q    And according to you, it was very easy to fill out the

12   N-600 because according to you, you can read and write, isn't

13   that correct?

14   A    Yes, sir.

15   Q    And, you didn't need an attorney to fill out the N-600

16   form, according to you?

17   A    No, sir.

18             THE COURT:  What Exhibit number is that, that form?

19             MR. MARUTOLLO:  I don't believe there is actually an

20   exhibit, the N-600 form.  It maybe for the plaintiff.

21             THE COURT:  I would like to look at it.

22             MR. FLESSNER:  I don't know if I-- if I don't have

23   it, I will make a copy of it and-- I think I do have it.  I

24   will find it.  I think I do have it.

25             THE COURT:  Fine, go ahead.

1   Q    And Mr. Watson, you didn't get any help to fill out the

2   N-600 form?

3   A    If I got help?

4   Q    You did not get any help to fill out the N-600 form,

5   right?

6   A    Yes, sir.

7   Q    Yes, you did not get any help?

8   A    I did get help, sir.

9   Q    One moment, Your Honor.

10        Mr. Watson, turning your attention to page 133,

11  lines 9 through 11 of your deposition transcript.  Did you

12  give the following answer to the following question:

13        QUESTION: "Did you speak with anyone in preparing

14  the N-600?"

15        ANSWER: "No."

16        Did you give that answer to that question?

17  A    Yes, sir.

18  Q    You also, once your N-600 was denied, you filed a notice

19  of appeal, right, with the Federal Government?

20  A    Yes, sir.

21  Q    And you obtained this notice of appeal form, on the

22  Buffalo Federal Detention Facility computer system, right?

23  A    Say that again, sir.

24  Q    You obtained the notice of appeal form, on the Buffalo

25  Federal Detention Facility's computer system, right?

1    A    Sir, when I gave that statement, sir, I specifically said

2    that I didn't remember exactly how I went about.  But I

3    believe to my knowledge, that the Judge gave me a bunch of

4    appeal forms, sir, to be correct.

5    Q    So Mr. Watson, let me draw your attention back to your

6    deposition transcript on page 138, at lines 17 through 24.

7    Did you give the following answer to the following question:

8              QUESTION:  "Where did you obtain this form, I-290B

9    notice for appeal or motion, that is on the document Bates

10   number A FILE 190-A to 191?"

11             ANSWER:  "I believe it was on the computer."

12             QUESTION: "When you say, it was on the computer, how

13   did you access itself on the computer?"

14             ANSWER:  "It's in the computer system."

15             Did you give that answer to that question?

16   A    Yes, sir.

17   Q    And you knew where to mail the notice of appeal, because

18   according to you, the Buffalo Federal Detention Facility had a

19   paper stating who to mail different forms to, which Court or

20   District Court, isn't that right?

21   A    Yes, sir.

22   Q    And while at the Buffalo Federal Detention Facility, you

23   also filed a Petition for review of an immigration matter,

24   right?

25   A    Yes, sir.

1    Q    And, while at the Buffalo Federal Detention Facility and

2    after your Petition for review is denied, you also filed a

3    motion to reinstate your Petition for review, right?

4    A    Yes, sir.

5    Q    And in this reinstatement motion, you cited these cases

6    that you found via the Buffalo Federal Detention Facility

7    LexisNexis research tool, right?

8    A    Yes, sir.

9    Q    So let me get this straight, according to you, the

10   resources at the Buffalo Federal Detention Facility were

11   sufficient for you to file all these motions related to your

12   detention, but the facility's resources were not sufficient to

13   file an administrative claim pertaining to your detention?

14   A    Well, sir, I would go to answer this question according

15   to -- well, I had no knowledge of what an administrative claim

16   was at that specific time, during the entire time of my

17   detention.  I was-- my sole concern was to prove my case of

18   citizenship.

19   Q    Mr. Watson, while at the Buffalo Federal Detention

20   Facility, you admit that you did not educate yourself about

21   complaints that you could file, related to your underlining

22   detention, right?

23   A    Yes, sir.

24   Q    And you did not ask anyone, in Buffalo Federal Detention

25   Facility about how to file an administrative claim with the

Watson - Cross - Marutollo                    63

1  Government, right?

2  A    Absolutely not, no, sir.

3  Q    There were no extraordinary circumstances at the Buffalo

4  Federal Detention Facility that stood in your way of pursuing

5  your legal, your administrative claims, right?

6              MR. FLESSNER:  Objection to the form of the

7  question.

8              THE COURT:  If you can answer it, answer it, if you

9  can't, say I can't answer it.

10 A    I cannot answer that.

11 Q    There were no extraordinary circumstances in your way--

12             MR. FLESSNER:  Same objection, it is the same

13 question.

14 A    I can't answer that.

15             MR. FLESSNER:  He just answered that.

16 Q    Mr. Watson, you were not acting diligently to pursue your

17 administrative claims, were you?

18             MR. FLESSNER:  Objection.

19             THE COURT:  You can answer it if you can or say, you

20 can't answer it.

21 A    Can you restate that question differently.  I don't

22 understand what you mean.

23 Q    You were not acting to pursue your administrative claims,

24 right?

25 A    Sir, again, I did-- my sole concern was getting my

1  freedom of terminating removal proceeding, proving that I was

2  United States citizen.

3  Q    And, there were no circumstances at the Buffalo Federal

4  Detention Facility that prevented you from filing an

5  administrative claim, right?

6  A    Sir, again, I didn't know what an administrative claim

7  was.  Again, my sole concern was proving that I was a United

8  States citizen.

9  Q    So is that a "yes" or "no"?

10           MR. FLESSNER:  Objection.

11           THE COURT:  You can say, I can't answer it, yes or

12  no.

13  A    I can't answer that question.

14  Q    So apart from your lack of knowledge, about the process,

15  there were no obstacles that would have prevented you from

16  filing an administrative claim while you were at the Buffalo

17  Detention Facility, right?

18           MR. FLESSNER:  Objection.

19           THE COURT:  If you can answer it, say.

20  A    I cannot answer that question.

21  Q    Why not?  What can't you answer that question?

22  A    Sir, I'm politely saying this, that I had no knowledge

23  what an administrative claim was.  I had no knowledge of

24  anything of that sort.

25           My sole concern was proving that I was a United

1   States citizen, thus returning to my family, terminating

2   removal proceeding.

3   Q    But Mr. Watson, nothing at the facility prevented you

4   from obtaining the knowledge to file an administrative claim,

5   right?

6   A    I cannot answer that question.

7           THE COURT:  You can say, I don't know, I can't

8   answer, yes or no.

9           THE WITNESS:  I don't know.

10  Q    So, after the Buffalo Federal Detention Facility you were

11  transferred to the Tensas Parish Detention Center Louisiana;

12  isn't that right?

13  A    Yes.

14  Q    Then you were sent to the Etowah County Jail in Alabama,

15  right?

16  A    Yes, sir.

17  Q    This was in the fall of 2011?

18  A    Yes, sir.

19  Q    And in both the Alabama and Louisiana facility, you did

20  not file any administrative claims against the Federal

21  Government, right?

22  A    No, sir.

23  Q    And in both the Alabama and Louisiana facility, you did

24  not ask anyone about how to file an administrative claim,

25  right?

1   A    No, sir.

2   Q    Yet you are here today, claiming your detention in all of

3   these facilities is wrong, correct?

4   A    Yes, sir.

5   Q    And, looking back on the entirety of your ICE detention,

6   you did not suffer from any disability that prevented you from

7   filing a lawsuit pertaining to your ICE detention, right?

8            MR. FLESSNER:  Objection.

9            THE COURT:  You mean his physical or mental?

10           MR. MARUTOLLO:  That's correct.

11  A    No, sir.

12  Q    And you did not suffer from any physical or mental

13  ailments that prevented you from filing an administrative

14  claim against the Federal Government?

15           MR. FLESSNER:  Objection.

16           THE COURT:  You may answer.

17  A    No, sir.

18  Q    During your entire ICE detention no one prevented you

19  from filing an administrative claim pertaining to your ICE

20  detention, right?

21           MR. FLESSNER:  Objection, asked and answered.

22           THE COURT:  You may answer.

23  A    I do not know how to answer that question.

24  Q    Let me turn your attention to page 84 of your deposition.

25  A    Say that again, 84?

1   Q    Yes, page 84, lines 21 through 24.

2        Did you give the following answer to the following

3   question:

4        QUESTION:  "Did anyone prevent you at any point

5   during your ICE detention from filing an administrative or

6   legal claim?"

7        ANSWER: "No, sir."

8        Did you give that answer to that question?

9   A    Yes, sir.

10  Q    You were never induced or tricked by any Government

11  employee into allowing any filing deadlines to pass, right?

12  A    Can you repeat that question, again, sir.

13  Q    You were never induced or tricked by any Government

14  employee into allowing any filing deadlines to pass, right?

15  A    No, sir.

16  Q    Let me again turn your attention to your deposition page

17  84.

18       MR. FLESSNER:  He said, no.

19  Q    So, no, you did not get it-- thank you Mr. Watson.

20       So to sum up, at no point during your entire ICE

21  detention, you did not file any administrative claim

22  pertaining to your detention, right?

23  A    Correct, sir.

24  Q    You also never filed any Petition for a writ of habeas

25  corpus at any point during your ICE detention, right?

1  A    Correct, sir.

2  Q    After you were released from ICE detention on

3  November 2nd, 2011, you went to your aunt's house in Brooklyn,

4  right?

5  A    Yes, sir.

6  Q    You personally had access to the Internet after being

7  released from ICE detention, right?

8  A    Yes, sir.

9  Q    Even though you were happy to be released from ICE

10 custody, you were still upset about your alleged unlawful

11 detention, right?

12 A    Yes, sir.

13 Q    Even though you were upset, you still did not conduct any

14 searches on the Internet about remedies available to you,

15 right?

16 A    No, sir.

17 Q    So even after your release, you didn't research anything

18 related to your claims of false imprisonment, malicious

19 prosecution or negligence, right?

20 A    Sir, I would say, no, but because the fact that I did not

21 know that I had those rights.  I didn't know what my rights

22 were.  I didn't know the reason why I was being released.

23        My case was still in the Second Circuit, sir.  So I

24 didn't have any knowledge of that I was-- you know, entitled

25 to anything of that sort.  So, there was no reason for me to

1   go to search for that, for, you know, on line for any claims

2   or ways or procedures of where to file claims.

3   Q    Still the answer is, you did not research any of those

4   claims?

5   A    No, sir.

6   Q    So, even when you are out of ICE detention, you still

7   didn't pursue your administrative claims, right?

8   A    Correct, sir.

9   Q    Now, I would like to talk to you for a moment about your

10  attorneys during your immigration proceedings.

11       During your ICE detention you obtained counsel from

12  Gibson & Dunn; is that right?

13  A    Yes, sir.

14  Q    And, you retained counsel from Gibson & Dunn law firm as

15  early as April 2011, right?

16  A    Yes, sir.

17  Q    And that is when you were still at the Buffalo Federal

18  Detention Facility?

19  A    Yes, sir.

20  Q    You spoke via telephone to your Gibson, Dunn attorneys at

21  least twenty times, while you were in federal detention

22  facility and at least twenty times, after you were released

23  from federal detention, right?

24  A    Yes, sir.

25  Q    So that is at least forty times overall that you spoke to

1   your attorneys?

2   A    Yes, sir.

3   Q    While at the Buffalo Facility, you received letters from

4   your Gibson, Dunn attorneys, right?

5   A    Yes, sir.

6   Q    You were never prevented from meeting with your Gibson,

7   Dunn attorneys, right?

8   A    No, sir.

9   Q    And your Gibson, Dunn attorneys appeared on your behalf

10  in court and filed motions on your behalf, right?

11  A    Yes, sir.

12  Q    And your Gibson, Dunn attorneys gave you legal advice,

13  right?

14  A    Yes, sir.

15  Q    And according to you, you had one conversation with the

16  Gibson, Dunn attorney, about filing an administrative claim,

17  pertaining to your ICE detention, right?

18  A    Yes, sir.

19  Q    And, you are not sure when that conversation with your

20  Gibson, Dunn attorneys occurred, right?

21  A    No, sir.

22  Q    But you know that the conversation was in person,

23  correct?

24  A    Yes, sir.

25  Q    And, that your Gibson, Dunn attorney initiated the

1  conversation about filing an administrative claim with you,
2  right?
3  A    Yes, sir.
4  Q    But even after you had this conversation, you still did
5  not file an administrative claim pertaining to your ICE
6  detention, right?
7  A    No, sir.
8  Q    And now, Mr. Watson, in addition to your Gibson, Dunn
9  attorneys, you also had attorneys from National Immigrant
10 Justice Center, right?
11 A    Yes, sir.
12 Q    You retained counsel from this Justice Center in 2014,
13 right?
14 A    Yes, sir.
15 Q    You also had at least one conversation with attorneys
16 from the National Immigrant Justice Center about filing an
17 administrative claim pertaining to your ICE detention, right?
18 A    Yes, sir.
19 Q    This conversation with the National Immigrant Justice
20 Center attorney pertaining to the filing of an administrative
21 claim, occurred in some point between 2013 and 2014, right?
22 A    Yes, sir.
23 Q    And even after this conversation, you still did not file
24 an administrative claim pertaining to your ICE detention?
25 A    No, sir.

1  Q    So despite having attorneys from Gibson, Dunn and the

2  National Immigrant Justice Center and despite having

3  conversations with them about filing an administrative claim,

4  you didn't file your standard form 95 here until October 30th,

5  2013, right?

6  A    Yes, sir.

7  Q    And according to you, you claim that you didn't know what

8  an SF-95 was, until October 30th, 2013, the day it was

9  actually filed, right?

10  A    Correct.

11  Q    And you claim that you did not even contemplate an SF-95

12  until October 30th, 2013, the date it was actually filed,

13  right?

14  A    Correct, sir.

15  Q    And you did not-- and, you ultimately filed this lawsuit

16  more than six years after May 8th, 2008, the date that you

17  originally were detained by ICE, right?

18  A    Correct, sir.

19          MR. MARUTOLLO:  No further questions, Your Honor.

20          THE COURT:  Any redirect?

21  REDIRECT EXAMINATION BY MR. FLESSNER:

22  Q    Mr. Watson did you suffer from depression while you were

23  detained?

24  A    Yes, sir.

25          MR. FLESSNER:  No further questions.

- Proceedings -                                73

1        THE COURT:  All right.  Thank you, do you have

2   another witness?

3        MR. FLESSNER:  That is it.

4        THE COURT:  The plaintiff rests?

5        Do you want to make a motion?

6        MR. MARUTOLLO:  Yes, Your Honor, we would move as a

7   matter of law that the plaintiff has not met his burden to

8   show equitable tolling in this case, for the reasons set forth

9   during the plaintiff's examination, as well as for the reasons

10  set forth in our moving papers and supplemental papers.

11  Ultimately he has not shown he has been pursuing his rights

12  diligently.

13       He has shown-- the plaintiff has not met his burden

14  in establishing that any extraordinary circumstances stood in

15  his way.

16       And, ultimately, Your Honor, the fact that he claims

17  ignorance of the law, that is not sufficient for purposes of

18  getting equitable tolling.

19       Further, the fact that his concern was about his

20  detention, is not sufficient to carry his burden.  The law

21  doesn't recognize the plaintiff's focus on his underlining

22  immigration proceeding or for that matter, underlying criminal

23  proceeding in another wrongfully detained case, as a basis for

24  postponing accrual.  Otherwise, all inmates would have that

25  benefit and ignorance of the law, would be a motivating factor

- Proceedings -                           74

1   for detainees and inmates to not pursue the claims until they

2   can obtain a lawyer at a later point.

3           So, Your Honor, we think that the plaintiff has not

4   met his burden to establish equitable tolling in this case and

5   the reasons we set forth in the moving papers as well.

6           THE COURT:  Now, after you were released, you didn't

7   immediately receive citizenship papers for yourself, did you?

8           THE WITNESS:  No, I did not, sir.

9           THE COURT:  Did you still think that they were

10  denying you your citizenship rights?

11          THE WITNESS:  Yes, sir, absolutely.

12          THE COURT:  To be free of detention as a non

13  citizen.

14          THE WITNESS:  Repeat that again, sir I'm sorry.

15          THE COURT:  Did you believe that you were being

16  denied the right to be free of detention as if you were-- free

17  of detention as a citizen.

18          THE WITNESS:  Yes, sir.

19          THE COURT:  So you believed you had a right to be

20  released.

21          THE WITNESS:  Yes, sir.

22          THE COURT:  At every moment while you were detained?

23          THE WITNESS:  Well, I would say this, sir, that when

24  I was being denied-- when the Judge Reid from Buffalo

25  Detention Facility denied my case, and ordered me removed, I

- Proceedings -                                       75

1   started having little doubts, but I still trying to have faith

2   because I read the law.  And you know, the words, shouldn't be

3   changed around.  It should be dealt according to what it says.

4   So, I just had faith and trying to prove my case.

5           When I was released from the facility in Etowah

6   County, I was given information about-- I wasn't given no

7   information.  Nor did any lawyer know where I was, until late,

8   when he did reach out to call a family member.  My lawyers

9   weren't told where I was.

10          I was confused-- then it took two years for them to

11  issue a citizenship certificate.  I could not work, I was

12  depressed.  I started doing drugs.

13          My grandfather died and that got me depressed, I was

14  not able to go to his funeral.  I became homeless and I

15  suffered a lot.

16          To this day, right now, I'm in a Christian, a

17  Christian drug program called Anchor House, because for all

18  those years, I have been so depressed and I turned to drugs

19  which have destroyed my life.  I'm in this program now and I'm

20  in school and I'm doing a little better.  I'm getting the help

21  I need and assistance through this program.

22          I didn't have no -- I wasn't sure until I won the

23  Second Circuit case, that I was indeed a citizen.  I had faith

24  that I was, but I started having doubts, Your Honor.

25          THE COURT:  Are you free of drugs today, while you

- Proceedings -                                    76

1    are testifying?

2            THE WITNESS:  Yes, sir.

3            THE COURT:  Is your mind clear?

4            THE WITNESS:  Yes, sir.

5            THE COURT:  Now, when did you receive the

6    certificate?

7            THE WITNESS:  I received the certificate, in the

8    year 2013.  I don't believe the exact date.

9            THE COURT:  At that point, were you clear that you

10   were a citizen.

11           THE WITNESS:  Yes, sir.

12           THE COURT:  Up to that point, as I understand it,

13   you were dubious about it, because of the Judge's advice to

14   you.

15           THE WITNESS:  Yes, sir.

16           THE COURT:  Why did you file this lawsuit, this

17   particular lawsuit?  How did you get to this attorney?

18           THE WITNESS:  Well, it was through the lawyers at

19   Gibson & Dunn.  I met with them briefly, one time, and we sat

20   down and they spoke about it because when I--

21           THE COURT:  How did you get to the attorney?

22           THE WITNESS:  Gibson & Dunn helped me.

23           THE COURT:  The original attorney?

24           THE WITNESS:  Right.

25           THE COURT:  When did you call them?

1          THE WITNESS:  Excuse me, sir?

2          THE COURT:  When did you call them, after you were

3     released?

4          THE WITNESS:  Well, they were assigned to me, I

5     believe April of 20-- Gibson, Dunn, April of 2011, I would

6     say, around there.

7              So I had relationship with them up until that point,

8     where I was released, I was still talking to them.  And you

9     know, based on the decision of my Second Circuit case, that

10    was the only time that I was absolutely certain now that I was

11    a United States citizen.

12             This is when we-- we never met before, prior to that

13    in person.  After that date, I went to their office and we

14    spoke.

15             So, basically, based off my-- the ruling of the

16    Court, that I was indeed a United States citizen, that is when

17    I was certain, and that is when the conversation came about as

18    far as any type of damages claim.

19         THE COURT:  So you received this certificate of

20    citizenship then on November 26, 2013?

21         THE WITNESS:  Yes, sir.

22         THE COURT:  And was it after that that you decided

23    to sue?

24         THE WITNESS:  Yes, sir.

25         THE COURT:  When did you decide to sue after that?

- Proceedings -                                      78

1          THE WITNESS:  I don't remember the exact date, but

2    the moment when I met Jeff Solomon, partner of Gibson & Dunn

3    at his office, off Grand Central.

4          THE COURT:  But you're sure that was after

5    November 26th, 2013, that you were informed that you had a

6    right --

7          THE WITNESS:  Yes, sir.

8          THE COURT:  -- to sue?

9          When did you decide to sue?

10          THE WITNESS:  Well, when I mentioned to them, I

11    was-- they contacted some other lawyers, which was Heartland

12    Alliance and I guess they were in control from there, sir.

13          THE COURT:  Well, do you remember when you were told

14    you had a right to sue?

15          THE WITNESS:  At that conversation, that I had with

16    Jeff Solomon of Gibson & Dunn, the date I went to see him.  I

17    don't remember the exact date.  It was absolutely after I

18    received my citizenship, sir.

19          THE COURT:  The docket sheet in the Court shows that

20    you filed your complaint.

21          MR. FLESSNER:  October 31st of 2014.

22          THE COURT:  On October 31st of 2014.  Docket entry

23    one; is that correct?

24          THE WITNESS:  Yes, sir.

25          THE COURT:  How soon before that, were you informed

1    that you had a right to sue?

2            THE WITNESS:  I would say, a few months, sir.

3            THE COURT:  About how long?

4            THE WITNESS:  A few months.

5            THE COURT:  Just a few months?

6            THE WITNESS:  Yes, sir.

7            THE COURT:  No more than two?

8            THE WITNESS:  No, sir.

9            THE COURT:  Two?

10           THE WITNESS:  About two or three months, tops, I

11   would say, sir.

12           THE COURT:  So you were informed of your right to

13   sue, you say by July 31, 2014?

14           THE WITNESS:  Yes, sir.

15           THE COURT:  Would that be a close approximation of

16   when you were informed?

17           THE WITNESS:  Yes, sir.

18           THE COURT:  Were you then under drugs?

19           THE WITNESS:  When I was informed, sir?

20           THE COURT:  When you were informed?

21           THE WITNESS:  Yes, sir.

22           THE COURT:  You were-- that was part of that drug

23   period of your life?

24           THE WITNESS:  Yes, sir.

25           THE COURT:  How soon after you were released, did

- Proceedings -                    80

1   you go on drugs?

2            THE WITNESS:  I would say maybe, within a month,

3   sir.

4            THE COURT:  You received in your hands the

5   certificate, again, give me the date.

6            THE WITNESS:  It was around April 2013.

7            MR. FLESSNER:  Your Honor, can I interject?

8            THE COURT:  Yes.

9            MR. FLESSNER:  He received the certificate of

10  citizenship in November 26th, 2013.

11           THE COURT:  The year?

12           MR. FLESSNER:  2013.

13           THE COURT:  Is that stipulated?

14           MR. MARUTOLLO:  That is stipulated, Your Honor.

15           THE COURT:  You received the certificate,

16  November 22nd, 2013?

17           MR. FLESSNER:  The 26th.

18           THE COURT:  The 26th, I'm sorry.  You were informed

19  of your right to sue on or about July 31, 2014, correct?

20           THE WITNESS:  Yes, sir.

21           THE COURT:  You actually began the suit on

22  November 31, 2014.

23           MR. FLESSNER:  October 31st, Judge.

24           THE COURT:  October, I'm sorry.  10/31.

25  October 31st?

- Proceedings -                        81

1          THE WITNESS:  Yes, sir.

2          THE COURT:  All right.  Do you want to ask any

3     further questions?

4          MR. MARUTOLLO:  Your Honor, may I respond to clarify

5     a few things.

6              First, as we-- as plaintiff previously testified

7     today, and throughout his removal proceedings, both in written

8     briefs and at his deposition, plaintiff always believed that

9     he was a citizen.  He always understood he was a citizen.

10             Ultimately, the federal law here is that this

11    accrual date, is a date that the plaintiff knows or has reason

12    to know the constitutional injury against-- the receipt of

13    certificate is not relevant to the accrual of his claim

14    because he had reason to know, when he was detained by ICE, in

15    legal detention, that his claim, that he was being unlawfully

16    detained because he believed he was a citizen.

17             Further, the plaintiff's ignorance of the law, and

18    lack of education, are not sufficient ground to warrant

19    equitable tolling and we cited to Smith v McGinnis case from

20    the Second Circuit in our brief, as well as Lizaide v

21    Kirkpatrick, an Eastern District case, along with an

22    assortment of other cases, in which mere ignorance of the law,

23    even where the inmate is pro se, even where in one case, we

24    cited to, where the inmate cannot speak English, is not

25    sufficient grounds to warrant equitable tolling.

- Proceedings -                                    82

1          The plaintiff's use of drugs, is not a factor

2   regarding accrual, is not a factor regarding accrual of the

3   claim.  It is not relevant to the factors of whether or not he

4   was pursuing his claims diligently or whether equitable

5   tolling applied.

6          Just because the plaintiff is now in self serving

7   testimony indicating that he was unsure about his citizenship

8   until he got the certificate, does not change the fact that on

9   May 8th, 2008, he knew he was a citizen.  And he is claiming

10  he was wrongfully detained, and the date of accrual here

11  commenced on May 8th, 2008.

12         THE COURT:  Now, you have a number of witnesses from

13  the place of detention?

14         MR. MARUTOLLO:  That's correct.

15         THE COURT:  You can put them on.  I think it should

16  be stipulated that there was a substantial library available

17  during those hours that we now have evidence of.

18         What else would you like a stipulation to?

19         MR. MARUTOLLO:  That there were no extraordinary

20  circumstances standing in the plaintiff's way, of obtaining

21  any information.

22         I mean the witnesses will be testifying consistent

23  with the deposition testimony frankly, that there were

24  LexisNexis resource, books available, the Internet searches.

25  You know, so again, they would also testify further about the

RW Barry     OCR

- Proceedings -                                      83

1   fact that the facility is a model for other facilities.

2          So we would request a stipulation that, one, that

3   there are no extraordinary circumstances standing in the

4   plaintiff's way.

5          MR. FLESSNER:  I won't stipulate to that.  I will

6   stipulate there was LexisNexis, they had these books.

7          I will also add that there was a DHS audit of the

8   facility in '09, in which the law library was found to be

9   inadequate.  I was going to-- and they failed to comply with

10  the recommendations to correct that.  I was going to cross

11  examine them on that.

12         THE COURT:  What way was it inadequate?

13         MR. FLESSNER:  I will pull out the report here.

14         October 27th through 28th of 2009, the Office of

15  Detention Oversight had an inspection, and with respect to the

16  access to legal material, the office found that there-- access

17  to legal materials during the initial ODO inspection, two

18  deficiencies were identified in this area, during the follow

19  up inspection the following deficiencies which was found were

20  not corrected.

21         The deficiency was, there wasn't adequate hours, not

22  adequate procedure for-- the law library was available-- not

23  available for use, scheduled hours were not accessible.  The

24  procedure for accessing.

25         I can-- I was going to use this in cross

- Proceedings -                          84

1    examination.

2              THE COURT:  I will put it in evidence.

3              MR. FLESSNER:  Put it in evidence and submit it.

4              THE COURT:  Court Exhibit 2.

5              MR. FLESSNER:  I can get a copy.

6              MR. MARUTOLLO:  We have never received this

7    document.

8              THE COURT:  Put it in as Court Exhibit 2.

9              (So marked.)

10             THE COURT:  I am prepared to find that the library

11   facilities for his person would be insufficient to provide

12   information sufficient.

13             MR. MARUTOLLO:  Your Honor, we would--

14             THE COURT:  Sufficient to permit a person in custody

15   to understand the --

16             MS. MATTHEWS:  Can we get clarification, the library

17   was sufficient; is that correct, Judge?

18             THE COURT:  For a person of skill and understanding,

19   to appreciate that he had a right to sue for false arrest.

20             That should suffice for you, shouldn't it?  Do you

21   want anything else?

22             MR. MARUTOLLO:  Well, Your Honor, just going back to

23   the extraordinary circumstances stipulation, we would argue

24   that the --

25             MR. FLESSNER:  That was not stipulated to.

- Proceedings -                               85

1          MR. MARUTOLLO:  I am trying to address it.

2          THE COURT:  What do you want?

3          MR. MARUTOLLO:  We would like clarification, from--

4   because the plaintiff did not present--

5          THE COURT:  What do you want, state it.

6          MR. MARUTOLLO:  We want the stipulation that there

7   were no extraordinary circumstances.

8          THE COURT:  Extraordinary circumstances is not a

9   stipulation, it is a conclusion.  Its the facts you want

10  stipulated to.

11         MR. MARUTOLLO:  So, Your Honor, we would ask for

12  stipulation, other than the plaintiff's lack of knowledge,

13  about filing an administrative claim, there were no

14  circumstances that the library that prevented his ability to

15  file such a claim.

16         THE COURT:  No, that I don't think is appropriate.

17         If you want to put on all your witnesses, I will

18  allow you to do so.

19         A stipulation that there was a library there, with

20  information adequate and other facilities, Nexis and Lexis,

21  adequate for a person of skill and understanding, to determine

22  with reasonable diligence that he could file a suit against

23  the Government for unlawful arrest and imprisonment.

24         Can you read that back.

25         (Read back by the Reporter.)

- Proceedings -                            86

1          MR. MARUTOLLO:  Your Honor, we would ask for this

2    additional stipulation, other than the plaintiff's lack of

3    knowledge, he has identified no circumstances that prevented

4    him from filing suit.

5          THE COURT:  I'm not going to require that

6    stipulation, because I have a person with limited education,

7    in a state of depression and with limited knowledge of his

8    rights, who has been informed by a Judge that he is not a

9    citizen.  So, I can't accept that, and expect the plaintiff to

10   make that stipulation, that you are now asking for.

11         So if you want to put on all your witnesses, put

12   them on, but I don't think it is necessary.

13         MR. MARUTOLLO:  We would ask if the plaintiff can

14   answer, when he was treated for depression, that is something

15   that has not come up yet.

16         THE COURT:  Were you treated for deposition while

17   you were in custody?

18         THE WITNESS:  No, sir.

19         THE COURT:  Did you see the medical facility

20   personnel?

21         MR. FLESSNER:  I think his treatment is post

22   release.  He can explain.

23         THE COURT:  Excuse me, I will ask the questions.

24         Did you see anyone in the facility, in the medical

25   area with respect to complaints about your depression?

- Proceedings -                                    87

1          THE WITNESS:  No, sir.

2          THE COURT:  Do you want to ask questions, you can.

3    That is what we have.

4          We have a person of limited education, in a

5    depression, confused about what his rights are, told by a

6    Judge that he doesn't-- he isn't a citizen.  Thinking he is a

7    citizen, and confused.

8          That is the situation as I see it.

9          MR. MARUTOLLO:  We would just argue that since he

10   knew that he was a citizen, and since--

11         THE COURT:  He believed he was a citizen.  A Judge

12   told him he was not.  So he was in a state of confusion.

13         MR. MARUTOLLO:  But Your Honor, we would argue that

14   is what Kronous versus United States submits.

15         THE COURT:  I understand your submission.  You are

16   saying that is not enough.

17         MR. MARUTOLLO:  Right.  He has reason to know.

18         THE COURT:  If you want to take that stipulation as

19   we have now laid it out, we can go forward without your

20   witnesses.  If you want your witnesses, I will listen to them

21   all day.  I'm sure they are delightful people coming from

22   Buffalo to New York City.

23         MR. MARUTOLLO:  Your Honor, may we have a short

24   five-minute recess to talk.

25         MS. MATTHEWS:  Thank you, Your Honor.

- Proceedings -                    88

1          (Recess taken.)

2          MS. MATTHEWS:  Thank you, Your Honor.

3          MR. MARUTOLLO:  Your Honor, my apologies for the

4     delay.

5          We would accept the stipulation, but we would ask

6     that items in our exhibit list, I can go through them, be

7     admitted into evidence --

8          THE COURT:  All right.

9          MR. MARUTOLLO:  -- then in lieu of any live

10    testimony, from the witnesses.

11         THE COURT:  The witnesses are here prepared to

12    testify.

13         MS. MATTHEWS:  Those are AUSAs, but the witnesses

14    are in the hallway.

15         THE COURT:  They are here.

16         Put in whatever you want.

17         MR. FLESSNER:  There was a document filed explaining

18    the objections to exhibits.  They had objections to ours and

19    we had objections to theirs.

20         MR. MARUTOLLO:  We want to put in, Your Honor, in

21    our exhibit binder, which I provided to Your Honor, Exhibit A,

22    which is the Jailhouse Lawyer Manual.

23         THE COURT:  The Columbia Human Rights Law Review.  I

24    suggested that, that they put that manual together many years

25    ago.

- Proceedings -                    89

1        MR. MARUTOLLO:  It is excellent.

2        THE COURT:  I was a teacher there.

3        MR. MARUTOLLO:  Also Exhibit B, which is a separate

4   chapter dealing with tort claims.

5        THE COURT:  Granted.

6        MR. MARUTOLLO:  Exhibit C, is legal reference

7   materials, for detention facility.

8        THE COURT:  Granted.

9        MR. MARUTOLLO:  Exhibit D, is the excerpt from the

10  Buffalo Federal Detention Facility.

11       THE COURT:  Granted.

12       MR. MARUTOLLO:  Exhibit E is the excerpt of the

13  document that was used in 2007, so this-- the text of this

14  document is part of the Buffalo Detention Handbook, the

15  previous exhibit, was also provided.  Substantively they are

16  the same.  We wanted to put both in.

17       MR. FLESSNER:  They was not at the facility in 2007.

18       THE COURT:  Granted.  I will assume it continued to

19  be used.

20       MS. MATTHEWS:  Yes.

21       MR. MARUTOLLO:  Exhibit F is the National Detention

22  Handbook.

23       THE COURT:  F?

24       MS. MATTHEWS:  F as in frank.

25       MR. MARUTOLLO:  Right.

- Proceedings -                                    90

1          THE COURT:  Okay.

2          MR. MARUTOLLO:  So Exhibit F, we ask to go into

3    evidence.  Excerpt from the National Detainee Handbook.

4          THE COURT:  Okay, admitted.

5          MR. MARUTOLLO:  Exhibit G is the quick reference

6    guide for LexisNexis that we were seeking to enter into

7    evidence, that is available to detainees at the facility.

8          THE COURT:  Granted.

9          MR. MARUTOLLO:  Exhibit H is a certificate of

10   accreditation from American Correctional Association,

11   indicating that the Buffalo facility was fully accredited from

12   2008 to 2011, the years the plaintiff was in custody.

13         THE COURT:  Granted.

14         MR. MARUTOLLO:  Exhibit I, is a-- Exhibit I through

15   Exhibit L, are all exhibits that are readily available on

16   discs or on the computer at the Buffalo Detention Center.

17         THE COURT:  Granted.

18         MR. MARUTOLLO:  So Exhibits I, J, K, L.

19         (So marked.)

20         MR. MARUTOLLO:  Exhibit M, is plaintiff's phone log

21   from his detention.

22         THE COURT:  Granted.

23         MR. MARUTOLLO:  Exhibit N is already in evidence.

24         Exhibit O, is plaintiff's detention history that

25   actually provides the precise number days, he was at different

- Proceedings -                                        91

1   facilities.

2            THE COURT:  Granted.

3            MR. MARUTOLLO:  Exhibit P is the plaintiff's

4   retention letter, there was no objection to that, Your Honor.

5            THE COURT:  Granted.

6            MR. MARUTOLLO:  Exhibit Q, is a listing of free

7   legal services and a disclaimer that is available to detainees

8   in Buffalo.

9            THE COURT:  Granted.

10           MR. MARUTOLLO:  Exhibit R is a screen shot of the

11  detainee computer desktop at the Buffalo Federal Detention

12  Facility.

13           THE COURT:  Granted.

14           MR. FLESSNER:  Objection.  This was not available

15  from '08 to 2011.

16           THE COURT:  Then that is not of any significance.

17  Go ahead.

18           MR. MARUTOLLO:  Well, Your Honor, I think this

19  actually is significant.

20           THE COURT:  Bring in the witness, if you are going

21  to oppose it.

22           MR. FLESSNER:  Go ahead.

23           THE COURT:  It is in then.

24           (So marked.)

25           MR. MARUTOLLO:  Exhibit S is a screen shot of

RW Barry    OCR

- Proceedings -                                    92

1   documents containing a legal form short cut, that has an SF-95

2   sub-folder in it.

3            THE COURT:  Granted.

4            MR. MARUTOLLO:  Exhibit T is SF-95 available on the

5   desktop and discs, during the plaintiff's detention.

6            THE COURT:  Granted.

7            MR. MARUTOLLO:  Exhibit U is a screen shot of

8   selective topics on the LexisNexis program that were available

9   to detainees.

10           THE COURT:  Granted.

11           MR. MARUTOLLO:  Exhibit V is a printout of materials

12  on LexisNexis concerning constitutional rights to prisoners

13  including FTCA claims.

14           THE COURT:  Granted.

15           MR. MARUTOLLO:  Exhibit W is another printout of

16  materials available to detainees on the Lexis program that

17  also has FTCA information in it.

18           THE COURT:  Granted.

19           Do you rest?

20           MR. MARUTOLLO:  Yes, Your Honor.

21           THE COURT:  Do you rest?

22           MR. FLESSNER:  I would just move to admit our

23  exhibits as well.

24           THE COURT:  Okay.

25           MR. FLESSNER:  I can read through them or it is A

- Proceedings -                                    93

1   through BB.

2         THE COURT:  Do you object to any of them?

3         MR. MARUTOLLO:  Yes, we do.

4         THE COURT:  Which ones?

5         MR. MARUTOLLO:  We object to-- pursuant to the

6   filing, we object to a number of these exhibits.

7         THE COURT:  Which ones?

8         MR. MARUTOLLO:  Exhibit A.

9         THE COURT:  A?

10        MR. MARUTOLLO:  A as in Adam.

11        MR. FLESSNER:  The transcript of the removal

12   proceedings.

13        THE COURT:  Overruled.  Admitted.  What else?

14        MR. MARUTOLLO:  We object to Exhibit B which is the

15   decision of the immigration appeals.  We argued that again.

16        THE COURT:  Overruled.  It is admitted.

17        D is marked 7/14/08.  It is right in the middle.

18        MR. MARUTOLLO:  Your Honor, we object to Exhibit D.

19        THE COURT:  Exhibit what?

20        MR. MARUTOLLO:  D is in David.

21        THE COURT:  No, that is admitted.  It is a statement

22   by Watson.  Contemporaneous to show it is state of mind.

23        MR. MARUTOLLO:  Your Honor, the major objections are

24   Exhibit T.

25        THE COURT:  Let's get to T.

- Proceedings -                    94

1          MR. MARUTOLLO:  That is the entirety of the

2    plaintiff's deposition transcript.

3          THE COURT:  We will keep it out except as it is used.

4          MS. MATTHEWS:  That is fine.

5          MR. MARUTOLLO:  Your Honor, we would also object

6    definitely to-- I'm sorry, withdrawn.  I don't think we have

7    any other objections.

8          THE COURT:  Okay.  That is it.

9          Anything else you want to put in?

10         MR. MARUTOLLO:  No, Your Honor.

11         MR. FLESSNER:  So I'm clear everything is admitted

12   except T, was that your ruling?

13         THE COURT:  Except for the deposition and the

14   deposition was in, insofar as it was used, and being quoted

15   from.

16         MR. FLESSNER:  Thank you, nothing further from us.

17         THE COURT:  Do you rest?

18         MR. MARUTOLLO:  Yes, Your Honor.

19         THE COURT:  All right.  I'm going to find that the

20   statute began to run when he received the certificate on

21   November 26th, 2013.  That if that is not the statute, that

22   equitable tolling ran until he was informed of the right to

23   sue on July 31, 2014.

24         So there was tolling, equitable tolling until

25   July 31, 2014.  Therefore the suit is timely, and an opinion

- Proceedings -                                    95

1  will obviously have to follow and I will issue it, but I

2  wanted to move the case.

3          Now, when will you be prepared to try the case?

4          MR. FLESSNER:  Well, Your Honor, we were actually

5  talking about this earlier.  With respect to liability, there

6  really is very little.

7          THE COURT:  Make that a docket entry.

8          MR. FLESSNER:  I'm sorry, with respect to liability

9  there is really very little discovery that needs to be done.

10 We have obtained most of the Government's file through FOIA

11 and obviously Mr. Watson has no documents.

12         I think it is-- if we bifurcate the damages from the

13 liability, because I think damages, we are going to need

14 expert witnesses and need medical records. If we were going to

15 just try this case on liability, I think this case can be

16 tried in October.

17         THE COURT:  Is that true?  Do you want to bifurcate

18 it?

19         MR. MARUTOLLO:  Well, Your Honor, first we would

20 just note, I realize a decision is still pending, we still

21 have two issues that we had moved on with respect to the

22 plaintiff's FTCA claims, that there were no private analog for

23 his negligence or malicious prosecution claim and that

24 assuming that the-- you know, that the claims are timely, the

25 only remaining claim is for false arrest.  Malicious

1    prosecution claim and negligence claims out.

2         Having said that, we also in the motion moved for

3    summary judgment, you know, on all of plaintiffs's claims.

4    Even if they are timely, we still thought on the merits that

5    the plaintiff's FTCA claims would be-- should be dismissed.

6         THE COURT:  Well, I will reserve until I hear the

7    evidence on that issue.  I will try it and reserve.

8         MR. MARUTOLLO:  Right.  I think Your Honor, there is

9    the probable cause is undisputed.  The argument made-- we have

10   already set forth the argument pertaining to the probable

11   cause that existed for the false arrest and the malicious

12   prosecution.

13        So again, on the merits, we would think that you

14   know, as a matter of law, without a trial this case should be

15   dismissed.

16        THE COURT:  I will reserve on those until I hear the

17   evidence on liability.

18        MR. MARUTOLLO:  Then, given that, Your Honor, we

19   would then ask for bifurcation of the liability and damages

20   portions.

21        THE COURT:  Granted, both sides wish it.

22        Why can't it go forward before October?

23        MR. FLESSNER:  I was just thinking, maybe if we can

24   schedule it before.

25        THE COURT:  It seems to me it is a September case.

- Proceedings -                                    97

1          MR. MARUTOLLO:  The one caveat, I might add to the

2    extent we need witnesses from Buffalo, I'm not sure

3    necessarily of their availability in September.

4          THE COURT:  It is a non jury, so we can take them by

5    phone or we can take them with continuances.

6          MR. FLESSNER:  I am looking at the week of the 21st.

7          THE COURT:  Of what?

8          MR. MARUTOLLO:  September 21st, I can certainly be

9    here.

10          THE COURT:  Is that a viable date?

11          That's not good.

12          MR. FLESSNER:  I can juggle things to do the

13    following week as well, the week of the 28th.

14          THE COURT:  That is okay.

15          MR. MARUTOLLO:  Yes, Your Honor, that is fine by me

16    as well.

17          THE COURT:  The 28th.

18          So, try to get to me at least three or four days

19    before the trial date, working business days, with a list of

20    all your witnesses, what they are going to say, a list of all

21    your documents, preferably, conceded that they will be

22    admissible or objecting as the case maybe.  Marked and

23    exchanged.

24          And, proposed findings of fact and law and briefs,

25    supporting those proposed findings of fact and law.

- Proceedings -                    98

1          MS. MATTHEWS:  What is the date that the proposed
2    findings of fact and law are due, Judge?
3          THE COURT:  About four days before-- four days
4    before.
5          MR. MARUTOLLO:  September 23rd, Your Honor?
6          THE COURT:  Yes.  Is that right?
7          COURTROOM DEPUTY:  Yes.
8          MR. FLESSNER:  9/23.
9          THE COURT:  Yes, I want a few days to go through
10   them, the briefs and everything.
11         So you can work out your own briefing schedule, if
12   you can't the Magistrate Judge will do it.
13         MR. MARUTOLLO:  Sorry, for clarification, the
14   proposed findings of fact and conclusions of law are due
15   September 23rd, but the briefs are due prior to
16   September 23rd.
17         THE COURT:  No, that is fine.
18         MR. FLESSNER:  The witness list and everything is
19   due the 23rd?
20         THE COURT:  Yes.
21         MR. FLESSNER:  Your Honor, one other thing.
22         THE COURT:  Any other rulings that you want at this
23   point?
24         MR. MARUTOLLO:  No, Your Honor.
25         MR. FLESSNER:  The N-600 application, I have the

- Proceedings -                99

1   ruling on the N-600 application in my exhibits.  I don't have

2   the actual application, if you want me to supply it to the Court.

3           THE COURT:  You can send it in.  I will take it you

4   will rely on that at the trial so it will be part of the trial

5   materials.

6           Anything we have now, you don't have to duplicate

7   just indicate it on your list of documents.

8           MR. MARUTOLLO:  Your Honor, just again for

9   clarification sake, the only claims now that will be addressed

10  at this trial on liability on September 28th, will be the

11  plaintiff's FTCA false arrest, negligence and malicious

12  prosecution claims, right?

13          THE COURT:  Yes.

14          Well, false arrest.

15          MR. MARUTOLLO:  I should say, false imprisonment.

16          THE COURT:  False imprisonment.  I really don't

17  see-- malicious prosecution for these people.  It seems to me

18  it is a false arrest, a false imprisonment, negligence with

19  respect to that, but not malicious prosecution. I don't see

20  any point going forward with malicious prosecution.

21          MR. FLESSNER:  Malicious prosecution, that was

22  putting him in removal proceedings and prosecuting him even up

23  to two years after he was released from detention.  After he

24  was even released, and they internally determined, they

25  continued to prosecute him in removal proceedings, not

- Proceedings -                    100

1   allowing him to have papers and work for two more years.  That

2   is the malicious prosecution claim.

3           THE COURT:  I see.

4           MR. FLESSNER:  So there are two years after.

5           THE COURT:  I think that those claims for two years

6   beyond, could come in as part of his false imprisonment on the

7   theory that when you can't work freely, you are still being

8   detained.  You are not free.

9           But if you want to argue malicious prosecution, I

10  will hear it.  Malicious prosecution, gets a little more

11  complicated.  But I think arguably, a person is not free just

12  as when he is not free on the supervised release, because he

13  is limited.  He is not free if he can't work.  A person who

14  can't work is not free, right?  I mean that is the theory.

15          MR. FLESSNER:  I think the evidence will show that

16  and we will demonstrate, they should have dismissed his

17  removal proceedings as soon as they released him.

18          THE COURT:  When they released him.

19          MR. FLESSNER:  Correct.

20          THE COURT:  All right.  And that-- so the malicious

21  prosecution would begin from that point.

22          MR. FLESSNER:  I guess that is right.  Once they

23  made their determination.

24          THE COURT:  So, it is false imprisonment, false

25  arrest from the time he is picked up until he is released, and

- Proceedings -                                    101

1  malicious prosecution from that time until his case is

2  dismissed, right?

3          MR. FLESSNER:  Right.  Well, no until-- no, you are

4  right.  The negligence would include the time in which he

5  didn't get his certificate.

6          THE COURT:  Right.  So that is the way you will

7  brief it.

8          MR. FLESSNER:  Correct.

9          THE COURT:  We will try to get out a little

10  memorandum and order for you.

11          Anything else you wish done at this time?

12          MS. MATTHEWS:  No.

13          MR. MARUTOLLO:  No, Your Honor.

14          MR. FLESSNER:  Thank you very much, Your Honor.

15          THE COURT:  Thank you very much for your help.

16          (Matter concluded.)

17              - - o o O o o - -

18  I CERTIFY that the foregoing
    is a correct transcript from
19  the record of proceedings
    in the above entitled matter.

20
    s/Richard W. Barry
21  _____

22  Richard W. Barry, RPR

23

24

25

## <u>INDEX</u>

<u>WITNESS:</u>                                                        <u>PAGE:</u>

                    DAVINO WATSON                              2
                         DIRECT EXAMINATION BY MR. FLESSNER    19
                         CROSS EXAMINATION BY MR. MARUTOLLO    43
                         REDIRECT EXAMINATION BY MR. FLESSNER  72

                              * * * * *


Court Exhibit 1                                              48
Court Exhibit 2                                              84
Exhibit V                                                   33
Exhibit W                                                   33
Exhibit N                                                   56
Exhibit A                                                   93
Exhibit B                                                   93
Exhibit D                                                   93
Exhibit A                                                   88
Exhibit B                                                   89
Exhibit C                                                   89
Exhibit D                                                   89
Exhibit E                                                   89
Exhibit F                                                   89
Exhibit G                                                   90
Exhibit H                                                   90
Exhibits I, J, K, L.                                        90
Exhibit M                                                   90
Exhibit O                                                   90
Exhibit P                                                   91
Exhibit Q                                                   91
Exhibit R                                                   91
Exhibit S                                                   91
Exhibit T                                                   92
Exhibit U                                                   92
Exhibit V                                                   92

                              * * * * *

1

'08 [1] - 91:15
'09 [1] - 83:8

**1**

1 [2] - 48:18, 102:7
1,023 [2] - 16:8, 16:10
1-8 [1] - 1:9
10/31 [1] - 80:24
10019 [1] - 1:18
10th [5] - 45:15, 45:21, 46:11, 55:19, 55:20
11 [2] - 56:18, 60:11
11201 [1] - 1:21
11th [1] - 20:4
133 [1] - 60:10
138 [1] - 61:6
14-CV-6459 [1] - 1:4
147 [1] - 54:1
1503 [1] - 3:21
17 [2] - 54:2, 61:6
17th [2] - 19:12, 19:15
18 [1] - 36:22
18th [2] - 49:17, 50:4
19 [2] - 48:20, 102:4
190-A [1] - 61:10
191 [1] - 61:10

**2**

2 [4] - 84:4, 84:8, 102:3, 102:8
20 [4] - 1:8, 17:24, 77:5
2002 [2] - 19:12, 19:15
2004 [2] - 49:4, 49:10
2005 [1] - 49:9
2006 [1] - 49:13
2007 [4] - 49:17, 50:4, 89:13, 89:17
2008 [25] - 14:22, 14:24, 15:1, 21:21, 23:24, 44:2, 44:6, 44:9, 44:12, 44:14, 44:17, 44:22, 45:3, 47:6, 47:9, 47:17, 48:24, 50:19, 50:23, 52:6, 72:16, 82:9, 82:11, 90:12
2009 [3] - 32:20, 45:12, 83:14
2011 [11] - 17:21, 32:13, 42:3, 42:4, 52:11, 65:17, 68:3, 69:15, 77:5, 90:12, 91:15
2013 [16] - 20:5, 20:25, 21:2, 21:4, 71:21, 72:5, 72:8, 72:12, 76:8, 77:20, 78:5, 80:6, 80:10, 80:12, 80:16, 94:21
2014 [9] - 71:12, 71:21, 78:21, 78:22, 79:13, 80:19, 80:22, 94:23, 94:25
2015 [4] - 1:8, 45:21, 46:11, 48:3
21 [1] - 67:1
21st [2] - 97:6, 97:8
22nd [2] - 49:13, 80:16
23rd [9] - 45:3, 48:2, 49:4, 50:23, 52:6, 98:5, 98:15, 98:16, 98:19
24 [6] - 23:13, 23:14, 47:20, 48:20, 61:6, 67:1
24th [1] - 52:11

25th [2] - 23:24, 45:12
26 [1] - 77:20
2676 [1] - 9:9
26th [8] - 32:13, 49:8, 78:5, 80:10, 80:17, 80:18, 94:21
271 [1] - 1:21
27th [1] - 83:14
28 [1] - 9:9
28th [4] - 83:14, 97:13, 97:17, 99:10
29th [3] - 11:1, 11:3
2nd [2] - 42:4, 68:3

**3**

30 [1] - 49:9
30th [3] - 72:4, 72:8, 72:12
31 [6] - 1:17, 79:13, 80:19, 80:22, 94:23, 94:25
31st [4] - 78:21, 78:22, 80:23, 80:25
320 [1] - 45:6
33 [2] - 102:8, 102:9

**4**

43 [1] - 102:4
48 [1] - 102:7

**5**

52nd [1] - 1:17
56 [1] - 102:9
5th [1] - 32:20

**6**

650 [1] - 34:9

**7**

7/14/08 [1] - 93:17
72 [1] - 102:5
735 [1] - 5:6

**8**

8 [1] - 3:21
84 [5] - 66:24, 66:25, 67:1, 67:17, 102:8
88 [1] - 102:11
89 [5] - 102:12, 102:12, 102:13, 102:14
8th [21] - 14:22, 14:24, 15:1, 21:21, 22:3, 44:2, 44:6, 44:9, 44:12, 44:14, 44:17, 44:22, 47:6, 47:9, 47:17, 48:24, 50:19, 50:23, 72:16, 82:9, 82:11

**9**

9 [1] - 60:11
9/23 [1] - 98:8
90 [5] - 102:14, 102:15, 102:15, 102:16, 102:16
91 [4] - 102:17, 102:17, 102:18, 102:18
92 [3] - 102:19, 102:19, 102:20
93 [3] - 102:10, 102:10, 102:11

95 [2] - 15:12, 72:4
96 [1] - 15:22

**A**

ability [6] - 16:17, 17:1, 25:8, 41:23, 56:2, 85:14
able [15] - 4:3, 5:7, 16:18, 21:16, 25:21, 35:23, 36:1, 36:23, 38:8, 39:10, 39:19, 41:14, 41:18, 46:4, 75:14
absolutely [5] - 39:21, 63:2, 74:11, 77:10, 78:17
accept [2] - 86:9, 88:5
access [25] - 3:18, 4:1, 4:17, 4:18, 16:24, 17:1, 17:11, 24:22, 31:6, 35:23, 36:1, 51:25, 52:3, 53:2, 53:19, 54:24, 55:4, 57:14, 58:5, 58:6, 58:12, 61:13, 68:6, 83:16
accessed [1] - 17:10
accessible [1] - 83:23
accessing [1] - 83:24
according [16] - 44:17, 45:25, 46:11, 47:9, 47:17, 58:25, 59:4, 59:11, 59:12, 59:16, 61:18, 62:9, 62:14, 70:15, 72:7, 75:3
accordingly [1] - 18:22
accreditation [1] - 90:10
accredited [2] - 15:23, 90:11
accrual [6] - 73:24, 81:11, 81:13, 82:2, 82:10
accrued [1] - 14:25
act [2] - 4:23, 45:6
Act [8] - 5:22, 7:19, 8:21, 13:3, 13:8, 13:9, 14:9, 27:18
acting [2] - 63:16, 63:23
action [9] - 3:11, 4:8, 7:11, 8:8, 8:10, 9:18, 13:21, 13:22, 13:23
actions [1] - 37:8
actual [1] - 99:2
Adam [1] - 93:10
add [3] - 14:11, 83:7, 97:1
addition [1] - 71:8
additional [5] - 35:9, 35:13, 45:5, 49:14, 86:2
address [1] - 85:1
addressed [2] - 17:2, 99:9
adequate [4] - 83:21, 83:22, 85:20, 85:21
administrative [38] - 4:7, 15:18, 16:17, 18:5, 18:8, 18:15, 18:21, 25:6, 51:1, 51:6, 51:9, 58:12, 62:13, 62:15, 62:25, 63:5, 63:17, 63:23, 64:5, 64:6, 64:16, 64:23, 65:4, 65:20, 65:24, 66:13, 66:19, 67:5, 67:21, 69:7, 70:16, 71:1, 71:5, 71:17, 71:20, 71:24, 72:3, 85:13
admissible [1] - 97:22
admit [2] - 62:20, 92:22
admits [1] - 17:12
admitted [6] - 88:7, 90:4, 93:13, 93:16, 93:21, 94:11
advantage [4] - 7:8, 7:10, 16:21, 17:1

**advantages** [1] - 7:22
**advice** [6] - 30:7, 38:17, 38:19, 43:12, 70:12, 76:13
**affected** [1] - 25:2
**affirmed** [1] - 29:6
**afford** [1] - 27:1
**agency** [1] - 51:2
**agent** [1] - 38:24
**agents** [14] - 8:2, 12:5, 12:8, 23:2, 23:5, 24:8, 30:23, 38:16, 38:23, 43:12, 44:7, 44:9, 44:11, 50:19
**agents'** [1] - 14:12
**ago** [1] - 88:25
**agree** [2] - 14:8, 29:9
**agreed** [2] - 32:9, 32:16
**ahead** [4] - 13:9, 13:10, 14:20, 59:25, 91:17, 91:22
**aided** [1] - 1:25
**ailments** [1] - 66:13
**Akim** [1] - 21:9
**al.** [1] - 2:3
**Alabama** [6] - 41:1, 42:18, 42:19, 65:14, 65:19, 65:23
**allege** [1] - 48:24
**alleged** [3] - 47:10, 47:18, 68:10
**Allegheny** [17] - 23:4, 23:16, 23:19, 24:23, 24:25, 25:20, 44:12, 46:4, 50:19, 50:22, 50:25, 51:8, 51:18, 51:22, 52:1, 52:4, 52:7
**Alliance** [1] - 78:12
**allow** [7] - 7:4, 13:21, 25:8, 30:14, 47:14, 50:1, 85:18
**allowed** [5] - 11:10, 11:13, 34:13, 34:16, 34:21
**allowing** [3] - 67:11, 67:14, 100:1
**alternative** [1] - 11:8
**American** [1] - 90:10
**analog** [2] - 11:5, 95:22
**Anchor** [1] - 75:17
**ANSWER** [8] - 49:1, 54:7, 54:10, 54:14, 60:15, 61:11, 61:14, 67:7
**answer** [32] - 47:15, 48:22, 49:2, 51:12, 51:14, 60:12, 60:16, 61:7, 61:15, 62:14, 63:8, 63:9, 63:10, 63:14, 63:19, 63:20, 64:11, 64:13, 64:19, 64:20, 64:21, 65:6, 65:8, 66:16, 66:22, 66:23, 67:2, 67:8, 69:3, 86:14
**answered** [2] - 63:15, 66:21
**answering** [1] - 48:9
**answers** [2] - 48:7, 54:2
**anyway** [1] - 14:3
**apart** [1] - 64:14
**apologies** [1] - 88:3
**apologize** [1] - 51:16
**appeal** [12] - 29:2, 29:11, 29:25, 31:20, 46:15, 46:24, 60:19, 60:21, 60:24, 61:4, 61:9, 61:17
**Appeals** [1] - 32:20
**appeals** [3] - 29:4, 29:9, 93:15
**appear** [1] - 28:8
**appearances** [1] - 2:4

**appeared** [2] - 50:15, 70:9
**application** [12] - 28:19, 46:12, 46:17, 46:20, 46:23, 46:25, 47:1, 47:4, 58:22, 98:25, 99:1, 99:2
**applied** [1] - 82:5
**apply** [1] - 28:22
**appoint** [1] - 31:11
**appointed** [1] - 33:1
**appreciate** [1] - 84:19
**approached** [1] - 42:8
**appropriate** [3] - 7:21, 14:13, 85:16
**approved** [1] - 25:12
**approves** [1] - 10:7
**approximation** [1] - 79:15
**April** [9] - 11:1, 11:3, 17:21, 32:13, 69:15, 77:5, 80:6
**area** [4] - 42:12, 43:1, 83:18, 86:25
**arguably** [1] - 100:11
**argue** [6] - 18:9, 55:12, 84:23, 87:9, 87:13, 100:9
**argued** [7] - 5:8, 5:9, 11:4, 11:7, 12:1, 12:2, 93:15
**argues** [1] - 17:7
**argument** [4] - 3:12, 35:19, 96:9, 96:10
**arrest** [10] - 23:7, 25:1, 84:19, 85:23, 95:25, 96:11, 99:11, 99:14, 99:18, 100:25
**arrival** [1] - 41:17
**assigned** [5] - 26:4, 26:12, 34:7, 40:3, 77:4
**assist** [3] - 3:21, 28:4, 31:19, 40:2, 40:5, 43:13
**assistance** [1] - 75:21
**Assistant** [1] - 2:10
**assisted** [1] - 30:6
**Association** [1] - 90:10
**assortment** [1] - 81:22
**assume** [2] - 33:23, 89:18
**assuming** [1] - 95:24
**assumption** [1] - 13:10
**attain** [1] - 27:12
**attained** [1] - 20:5
**attempt** [2] - 22:12, 22:15
**attempted** [3] - 49:5, 49:18, 50:5
**attend** [1] - 39:3
**attended** [1] - 20:4
**attention** [8] - 21:21, 48:17, 48:20, 54:1, 60:10, 61:5, 66:24, 67:16
**attorney** [10] - 26:22, 27:2, 27:5, 59:15, 70:16, 70:25, 71:20, 76:17, 76:21, 76:23
**Attorney** [2] - 2:10, 18:4
**attorneys** [26] - 4:1, 4:2, 4:18, 17:23, 18:1, 18:3, 27:8, 31:11, 31:14, 31:18, 41:11, 45:21, 58:1, 58:8, 69:10, 69:20, 70:1, 70:4, 70:7, 70:9, 70:12, 70:20, 71:9, 71:15, 72:1
**audit** [2] - 32:20, 83:7
**August** [6] - 1:8, 45:15, 45:21, 46:11, 55:19, 55:20
**aunt's** [1] - 68:3

**AUSAs** [1] - 88:13
**availability** [1] - 97:3
**available** [24] - 15:17, 16:4, 16:6, 16:16, 36:17, 52:23, 53:16, 54:5, 54:7, 54:18, 55:22, 57:13, 68:14, 82:16, 82:24, 83:22, 83:23, 90:7, 90:15, 91:7, 91:14, 92:4, 92:8, 92:16
**avenues** [1] - 15:17
**average** [2] - 35:3, 36:20
**aware** [4] - 4:10, 24:24, 34:10, 36:10
**awhile** [1] - 26:17
**awkward** [1] - 7:3

## B

**background** [1] - 20:3
**bar** [2] - 9:10, 9:18
**barred** [4] - 11:4, 13:11, 15:1, 18:23
**Barry** [3] - 1:23, 101:20, 101:21
**based** [4] - 22:7, 55:9, 77:9, 77:15
**basis** [2] - 32:17, 73:23
**Batavia** [3] - 3:24, 24:4, 46:7
**Bates** [1] - 61:9
**BB** [1] - 93:1
**became** [3] - 19:21, 25:13, 75:14
**become** [3] - 19:11, 19:19, 22:24
**bed** [1] - 34:24
**BEFORE** [1] - 1:14
**began** [4] - 47:11, 47:18, 48:25, 80:21, 94:20
**begin** [2] - 25:11, 100:21
**begins** [1] - 3:9
**behalf** [3] - 2:6, 70:9, 70:10
**behind** [1] - 13:19
**bench** [6] - 6:19, 7:1, 7:4, 7:21, 14:2, 27:18
**benefit** [1] - 73:25
**better** [4] - 13:21, 22:8, 22:24, 75:20
**between** [4] - 6:16, 34:20, 50:23, 71:21
**beyond** [1] - 100:6
**BIA** [5] - 5:11, 5:12, 5:16, 12:22, 31:20
**bifurcate** [3] - 8:24, 95:12, 95:17
**bifurcation** [2] - 8:25, 96:19
**binder** [2] - 56:11, 88:21
**biological** [1] - 46:9
**Bivens** [20] - 5:21, 5:22, 6:4, 6:16, 6:22, 6:23, 7:9, 7:24, 9:10, 9:18, 9:22, 9:25, 10:13, 10:16, 10:24, 11:8, 11:11, 11:14, 13:21, 14:14
**Black** [1] - 14:1
**blank** [1] - 17:11
**board** [2] - 29:4, 29:8
**Board** [3] - 32:20, 41:5, 41:24
**Bob** [1] - 2:6
**bond** [1] - 3:17
**bono** [2] - 27:13, 32:16
**book** [1] - 31:22
**booked** [2] - 43:1, 43:2
**books** [18] - 16:5, 16:12, 33:13, 33:14, 33:15, 36:23, 37:1, 53:19, 53:21, 53:23, 54:4, 54:8, 54:12, 54:17, 54:20,

58:6, 82:24, 83:6
**break** [1] - 43:20
**brief** [12] - 2:25, 45:5, 45:20, 45:25, 46:11, 46:23, 47:4, 55:19, 55:20, 81:20, 101:7
**briefing** [2] - 6:6, 98:11
**briefly** [3] - 20:2, 58:19, 76:19
**briefs** [7] - 15:15, 37:15, 58:16, 81:8, 97:24, 98:10, 98:15
**bring** [2] - 7:17, 91:20
**Brooklyn** [3] - 1:6, 1:21, 68:3
**Buck** [1] - 16:2
**Buffalo** [68] - 3:24, 15:19, 15:21, 15:25, 16:7, 24:3, 25:20, 26:10, 33:6, 34:8, 36:20, 38:16, 40:17, 41:4, 41:22, 46:7, 52:7, 52:10, 52:13, 52:16, 52:19, 52:20, 53:1, 53:11, 53:16, 53:18, 54:5, 54:9, 54:13, 54:21, 54:23, 54:25, 56:1, 56:9, 57:6, 57:14, 57:17, 57:20, 57:23, 58:2, 58:4, 59:1, 59:4, 59:8, 60:22, 60:24, 61:18, 61:22, 62:1, 62:6, 62:10, 62:19, 62:24, 63:3, 64:3, 64:16, 65:10, 69:17, 70:3, 74:24, 87:22, 89:10, 89:14, 90:11, 90:16, 91:8, 91:11, 97:2
**building** [2] - 20:9, 20:12
**bulk** [2] - 52:13, 52:16
**bunch** [2] - 27:5, 61:3
**burden** [7] - 2:19, 15:3, 15:8, 73:7, 73:13, 73:20, 74:4
**BURNS** [2] - 1:19, 2:14
**Burns** [2] - 2:6, 2:14
**bus** [1] - 43:2
**business** [1] - 97:19
**BY** [8] - 1:18, 1:22, 19:6, 43:24, 72:21, 102:4, 102:4, 102:5
**Byrd** [1] - 13:25
**BYRD** [1] - 13:25

## C

**Cadman** [1] - 1:21
**cannot** [8] - 15:8, 18:20, 27:12, 36:21, 63:10, 64:20, 65:6, 81:24
**capacity** [1] - 34:8
**carpentry** [2] - 20:17, 21:13
**carry** [1] - 73:20
**carved** [2] - 10:17
**case** [52] - 2:1, 3:7, 3:8, 4:3, 5:11, 5:12, 5:14, 7:11, 9:13, 9:18, 12:12, 14:19, 17:19, 17:21, 18:10, 20:20, 22:10, 26:4, 26:13, 27:15, 28:4, 30:1, 30:9, 30:24, 31:1, 33:1, 37:17, 40:11, 45:15, 45:20, 45:21, 56:21, 62:17, 68:23, 73:8, 73:23, 74:4, 74:25, 75:4, 75:23, 77:9, 81:19, 81:21, 81:23, 95:2, 95:3, 95:15, 96:14, 96:25, 97:22, 101:1
**casebooks** [1] - 16:11
**cases** [7] - 17:6, 27:14, 35:18, 40:9, 55:9, 62:5, 81:22
**CAUSE** [1] - 1:13
**causes** [5] - 3:11, 4:8, 6:15, 7:11, 8:8
**caveat** [1] - 97:1

**cell** [3] - 36:19, 36:24, 42:7
**cellphone** [3] - 42:19, 42:24
**center** [2] - 29:17, 30:23
**Center** [18] - 3:25, 17:22, 18:7, 25:20, 26:10, 34:8, 36:20, 40:18, 41:4, 41:22, 65:11, 71:10, 71:12, 71:16, 71:20, 72:2, 90:16
**Central** [1] - 78:3
**certain** [4] - 15:12, 44:21, 77:10, 77:17
**certainly** [1] - 10:2, 11:23, 97:8
**certificate** [23] - 5:6, 20:24, 21:7, 21:15, 24:12, 24:13, 28:20, 46:2, 46:5, 46:8, 46:21, 75:11, 76:6, 76:7, 77:19, 80:5, 80:9, 80:15, 81:13, 82:8, 90:9, 94:20, 101:5
**certification** [1] - 47:1
**CERTIFY** [1] - 101:18
**change** [1] - 82:8
**changed** [1] - 75:3
**chapter** [1] - 89:4
**chart** [2] - 3:10, 5:3
**choice** [3] - 6:15, 7:13, 9:22
**choose** [2] - 8:10, 9:23
**Christian** [2] - 75:16, 75:17
**Circuit** [10] - 5:10, 5:11, 5:13, 5:15, 12:22, 31:11, 68:23, 75:23, 77:9, 81:20
**circumstances** [14] - 15:6, 17:18, 18:21, 63:3, 63:11, 64:3, 73:14, 82:20, 83:3, 84:23, 85:7, 85:8, 85:14, 86:3
**cited** [2] - 62:5, 81:19, 81:24
**citizen** [46] - 4:13, 4:15, 4:21, 5:14, 12:13, 14:23, 19:9, 19:11, 19:19, 23:6, 23:9, 23:10, 23:12, 24:9, 26:8, 26:11, 26:14, 26:16, 35:20, 43:6, 44:19, 44:21, 44:25, 45:6, 45:10, 55:13, 64:2, 64:8, 65:1, 74:13, 74:17, 75:23, 76:10, 77:11, 77:16, 81:9, 81:16, 82:9, 86:9, 87:6, 87:7, 87:10, 87:11
**citizenship** [30] - 3:22, 5:6, 12:17, 12:20, 19:22, 20:24, 21:7, 21:15, 28:19, 28:20, 45:17, 45:18, 45:22, 45:23, 46:2, 46:13, 46:17, 46:18, 46:23, 47:1, 47:4, 62:18, 74:7, 74:10, 75:11, 77:20, 78:18, 80:10, 82:7
**City** [1] - 87:22
**CIVIL** [1] - 1:13
**Civil** [1] - 16:11
**civil** [2] - 2:2
**Claim** [5] - 7:19, 8:20, 13:8, 13:9, 14:9
**claim** [57] - 6:1, 6:4, 6:8, 6:16, 9:10, 11:10, 11:11, 11:12, 14:13, 16:19, 17:16, 17:19, 18:5, 18:8, 18:10, 18:15, 25:6, 51:1, 51:4, 51:6, 51:9, 51:19, 51:21, 58:11, 58:12, 62:13, 62:15, 62:25, 64:5, 64:6, 64:16, 64:23, 65:4, 65:24, 66:14, 66:19, 67:6, 67:21, 70:16, 71:1, 71:5, 71:17, 71:21, 71:24, 72:3, 72:7, 72:11, 77:18, 81:13, 81:15, 82:3, 85:13, 85:15, 95:23, 95:25, 96:1, 100:2

**claimed** [2] - 12:16, 12:17
**claiming** [4] - 11:20, 12:20, 66:2, 82:9
**claims** [41] - 3:22, 6:7, 11:4, 11:6, 11:8, 11:9, 12:24, 13:4, 13:18, 14:25, 15:10, 16:15, 16:17, 17:3, 17:8, 18:12, 18:19, 18:22, 18:23, 63:5, 63:17, 63:23, 65:20, 68:18, 69:1, 69:2, 69:4, 69:7, 73:16, 74:1, 82:4, 89:4, 92:13, 95:22, 95:24, 96:1, 96:3, 96:5, 99:9, 99:12, 100:5
**Claims** [5] - 5:22, 7:9, 7:23, 13:2, 27:18
**clarification** [4] - 84:16, 85:3, 98:13, 99:9
**clarify** [2] - 10:5, 81:4
**class** [1] - 20:9
**classes** [3] - 20:6, 20:8, 25:10
**clear** [7] - 14:1, 47:3, 57:3, 58:4, 76:3, 76:9, 94:11
**clearly** [2] - 3:14, 25:8
**Clerk** [1] - 40:3
**clerk** [1] - 40:13
**Clerk's** [1] - 40:4
**clerks** [2] - 40:8, 40:15
**close** [1] - 79:15
**closely** [1] - 22:21
**clothes** [1] - 42:13
**cocaine** [2] - 49:18, 50:5
**Columbia** [2] - 16:13, 88:23
**coming** [1] - 87:21
**commenced** [1] - 82:11
**common** [1] - 59:1
**commonly** [2] - 17:10, 59:9
**companies** [2] - 21:8, 21:12
**company** [3] - 21:9, 21:10
**complaint** [1] - 78:20
**complaints** [2] - 62:21, 86:25
**completed** [2] - 56:8, 56:20
**complicated** [1] - 100:11
**comply** [1] - 83:9
**Computer** [1] - 1:25
**computer** [8] - 60:22, 60:25, 61:11, 61:12, 61:13, 61:14, 90:16, 91:11
**Computer-aided** [1] - 1:25
**computerized** [1] - 1:25
**computers** [7] - 17:11, 33:11, 35:24, 54:24, 54:25, 55:5, 58:6
**conceded** [1] - 97:21
**concern** [9] - 30:15, 33:15, 43:4, 43:6, 62:17, 63:25, 64:7, 64:25, 73:19
**concerning** [1] - 92:12
**concluded** [1] - 101:16
**conclusion** [2] - 47:13, 85:9
**conclusions** [1] - 98:14
**conduct** [7] - 10:14, 10:17, 10:18, 10:21, 14:12, 18:19, 68:13
**conducted** [1] - 55:7
**confined** [1] - 36:19
**confirm** [1] - 32:21
**confused** [5] - 25:13, 42:18, 75:10, 87:5, 87:7
**confusion** [1] - 87:12

**connection** [4] - 32:18, 49:10, 50:15, 58:16
**consider** [1] - 10:2
**consistent** [1] - 82:22
**constitutional** [7] - 4:8, 4:16, 6:2, 11:21, 31:9, 81:12, 92:12
**Construction** [1] - 21:11
**contact** [4] - 27:22, 41:11, 41:14, 41:20
**contacted** [1] - 78:11
**contacting** [1] - 17:25
**containing** [1] - 92:1
**contains** [1] - 16:10
**contemplate** [1] - 72:11
**contemplated** [1] - 3:5
**contemporaneous** [1] - 93:22
**continually** [2] - 4:20, 5:8
**continuances** [1] - 97:5
**continued** [2] - 89:18, 99:25
**control** [2] - 3:14, 78:12
**controlled** [2] - 22:12, 22:16
**conversation** [10] - 70:15, 70:19, 70:22, 71:1, 71:4, 71:15, 71:19, 71:23, 77:17, 78:15
**conversations** [3] - 18:3, 18:8, 72:3
**convicted** [6] - 22:11, 22:12, 22:15, 49:5, 49:17, 50:4
**conviction** [1] - 49:10
**copies** [1] - 46:8
**copy** [7] - 46:1, 46:5, 47:23, 48:13, 52:20, 59:23, 84:5
**Corporation** [1] - 20:14
**corpus** [2] - 3:18, 67:25
**correct** [48] - 5:24, 6:20, 6:24, 11:18, 11:19, 13:11, 13:12, 24:5, 28:7, 34:14, 40:18, 44:4, 44:8, 44:15, 45:8, 45:24, 46:16, 47:18, 49:19, 50:16, 51:15, 51:19, 52:18, 55:24, 57:15, 57:18, 57:21, 58:14, 58:23, 59:13, 61:4, 66:3, 66:10, 67:23, 68:1, 69:8, 70:23, 72:10, 72:14, 72:18, 78:23, 80:19, 82:14, 83:10, 84:17, 100:19, 101:8, 101:18
**corrected** [1] - 83:20
**Correctional** [1] - 90:10
**correctly** [1] - 33:11
**counsel** [8] - 2:4, 3:17, 17:20, 17:22, 18:6, 69:11, 69:14, 71:12
**County** [22] - 23:4, 23:17, 23:19, 24:23, 24:25, 41:2, 41:17, 44:12, 49:6, 49:19, 50:6, 50:20, 50:22, 50:25, 51:8, 51:18, 51:22, 52:1, 52:4, 52:7, 65:14, 75:6
**course** [4] - 8:20, 14:12, 47:25, 53:11
**court** [5] - 17:6, 44:25, 50:9, 50:15, 70:10
**Court** [28] - 1:23, 1:23, 3:8, 3:13, 3:22, 5:3, 5:25, 6:10, 20:2, 20:23, 21:12, 25:1, 27:4, 27:10, 42:6, 48:18, 49:19, 50:6, 55:9, 61:19, 61:20, 77:16, 78:19, 84:4, 84:8, 99:2, 102:7, 102:8
**COURT** [228] - 1:1, 1:14, 2:1, 2:8, 2:12, 2:17, 2:19, 2:21, 2:23, 3:2, 3:4, 5:19, 5:22, 6:1, 6:7, 6:19, 6:21, 6:23, 6:25,

7:3, 7:8, 7:17, 8:3, 8:5, 8:12, 8:19, 8:23, 8:25, 9:5, 9:7, 10:4, 10:8, 10:11, 10:20, 10:23, 11:2, 11:10, 11:16, 11:20, 12:2, 12:11, 12:23, 13:1, 13:13, 13:15, 13:24, 14:17, 18:25, 19:3, 19:5, 19:13, 20:11, 21:1, 22:14, 25:7, 27:16, 30:14, 33:19, 33:23, 34:1, 43:20, 43:23, 46:17, 46:20, 47:2, 47:5, 47:14, 47:25, 48:13, 48:15, 48:18, 49:22, 50:1, 51:12, 51:14, 51:17, 56:25, 59:18, 59:21, 59:25, 63:8, 63:19, 64:11, 64:19, 65:7, 66:9, 66:16, 66:22, 72:20, 73:1, 73:4, 74:6, 74:9, 74:12, 74:15, 74:19, 74:22, 75:25, 76:3, 76:5, 76:9, 76:12, 76:16, 76:21, 76:23, 76:25, 77:2, 77:19, 77:22, 77:25, 78:4, 78:8, 78:13, 78:19, 78:22, 78:25, 79:3, 79:5, 79:7, 79:9, 79:12, 79:15, 79:18, 79:20, 79:22, 79:25, 80:4, 80:8, 80:11, 80:13, 80:15, 80:18, 80:21, 80:24, 81:2, 82:12, 82:15, 83:12, 84:2, 84:4, 84:8, 84:10, 84:14, 84:18, 85:2, 85:5, 85:8, 85:16, 86:5, 86:16, 86:19, 86:23, 87:2, 87:11, 87:15, 87:18, 88:8, 88:11, 88:15, 88:23, 89:2, 89:5, 89:8, 89:11, 89:18, 89:23, 90:1, 90:4, 90:8, 90:13, 90:17, 90:22, 91:2, 91:5, 91:9, 91:13, 91:16, 91:20, 91:23, 92:3, 92:6, 92:10, 92:14, 92:18, 92:21, 92:24, 93:2, 93:4, 93:7, 93:9, 93:13, 93:16, 93:19, 93:21, 93:25, 94:3, 94:8, 94:13, 94:17, 94:19, 95:7, 95:17, 96:6, 96:16, 96:21, 96:25, 97:4, 97:7, 97:10, 97:14, 97:17, 98:3, 98:6, 98:9, 98:17, 98:20, 98:22, 99:3, 99:13, 99:16, 100:3, 100:5, 100:18, 100:20, 100:24, 101:6, 101:9, 101:15
**Court's** [1] - 14:5
**Courthouse** [1] - 1:6
**COURTROOM** [2] - 2:2, 98:7
**Courts** [1] - 3:19
**cousin** [2] - 41:19, 42:25
**credibility** [1] - 49:23
**credulity** [1] - 18:13
**criminal** [5] - 49:18, 50:5, 50:10, 50:16, 73:22
**cross** [3] - 43:23, 83:10, 83:25
**CROSS** [2] - 43:24, 102:4
**current** [2] - 45:15, 45:20
**custody** [9] - 18:18, 23:2, 30:16, 44:3, 50:22, 68:10, 84:14, 86:17, 90:12
**custom** [1] - 21:24
**cut** [3] - 13:2, 36:13, 92:1

## D

**damages** [8] - 5:20, 7:25, 8:8, 25:5, 77:18, 95:12, 95:13, 96:19
**date** [19] - 14:22, 44:2, 47:10, 47:17, 48:24, 72:12, 72:16, 76:8, 77:13, 78:1, 78:16, 78:17, 80:5, 81:11, 82:10, 97:10, 97:19, 98:1
**dated** [3] - 32:13, 45:12, 45:21

**David** [1] - 93:20
**Davino** [1] - 19:8
**DAVINO** [3] - 1:4, 2:15, 102:3
**days** [9] - 5:6, 41:10, 49:9, 90:25, 97:18, 97:19, 98:3, 98:9
**deadlines** [2] - 67:11, 67:14
**dealing** [2] - 14:17, 89:4
**dealt** [1] - 75:3
**decide** [5] - 6:9, 13:17, 26:18, 77:25, 78:9
**decided** [2] - 6:16, 77:22
**decides** [2] - 6:10, 10:13
**decision** [12] - 5:18, 6:18, 7:16, 9:12, 14:18, 29:2, 29:6, 29:11, 31:20, 77:9, 93:15, 95:20
**decisions** [1] - 11:24
**defendant** [3] - 2:8, 2:9, 18:22
**Defendant** [2] - 1:10, 1:20
**deficiencies** [2] - 83:18, 83:19
**deficiency** [1] - 83:21
**definitely** [1] - 94:6
**definitive** [1] - 5:16
**degree** [3] - 49:5, 49:18, 50:5
**delay** [1] - 88:4
**delightful** [1] - 87:21
**demonstrate** [1] - 100:16
**denied** [12] - 45:16, 45:22, 46:12, 46:22, 51:25, 52:3, 57:21, 60:18, 62:2, 74:16, 74:24, 74:25
**denying** [1] - 74:10
**Department** [3] - 10:6, 10:13, 25:2
**DEPARTMENT** [1] - 1:20
**deportation** [2] - 26:3, 26:12
**deposition** [14] - 47:23, 48:2, 48:5, 54:1, 60:11, 61:6, 66:24, 67:16, 81:8, 82:23, 86:16, 94:2, 94:13, 94:14
**depressed** [4] - 25:14, 75:12, 75:13, 75:18
**depression** [7] - 25:15, 25:17, 72:22, 86:7, 86:14, 86:25, 87:5
**DEPUTY** [2] - 2:2, 98:7
**describe** [6] - 20:2, 20:23, 21:6, 25:1, 33:8, 42:6
**described** [1] - 32:22
**desktop** [2] - 91:11, 92:5
**despite** [7] - 15:19, 17:14, 18:6, 18:7, 58:11, 72:1, 72:2
**destroyed** [1] - 75:19
**detained** [27] - 3:15, 4:19, 12:19, 14:22, 21:24, 22:2, 23:25, 24:8, 30:11, 36:2, 39:4, 39:22, 43:4, 43:5, 43:10, 44:6, 44:14, 47:7, 55:15, 72:17, 72:23, 73:23, 74:22, 81:14, 81:16, 82:10, 100:8
**detainee** [18] - 12:16, 17:11, 29:16, 37:3, 37:6, 37:7, 37:9, 38:22, 40:3, 40:4, 40:8, 40:15, 43:8, 52:21, 52:23, 56:8, 56:18, 91:11
**Detainee** [1] - 90:3
**detainees** [12] - 16:4, 34:9, 38:2, 40:5, 57:7, 57:10, 58:7, 74:1, 90:7, 91:7,

92:9, 92:16
**detaining** [1] - 23:5
**detention** [56] - 3:16, 4:23, 12:6, 12:9, 15:14, 15:23, 16:2, 17:24, 18:5, 29:17, 30:23, 43:16, 47:10, 47:18, 48:25, 51:1, 51:19, 51:22, 52:13, 52:16, 58:13, 62:12, 62:13, 62:17, 62:22, 66:2, 66:5, 66:7, 66:18, 66:20, 67:5, 67:21, 67:22, 67:25, 68:2, 68:7, 68:11, 69:6, 69:11, 69:21, 69:23, 70:17, 71:6, 71:17, 71:24, 73:20, 74:12, 74:16, 74:17, 81:15, 82:13, 89:7, 90:21, 90:24, 92:5, 99:23
**Detention** [60] - 3:25, 15:20, 15:21, 15:25, 16:8, 24:3, 25:20, 26:10, 34:8, 36:20, 38:16, 40:18, 41:4, 41:22, 46:8, 52:7, 52:10, 52:14, 52:17, 52:19, 52:20, 53:1, 53:12, 53:16, 53:17, 53:18, 54:5, 54:9, 54:13, 54:21, 54:25, 56:2, 56:9, 57:6, 57:20, 57:23, 58:2, 58:5, 60:22, 60:25, 61:18, 61:22, 62:1, 62:6, 62:10, 62:19, 62:24, 63:4, 64:4, 64:17, 65:10, 65:11, 69:18, 74:25, 83:15, 89:10, 89:14, 89:21, 90:16, 91:11
**determination** [3] - 5:12, 12:7, 100:23
**determine** [2] - 16:19, 85:21
**determined** [2] - 12:8, 99:24
**determines** [1] - 3:8
**devastated** [1] - 25:12
**DHS** [6] - 5:5, 12:19, 25:2, 41:11, 43:5, 83:7
**died** [1] - 75:13
**difference** [1] - 10:16
**different** [9] - 8:7, 8:8, 8:9, 8:15, 8:16, 25:10, 59:5, 61:19, 90:25
**differently** [1] - 63:21
**difficult** [1] - 13:4
**diligence** [1] - 85:22
**diligently** [6] - 15:5, 15:10, 17:15, 63:16, 73:12, 82:4
**direct** [2] - 53:4, 53:7
**DIRECT** [2] - 19:6, 102:4
**directed** [1] - 12:21
**directions** [1] - 12:19
**directly** [1] - 56:12
**disability** [1] - 66:6
**disc** [3] - 36:12, 36:15, 36:17
**disclaimer** [1] - 91:7
**discovery** [1] - 95:9
**discretion** [3] - 11:17, 12:5, 12:7
**discs** [2] - 90:16, 92:5
**dismiss** [5] - 9:23, 11:4, 11:11, 11:14, 13:8
**dismissed** [5] - 11:9, 96:5, 96:15, 100:16, 101:2
**dismissing** [1] - 9:21
**disposal** [1] - 16:23
**dispute** [1] - 17:23
**District** [2] - 61:20, 81:21
**DISTRICT** [3] - 1:1, 1:1, 1:14

**divested** [1] - 3:19
**doable** [1] - 7:6
**docket** [3] - 78:19, 78:22, 95:7
**document** [6] - 35:1, 61:9, 84:7, 88:17, 89:13, 89:14
**documents** [6] - 21:19, 24:15, 92:1, 95:11, 97:21, 99:7
**DOES** [1] - 1:9
**done** [4] - 7:6, 36:5, 95:9, 101:11
**Door** [1] - 31:15
**door** [1] - 42:14
**doubts** [2] - 75:1, 75:24
**down** [2] - 42:12, 76:20
**drafts** [1] - 37:14
**dramatically** [1] - 25:9
**draw** [1] - 61:5
**drawing** [1] - 54:1
**drill** [1] - 22:20
**dropped** [1] - 20:5
**drug** [2] - 75:17, 79:22
**drugs** [6] - 75:12, 75:18, 75:25, 79:18, 80:1, 82:1
**dubious** [1] - 76:13
**due** [7] - 18:15, 41:4, 41:8, 98:2, 98:14, 98:15, 98:19
**duly** [1] - 2:15
**Dunn** [24] - 17:21, 18:3, 31:15, 31:19, 32:7, 32:25, 41:11, 69:12, 69:14, 69:20, 70:4, 70:7, 70:9, 70:12, 70:16, 70:20, 70:25, 71:8, 72:1, 76:19, 76:22, 77:5, 78:2, 78:16
**duplicate** [1] - 99:6
**duplication** [1] - 9:4
**during** [19] - 4:12, 12:9, 12:18, 28:5, 39:18, 53:7, 55:20, 62:16, 66:18, 67:5, 67:20, 67:25, 69:10, 69:11, 73:9, 82:17, 83:17, 83:18, 92:5

## E

**E-mail** [1] - 1:24
**early** [2] - 8:17, 69:15
**easiest** [2] - 14:4, 14:5
**East** [1] - 1:21
**Eastern** [1] - 81:21
**EASTERN** [1] - 1:1
**easy** [2] - 17:1, 59:11
**educate** [1] - 17:17, 62:20
**education** [5] - 3:25, 4:9, 81:18, 86:6, 87:4
**educational** [1] - 20:2
**effect** [2] - 22:19
**effected** [2] - 25:7, 25:9
**efficient** [1] - 13:5
**eight** [2] - 22:18, 49:14
**either** [3] - 9:17, 15:8, 33:21
**electric** [1] - 20:16
**elements** [3] - 8:7, 8:9, 8:14
**eleven** [1] - 56:8
**emotionally** [1] - 25:2
**emotions** [1] - 25:7

**employee** [2] - 67:11, 67:14
**employees** [1] - 15:25
**employment** [2] - 14:12, 21:6
**enforcement** [1] - 21:24
**engagement** [1] - 32:21
**English** [1] - 81:24
**enter** [1] - 90:6
**entered** [1] - 44:2
**entering** [1] - 52:19
**entire** [5] - 7:17, 28:5, 62:16, 66:18, 67:20
**entirety** [2] - 66:5, 94:1
**entitled** [3] - 36:13, 68:24, 101:19
**entry** [2] - 78:22, 95:7
**envelopes** [1] - 57:14
**equitable** [13] - 2:17, 3:11, 15:3, 18:24, 49:21, 73:8, 73:18, 74:4, 81:19, 81:25, 82:4, 94:22, 94:24
**equitably** [1] - 5:2
**equity** [1] - 14:1
**error** [1] - 5:9
**ESQ** [4] - 1:18, 1:19, 1:22, 1:22
**essentially** [2] - 7:25, 11:17
**establish** [1] - 74:4
**establishing** [2] - 15:3, 73:14
**Estrada** [1] - 2:3
**ESTRADA** [1] - 1:8
**et** [1] - 2:3
**Etowah** [4] - 41:2, 41:17, 65:14, 75:5
**evaluation** [1] - 8:17
**eventually** [2] - 17:20, 31:11
**evidence** [31] - 3:1, 7:4, 7:20, 8:10, 8:15, 8:18, 9:4, 14:21, 15:2, 15:7, 16:7, 16:22, 17:9, 17:14, 18:12, 18:17, 27:17, 33:20, 33:24, 48:16, 56:24, 82:17, 84:2, 84:3, 88:7, 90:3, 90:7, 90:23, 96:7, 96:17, 100:15
**evidentiary** [1] - 2:2
**exact** [3] - 76:8, 78:1, 78:17
**exactly** [4] - 8:25, 12:4, 42:2, 61:2
**examination** [5] - 43:23, 53:4, 53:7, 73:9, 84:1
**EXAMINATION** [6] - 19:6, 43:24, 72:21, 102:4, 102:4, 102:5
**examine** [1] - 83:11
**excellent** [1] - 89:1
**except** [4] - 15:18, 94:3, 94:12, 94:13
**excerpt** [5] - 89:9, 89:12, 90:3
**exchanged** [1] - 97:23
**Excuse** [1] - 10:20
**excuse** [8] - 6:1, 7:19, 15:10, 29:24, 46:25, 48:13, 77:1, 86:23
**exercised** [1] - 11:17
**exhaust** [1] - 15:18
**exhausted** [1] - 15:17
**Exhibit** [34] - 31:21, 31:24, 33:18, 33:21, 33:22, 34:3, 45:7, 45:13, 48:18, 56:14, 56:15, 56:23, 59:18, 84:4, 84:8, 88:21, 89:3, 90:2, 90:14, 90:15, 90:23, 92:15, 93:14, 93:18, 93:24, 102:7, 102:8, 102:8, 102:9, 102:9, 102:10, 102:11,

102:11, 102:12

**exhibit** [39] - 33:24, 59:20, 88:6, 88:21, 89:6, 89:9, 89:12, 89:15, 89:21, 90:5, 90:9, 90:14, 90:20, 90:24, 91:3, 91:6, 91:10, 91:25, 92:4, 92:7, 92:11, 93:8, 93:19, 102:10, 102:12, 102:13, 102:13, 102:14, 102:14, 102:15, 102:16, 102:16, 102:17, 102:17, 102:18, 102:18, 102:19, 102:19, 102:20

**Exhibits** [2] - 90:18, 102:15

**exhibits** [8] - 31:22, 33:19, 56:13, 88:18, 90:15, 92:23, 93:6, 99:1

**existed** [1] - 96:11

**expect** [1] - 86:9

**expedite** [1] - 6:11

**expeditiously** [1] - 45:25

**experience** [2] - 22:19, 50:9

**expert** [1] - 95:14

**expire** [1] - 5:1

**expired** [1] - 18:11

**explain** [4] - 16:3, 27:4, 30:4, 86:22

**explained** [1] - 42:23

**explaining** [1] - 88:17

**explanation** [1] - 42:15

**explanations** [1] - 16:14

**extent** [2] - 49:23, 97:2

**extraordinary** [11] - 15:6, 17:18, 18:20, 63:3, 63:11, 73:14, 82:19, 83:3, 84:23, 85:7, 85:8

---

**F**

**facilities** [6] - 15:24, 66:3, 83:1, 84:11, 85:20, 91:1

**facility** [28] - 3:16, 15:23, 17:13, 17:17, 23:4, 33:6, 40:21, 41:1, 42:10, 52:24, 57:17, 59:1, 59:2, 59:4, 59:8, 65:3, 65:19, 65:23, 69:22, 75:5, 83:1, 83:8, 86:19, 86:24, 89:7, 89:17, 90:7, 90:11

**Facility** [47] - 15:20, 15:22, 15:25, 16:8, 22:4, 24:3, 46:8, 52:7, 52:10, 52:14, 52:17, 52:19, 52:21, 53:1, 53:12, 53:17, 53:18, 54:5, 54:9, 54:13, 54:21, 54:24, 54:25, 56:2, 56:9, 57:6, 57:20, 57:23, 58:2, 58:5, 60:22, 61:18, 61:22, 62:1, 62:6, 62:10, 62:20, 62:25, 63:4, 64:4, 64:17, 65:10, 69:18, 70:3, 74:25, 89:10, 91:12

**Facility's** [1] - 60:25

**facility's** [1] - 62:12

**fact** [14] - 18:16, 44:18, 53:23, 55:12, 56:17, 68:20, 73:16, 73:19, 82:8, 83:1, 97:24, 97:25, 98:2, 98:14

**factor** [3] - 73:25, 82:1, 82:2

**factors** [1] - 82:3

**facts** [1] - 85:9

**factually** [1] - 5:9

**failed** [4] - 12:17, 12:20, 16:20, 83:9

**failure** [2] - 15:10, 18:15

**fair** [1] - 36:22

**faith** [3] - 75:1, 75:4, 75:23

---

**fall** [1] - 65:17

**falls** [1] - 10:14

**false** [15] - 6:4, 8:13, 68:18, 84:19, 95:25, 96:11, 99:11, 99:14, 99:15, 99:16, 99:18, 100:6, 100:24

**family** [5] - 18:16, 18:18, 41:20, 65:1, 75:8

**far** [4] - 18:16, 33:15, 38:2, 77:18

**father** [4] - 4:13, 19:21, 24:12, 46:9

**father's** [2] - 46:1, 46:5

**February** [2] - 32:20, 49:13

**Federal** [56] - 3:19, 3:22, 5:22, 7:9, 7:19, 7:23, 8:20, 13:2, 13:8, 13:9, 14:9, 15:19, 15:21, 15:25, 16:7, 16:11, 24:3, 27:18, 44:15, 46:7, 52:10, 52:13, 52:17, 52:19, 52:20, 53:1, 53:12, 53:16, 54:5, 54:9, 54:13, 54:21, 56:9, 57:6, 57:23, 58:2, 58:4, 58:23, 60:19, 60:22, 60:25, 61:18, 61:22, 62:1, 62:6, 62:10, 62:19, 62:24, 63:4, 64:3, 65:10, 65:20, 66:14, 69:17, 89:10, 91:11

**federal** [7] - 4:24, 15:14, 16:12, 54:17, 69:21, 69:23, 81:10

**fee** [1] - 32:17

**few** [7] - 54:10, 57:13, 79:2, 79:4, 79:5, 81:5, 98:9

**FILE** [1] - 61:10

**file** [26] - 15:12, 16:19, 18:10, 18:15, 28:16, 41:23, 51:4, 51:9, 51:14, 51:19, 62:11, 62:13, 62:21, 62:25, 65:4, 65:20, 65:24, 67:21, 69:2, 71:5, 71:23, 72:4, 76:16, 85:15, 85:22, 95:10

**filed** [21] - 3:7, 15:15, 18:10, 25:6, 45:3, 45:21, 46:15, 46:24, 50:25, 56:18, 58:22, 60:18, 61:23, 62:2, 67:24, 70:10, 72:9, 72:12, 72:15, 78:20, 88:17

**filer** [1] - 15:14

**filing** [30] - 3:9, 4:7, 17:19, 18:4, 18:8, 18:21, 30:17, 31:1, 41:4, 41:8, 51:21, 58:12, 58:15, 58:25, 64:4, 64:16, 66:7, 66:13, 66:19, 67:5, 67:11, 67:14, 70:16, 71:1, 71:16, 71:20, 72:3, 85:13, 86:4, 93:6

**filings** [3] - 55:9, 55:12, 58:20

**fill** [8] - 30:5, 37:6, 37:7, 59:5, 59:11, 59:15, 60:1, 60:4

**finally** [1] - 41:16

**findings** [4] - 97:24, 97:25, 98:2, 98:14

**fine** [4] - 59:25, 94:4, 97:15, 98:17

**finish** [1] - 37:15

**Finnigan** [1] - 16:2

**firm** [3] - 17:21, 18:7, 69:14

**first** [11] - 2:15, 8:21, 10:5, 14:22, 15:9, 23:22, 32:13, 54:24, 58:22, 81:6, 95:19

**five** [5] - 17:12, 28:10, 49:9, 57:24, 87:24

**five-minute** [1] - 87:24

**FLESSNER** [97] - 1:18, 2:6, 2:18, 2:20, 2:22, 3:3, 3:5, 5:21, 5:24, 6:3, 6:14,

---

6:20, 6:22, 6:24, 7:2, 7:6, 7:10, 8:1, 8:9, 8:13, 8:22, 8:24, 9:2, 9:6, 9:11, 9:15, 9:20, 12:4, 12:15, 13:14, 13:20, 19:2, 19:6, 27:21, 33:25, 43:19, 46:21, 46:25, 47:12, 49:20, 50:11, 50:13, 57:1, 59:22, 63:6, 63:12, 63:15, 63:18, 64:10, 64:18, 66:8, 66:15, 66:21, 67:18, 72:21, 72:25, 73:3, 78:21, 80:7, 80:9, 80:12, 80:17, 80:23, 83:5, 83:13, 84:3, 84:5, 84:25, 86:21, 88:17, 89:17, 91:14, 91:22, 92:22, 92:25, 93:11, 94:11, 94:16, 95:4, 95:8, 96:23, 97:6, 97:12, 98:8, 98:18, 98:21, 98:25, 99:21, 100:4, 100:15, 100:19, 100:22, 101:3, 101:8, 101:14, 102:4, 102:5

**Flessner** [1] - 41:19, 42:25

**Florida** [2] - 41:19, 42:25

**focus** [3] - 30:11, 40:14, 73:21

**focused** [2] - 37:19, 40:11

**FOIA** [1] - 95:10

**folder** [1] - 92:2

**follow** [4] - 12:18, 12:20, 83:18, 95:1

**following** [15] - 11:21, 11:22, 48:22, 54:2, 54:3, 58:5, 60:12, 61:7, 67:2, 83:19, 97:13

**follows** [2] - 2:16, 12:13

**FOR** [1] - 1:13

**forced** [2] - 6:18, 7:15

**foregoing** [1] - 101:18

**form** [17] - 15:12, 20:18, 28:13, 28:15, 37:6, 50:13, 59:16, 59:18, 59:20, 60:2, 60:4, 60:21, 60:24, 61:8, 63:6, 72:4, 92:1

**forms** [7] - 17:10, 30:5, 36:13, 59:5, 59:9, 61:4, 61:19

**forth** [6] - 32:17, 52:23, 73:8, 73:10, 74:5, 96:10

**forty** [1] - 69:25

**forward** [12] - 2:21, 6:8, 6:12, 9:7, 9:21, 11:11, 11:13, 13:17, 13:22, 87:19, 96:22, 99:20

**four** [9] - 12:19, 33:12, 35:5, 41:10, 53:13, 54:2, 97:18, 98:3

**fourth** [1] - 17:9

**frank** [1] - 89:24

**frankly** [1] - 82:23

**free** [12] - 27:13, 74:12, 74:16, 75:25, 91:6, 100:8, 100:11, 100:12, 100:13, 100:14

**freedom** [1] - 64:1

**freely** [1] - 100:7

**friend** [4] - 29:16, 30:6, 30:7, 43:8

**friends** [1] - 18:16

**front** [2] - 31:22, 56:12

**FTCA** [30] - 5:21, 6:16, 6:17, 6:19, 9:10, 9:18, 9:21, 9:25, 10:1, 10:18, 11:5, 11:9, 11:10, 11:13, 13:22, 14:13, 14:17, 14:19, 14:25, 15:10, 15:19, 16:15, 17:2, 17:7, 17:19, 92:13, 92:17, 95:22, 96:5, 99:11

**fully** [1] - 90:11

7

**funeral** [1] - 75:14

## G

**GAIL** [1] - 1:22
**Gail** [1] - 2:10
**gas** [1] - 42:21
**GED** [1] - 20:5
**general** [2] - 6:9, 55:7
**generally** [4] - 32:23, 39:8, 40:9, 47:21
**Gibson** [24] - 17:21, 18:3, 31:15, 31:19, 32:7, 32:25, 41:11, 69:12, 69:14, 69:20, 70:4, 70:6, 70:9, 70:12, 70:16, 70:20, 70:25, 71:8, 72:1, 76:19, 76:22, 77:5, 78:2, 78:16
**given** [8] - 5:3, 22:8, 27:17, 52:20, 57:14, 75:6, 96:18
**gordian** [1] - 13:2
**Government** [18] - 2:25, 4:14, 4:20, 5:8, 10:15, 14:16, 16:20, 25:6, 44:15, 51:2, 58:23, 60:19, 63:1, 65:21, 66:14, 67:10, 67:13, 85:23
**government** [1] - 4:8
**Government's** [2] - 14:4, 95:10
**grade** [1] - 20:4
**Grand** [1] - 78:3
**grandfather** [1] - 75:13
**grant** [1] - 13:1
**granted** [18] - 89:5, 89:8, 89:11, 89:18, 90:8, 90:13, 90:17, 90:22, 91:2, 91:5, 91:9, 91:13, 92:3, 92:6, 92:10, 92:14, 92:18, 96:21
**great** [2] - 45:17, 45:23
**Greenland** [1] - 21:10
**Greyhound** [1] - 43:2
**ground** [1] - 81:18
**grounds** [2] - 11:11, 81:25
**guards** [2] - 11:17, 43:12
**guess** [5] - 9:15, 14:15, 36:22, 78:12, 100:22
**guide** [1] - 90:6
**GUNTHER** [1] - 1:9
**Gym** [1] - 38:2

## H

**habeas** [2] - 3:18, 67:24
**half** [5] - 3:15, 4:20, 12:18, 12:21, 30:12
**hallway** [1] - 88:14
**hand** [2] - 17:5, 17:7
**handbook** [2] - 52:21, 52:23
**Handbook** [3] - 89:14, 89:22, 90:3
**handcuffed** [2] - 44:9, 50:18
**handed** [1] - 56:11
**handing** [1] - 48:1
**handle** [1] - 29:21
**hands** [1] - 80:4
**happy** [1] - 68:9
**hard** [1] - 25:9
**hear** [8] - 3:20, 6:25, 7:20, 15:13, 16:5, 96:6, 96:16, 100:10
**hearing** [8] - 2:3, 2:17, 3:1, 3:17, 14:16,

15:2, 25:4, 27:17
**HEARING** [1] - 1:13
**Heartland** [1] - 78:11
**Heck** [2] - 3:8, 3:13
**held** [4] - 11:20, 11:23, 12:9, 12:14
**help** [15] - 30:6, 31:12, 38:6, 38:21, 40:6, 40:10, 42:23, 53:8, 60:1, 60:3, 60:4, 60:7, 60:8, 75:20, 101:15
**helped** [2] - 29:15, 76:22
**helper** [1] - 21:13
**helpful** [4] - 26:5, 26:19, 38:12, 39:1
**high** [4] - 3:25, 11:23, 18:6, 20:4
**highly** [1] - 10:9
**himself** [1] - 17:17
**history** [3] - 21:6, 50:10, 90:24
**hold** [1] - 12:6
**Holder** [1] - 32:19
**holding** [1] - 5:14
**Holland** [1] - 2:14
**HOLLAND** [1] - 1:17
**Homeland** [1] - 25:2
**homeless** [1] - 75:14
**honest** [1] - 47:19
**Honor** [62] - 2:24, 9:9, 9:17, 9:24, 10:25, 11:1, 11:3, 11:15, 11:19, 12:1, 12:25, 13:12, 14:11, 14:15, 14:21, 15:13, 19:4, 25:3, 27:20, 43:21, 47:22, 49:20, 56:23, 60:9, 72:19, 73:6, 73:16, 74:3, 75:24, 80:7, 80:14, 81:4, 84:13, 84:22, 85:11, 86:1, 87:13, 87:23, 87:25, 88:2, 88:3, 88:20, 88:21, 91:4, 91:18, 92:20, 93:18, 93:23, 94:5, 94:10, 94:18, 95:4, 95:19, 96:8, 96:18, 97:15, 98:5, 98:21, 98:24, 99:8, 101:13, 101:14
**HONORABLE** [1] - 1:14
**Horizon** [1] - 21:11
**hotel** [1] - 43:1
**hour** [1] - 35:8
**hours** [9] - 23:13, 23:14, 36:19, 36:21, 36:22, 47:20, 82:17, 83:21, 83:23
**House** [1] - 75:17
**house** [1] - 68:3
**Human** [1] - 88:23
**hundred** [1] - 34:11

## I

**I-290B** [1] - 61:8
**ICE** [35] - 12:5, 12:8, 14:23, 23:2, 23:5, 24:8, 44:3, 44:7, 44:9, 44:11, 44:18, 46:5, 47:7, 50:18, 50:22, 51:19, 51:22, 66:5, 66:7, 66:18, 66:19, 67:5, 67:20, 67:25, 68:2, 68:7, 68:9, 69:6, 69:11, 70:17, 71:5, 71:17, 71:24, 72:17, 81:14
**identification** [1] - 21:20
**identified** [2] - 83:18, 86:3
**ignorance** [5] - 15:9, 73:17, 73:25, 81:17, 81:22
**illegally** [1] - 23:6
**immediate** [1] - 41:20

**immediately** [4] - 42:8, 42:17, 44:17, 74:7
**Immigrant** [7] - 17:22, 18:4, 18:7, 71:9, 71:16, 71:19, 72:2
**Immigration** [4] - 32:20, 41:5, 41:24, 55:21
**immigration** [33] - 4:7, 4:23, 15:16, 17:6, 21:24, 26:22, 28:5, 28:9, 28:11, 28:15, 29:1, 29:4, 29:8, 30:1, 30:8, 30:9, 30:16, 33:1, 33:14, 33:16, 37:17, 39:8, 44:25, 45:5, 55:20, 56:21, 58:17, 58:20, 61:23, 69:10, 73:22, 93:15
**impacted** [1] - 22:20
**imprisonment** [9] - 6:5, 8:13, 68:18, 85:23, 99:15, 99:16, 99:18, 100:6, 100:24
**inadequate** [2] - 83:9, 83:12
**incarcerated** [1] - 25:16
**incarceration** [2] - 44:6, 49:14
**Incarceration** [1] - 22:4
**inclined** [1] - 13:1
**include** [1] - 101:4
**including** [2] - 16:4, 16:10, 92:13
**indeed** [5] - 23:12, 26:14, 35:19, 75:23, 77:16
**indemnification** [2] - 10:6, 10:15
**indemnify** [1] - 10:9
**indemnifying** [2] - 8:2, 9:20
**independent** [1] - 6:1
**INDEX** [1] - 102:1
**indicate** [1] - 99:7
**indicated** [1] - 45:16
**indicates** [1] - 47:4
**indicating** [2] - 82:7, 90:11
**individual** [3] - 8:2, 12:6, 12:20
**individuals** [1] - 22:8
**induced** [2] - 67:10, 67:13
**inform** [1] - 39:23
**information** [14] - 26:18, 29:21, 29:22, 29:25, 30:1, 36:11, 53:5, 58:12, 75:6, 75:7, 82:21, 84:12, 85:20, 92:17
**informed** [9] - 78:5, 78:25, 79:12, 79:16, 79:19, 79:20, 80:18, 86:8, 94:22
**initial** [1] - 83:17
**initiated** [1] - 70:25
**injured** [1] - 14:24
**injury** [1] - 81:12
**inmate** [1] - 81:23, 81:24
**inmates** [2] - 73:24, 74:1
**insofar** [1] - 94:14
**inspection** [3] - 83:15, 83:17, 83:19
**installed** [1] - 25:11
**instead** [1] - 44:5
**instructions** [1] - 16:24
**instructor** [1] - 22:20
**insufficient** [2] - 17:7, 84:11
**interest** [2] - 10:19, 10:22
**interesting** [1] - 13:17
**interestingly** [1] - 17:4
**interests** [1] - 10:15
**interfere** [1] - 41:23

**interject** [1] - 80:7
**internally** [1] - 99:24
**Internet** [7] - 16:18, 16:19, 35:23, 36:1, 68:6, 68:14, 82:24
**involved** [1] - 20:20
**issue** [4] - 14:18, 75:11, 95:1, 96:7
**issued** [2] - 5:5, 12:19
**issues** [6] - 6:9, 17:2, 26:20, 57:11, 95:21
**items** [1] - 88:6
**itself** [1] - 61:13

# J

**JACK** [1] - 1:14
**jail** [1] - 49:9
**Jail** [15] - 23:17, 23:19, 24:23, 24:25, 44:12, 50:20, 50:22, 50:25, 51:8, 51:18, 51:22, 52:1, 52:4, 52:7, 65:14
**jailers** [1] - 12:24
**Jailhouse** [2] - 16:13, 88:22
**January** [2] - 49:8
**JBW** [1] - 1:4
**Jeff** [2] - 78:2, 78:16
**job** [2] - 21:20, 40:4
**JOHN** [1] - 1:9
**JOSEPH** [1] - 1:22
**Joseph** [1] - 2:9
**JUAN** [1] - 1:8
**Juan** [1] - 2:3
**Judge** [31] - 10:10, 23:13, 23:14, 23:16, 23:23, 23:24, 24:2, 24:3, 25:21, 26:18, 26:23, 27:7, 28:9, 28:11, 28:15, 28:18, 29:1, 30:5, 30:8, 47:20, 48:14, 55:21, 61:3, 74:24, 80:23, 84:17, 86:8, 87:6, 87:11, 98:2, 98:12
**JUDGE** [1] - 1:14
**Judge's** [1] - 76:13
**judgement** [1] - 50:6
**judgment** [7] - 10:7, 10:13, 10:24, 11:8, 11:14, 12:24, 96:3
**juggle** [1] - 97:12
**July** [5] - 48:2, 79:13, 80:19, 94:23, 94:25
**June** [3] - 23:24, 50:23, 52:6
**jurisdiction** [1] - 3:19
**jury** [15] - 6:8, 6:9, 6:12, 6:13, 6:23, 7:1, 7:5, 7:18, 7:20, 7:21, 8:21, 8:22, 14:2, 97:4
**Justice** [9] - 10:7, 17:22, 18:4, 18:7, 71:10, 71:12, 71:16, 71:19, 72:2
**JUSTICE** [1] - 1:15
**justifies** [1] - 10:15

# K

**keep** [1] - 94:3
**kept** [1] - 4:14
**kind** [3] - 33:13, 35:16, 37:13
**Kings** [1] - 49:6
**Kirkpatrick** [1] - 81:21
**Knight** [1] - 2:14

**KNIGHT** [1] - 1:17
**knot** [2] - 13:2, 13:16
**knowledge** [14] - 30:17, 49:24, 51:11, 59:1, 61:3, 62:15, 64:14, 64:22, 64:23, 65:4, 68:24, 85:12, 86:3, 86:7
**knowledgeable** [1] - 12:11
**known** [1] - 4:15
**knows** [1] - 81:11
**Kronous** [1] - 87:14

# L

**laborer** [1] - 21:14
**lack** [4] - 64:14, 81:18, 85:12, 86:2
**lady** [1] - 42:22
**laid** [1] - 87:19
**Lakeview** [5] - 22:4, 22:17, 22:18, 22:25, 44:5
**Landscaping** [1] - 21:10
**large** [1] - 16:3
**late** [1] - 75:7
**law** [59] - 4:5, 4:7, 6:14, 7:12, 12:11, 15:9, 16:8, 17:21, 18:6, 24:22, 24:24, 29:23, 30:1, 33:5, 33:8, 34:7, 37:8, 37:12, 38:4, 39:16, 40:1, 40:8, 40:12, 40:13, 40:15, 43:9, 43:10, 53:2, 53:5, 53:10, 53:17, 53:19, 53:21, 53:23, 54:4, 54:5, 54:9, 54:12, 54:18, 55:21, 57:7, 58:7, 69:14, 73:7, 73:17, 73:20, 73:25, 75:2, 81:10, 81:17, 81:22, 83:8, 83:22, 96:14, 97:24, 97:25, 98:2, 98:14
**Law** [4] - 16:13, 40:3, 40:4, 88:23
**laws** [2] - 33:14, 39:9
**lawsuit** [6] - 20:21, 30:17, 66:7, 72:15, 76:16, 76:17
**Lawyer** [1] - 88:22
**lawyer** [3] - 29:19, 74:2, 75:7
**Lawyers** [2] - 16:14, 27:22
**lawyers** [7] - 27:13, 28:3, 39:12, 41:20, 75:8, 76:18, 78:11
**learn** [8] - 15:16, 15:21, 16:16, 16:25, 17:4, 17:20, 30:1, 39:22
**learned** [2] - 29:25, 58:25
**least** [8] - 17:24, 53:10, 69:21, 69:22, 69:25, 71:15, 97:18
**leaving** [1] - 5:7
**legal** [35] - 3:15, 4:10, 4:17, 4:22, 15:14, 16:5, 20:18, 24:13, 26:19, 26:20, 30:11, 32:18, 36:13, 36:23, 37:1, 38:17, 38:19, 40:5, 40:15, 43:12, 47:12, 53:21, 54:17, 57:11, 58:6, 58:19, 63:5, 67:6, 70:12, 81:15, 83:16, 83:17, 89:6, 91:7, 92:1
**lengths** [2] - 45:17, 45:23
**less** [1] - 41:10
**lesser** [1] - 22:8
**letter** [4] - 32:7, 32:9, 32:12, 91:4
**letters** [3] - 32:2, 32:6, 57:18, 70:3
**level** [2] - 4:9, 11:16
**Lexis** [4] - 17:7, 55:22, 85:20, 92:16

**LexisNexis** [16] - 16:23, 16:24, 17:1, 17:5, 54:24, 55:4, 55:7, 55:10, 55:17, 58:6, 62:7, 82:24, 83:6, 90:6, 92:8, 92:12
**liability** [7] - 95:5, 95:8, 95:13, 95:15, 96:17, 96:19, 99:10
**library** [45] - 16:1, 16:8, 16:10, 16:18, 24:22, 24:24, 29:23, 30:2, 30:22, 33:5, 33:8, 34:7, 34:14, 34:17, 34:22, 35:4, 35:7, 35:17, 35:23, 36:23, 37:1, 37:8, 37:12, 38:4, 40:1, 40:12, 53:2, 53:5, 53:10, 53:17, 53:19, 53:21, 53:24, 54:6, 54:9, 54:18, 57:8, 58:8, 82:16, 83:8, 83:22, 84:10, 84:16, 85:14, 85:19
**lieu** [1] - 88:9
**life** [7] - 22:19, 22:20, 22:23, 22:25, 25:11, 75:19, 79:23
**light** [1] - 20:16
**likelihood** [1] - 6:17
**likely** [1] - 10:9
**limitations** [5] - 3:7, 5:1, 13:11, 15:4, 18:11
**limited** [5] - 32:21, 86:6, 86:7, 87:4, 100:13
**line** [1] - 69:1
**lines** [6] - 48:20, 48:21, 54:2, 60:11, 61:6, 67:1
**list** [5] - 88:6, 97:19, 97:20, 98:18, 99:7
**listed** [1] - 4:2
**listen** [1] - 87:20
**listing** [1] - 91:6
**litigation** [1] - 13:19
**live** [1] - 88:9
**living** [2] - 18:18, 19:25
**Lizaide** [1] - 81:20
**LLP** [1] - 1:17
**log** [1] - 90:20
**look** [5] - 32:12, 33:18, 55:23, 56:14, 59:21
**looked** [2] - 13:25, 54:14
**looking** [2] - 66:5, 97:6
**lose** [1] - 9:7
**Louisiana** [4] - 40:21, 65:11, 65:19, 65:23
**low** [1] - 11:16

# M

**machinery** [1] - 7:18
**Magistrate** [1] - 98:12
**mail** [7] - 1:24, 17:12, 51:25, 57:21, 58:8, 61:17, 61:19
**mailed** [1] - 57:17
**maintenance** [2] - 20:9, 20:13
**Maintenance** [1] - 21:9
**major** [3] - 16:6, 16:22, 93:23
**majority** [1] - 30:5
**malicious** [17] - 6:5, 8:14, 11:6, 68:18, 95:23, 95:25, 96:11, 99:11, 99:17, 99:19, 99:20, 99:21, 100:2, 100:9,

100:10, 100:20, 101:1
**man** [1] - 25:25
**man's** [1] - 13:18
**mandatory** [1] - 12:6
**Manhattan** [1] - 20:13
**Manual** [2] - 16:14, 88:22
**manual** [1] - 88:24
**manuals** [2] - 16:5, 54:17
**mark** [1] - 2:6
**MARK** [1] - 1:18
**Mark** [1] - 31:15
**marked** [9] - 34:2, 48:16, 48:19, 57:2, 84:9, 90:19, 91:24, 93:17, 97:22
**MARUTOLLO** [104] - 1:22, 2:9, 2:24, 8:4, 9:9, 9:13, 9:17, 10:5, 10:25, 11:3, 11:15, 11:19, 11:25, 12:3, 12:25, 13:12, 14:11, 14:21, 19:4, 25:3, 27:20, 30:13, 33:21, 43:21, 43:24, 46:18, 47:3, 47:22, 48:14, 49:24, 56:23, 59:19, 66:10, 72:19, 73:6, 80:14, 81:4, 82:14, 82:19, 84:6, 84:13, 84:22, 85:1, 85:3, 85:6, 85:11, 86:1, 86:13, 87:9, 87:13, 87:17, 87:23, 88:3, 88:9, 88:20, 89:1, 89:3, 89:6, 89:9, 89:12, 89:21, 89:25, 90:2, 90:5, 90:9, 90:14, 90:18, 90:20, 90:23, 91:3, 91:6, 91:10, 91:18, 91:25, 92:4, 92:7, 92:11, 92:15, 92:20, 93:3, 93:5, 93:8, 93:10, 93:14, 93:18, 93:20, 93:23, 94:1, 94:5, 94:10, 94:18, 95:19, 96:8, 96:18, 97:1, 97:8, 97:15, 98:5, 98:13, 98:24, 99:8, 99:15, 101:13, 102:4
**Marutollo** [1] - 2:9
**masonry** [1] - 20:17
**material** [1] - 83:16
**materials** [7] - 4:18, 40:5, 83:17, 89:7, 92:11, 92:16, 99:5
**matter** [7] - 14:7, 32:22, 61:23, 73:7, 73:22, 96:14, 101:19
**Matter** [1] - 101:16
**matters** [1] - 32:23
**Matthew** [1] - 16:1
**MATTHEWS** [14] - 1:22, 2:11, 10:10, 10:12, 10:21, 84:16, 87:25, 88:2, 88:13, 89:20, 89:24, 94:4, 98:1, 101:12
**Matthews** [1] - 2:10
**McGinnis** [1] - 81:19
**mean** [7] - 9:24, 19:15, 25:9, 63:22, 66:9, 82:22, 100:14
**meaning** [1] - 29:8
**means** [1] - 31:8
**medical** [3] - 86:19, 86:24, 95:14
**meet** [3] - 15:3, 15:8, 15:24
**meeting** [1] - 70:6
**member** [1] - 75:8
**members** [1] - 56:3
**memo** [1] - 41:23
**memorandum** [1] - 101:10
**men** [1] - 22:7
**mental** [3] - 22:22, 66:9, 66:12

**mentioned** [2] - 42:25, 78:10
**mentioning** [1] - 51:7
**mere** [1] - 81:22
**merely** [2] - 11:21, 11:22
**merits** [3] - 11:7, 96:4, 96:13
**met** [6] - 73:7, 73:13, 74:4, 76:19, 77:12, 78:2
**method** [2] - 19:20, 34:21
**MICHAEL** [1] - 1:8
**Michael** [1] - 16:2
**middle** [1] - 93:17
**might** [1] - 97:1
**military** [1] - 76:3, 93:22
**mind** [2] - 76:3, 93:22
**mine** [2] - 29:16, 41:19
**minor** [1] - 19:23
**minute** [1] - 87:24
**model** [2] - 15:24, 83:1
**moment** [6] - 14:25, 53:15, 60:9, 69:9, 74:22, 78:2
**money** [1] - 42:19
**month** [4] - 23:20, 80:2
**months** [7] - 22:10, 22:18, 49:14, 79:2, 79:4, 79:5, 79:10
**moreover** [1] - 18:14
**morning** [2] - 43:25, 44:1
**most** [3] - 6:17, 18:2, 95:10
**mother** [1] - 24:13
**motion** [13] - 10:23, 11:14, 12:1, 12:23, 44:24, 45:3, 45:9, 45:15, 61:9, 62:3, 62:5, 73:5, 96:2
**motions** [5] - 15:15, 37:14, 58:16, 62:11, 70:10
**motivating** [1] - 73:25
**move** [5] - 33:25, 56:23, 73:6, 92:22, 95:2
**moved** [4] - 11:1, 11:3, 95:21, 96:2
**moving** [2] - 73:10, 74:5
**MR** [201] - 2:6, 2:9, 2:13, 2:14, 2:18, 2:20, 2:22, 2:24, 3:3, 3:5, 5:21, 5:24, 6:3, 6:14, 6:20, 6:22, 6:24, 7:2, 7:6, 7:10, 8:1, 8:4, 8:9, 8:13, 8:22, 8:24, 9:2, 9:6, 9:9, 9:11, 9:13, 9:15, 9:17, 9:20, 10:5, 10:25, 11:3, 11:15, 11:19, 11:25, 12:3, 12:4, 12:15, 12:25, 13:12, 13:14, 13:20, 14:11, 14:21, 19:2, 19:4, 19:6, 25:3, 27:20, 27:21, 30:13, 33:21, 33:25, 43:19, 43:21, 43:24, 46:18, 46:21, 46:25, 47:3, 47:12, 47:22, 48:14, 49:20, 49:24, 50:11, 50:13, 56:23, 57:1, 59:19, 59:22, 63:6, 63:12, 63:15, 63:18, 64:10, 64:18, 66:8, 66:10, 66:15, 66:21, 67:18, 72:19, 72:21, 72:25, 73:3, 73:6, 78:21, 80:7, 80:9, 80:12, 80:14, 80:17, 80:23, 81:4, 82:14, 82:19, 83:5, 83:13, 84:3, 84:5, 84:6, 84:13, 84:22, 84:25, 85:1, 85:3, 85:6, 85:11, 86:1, 86:13, 86:21, 87:9, 87:13, 87:17, 87:23, 88:3, 88:9, 88:17, 88:20, 89:1, 89:3, 89:6, 89:9, 89:12, 89:17, 89:21, 89:25, 90:2, 90:5, 90:9,

90:14, 90:18, 90:20, 90:23, 91:3, 91:6, 91:10, 91:14, 91:18, 91:22, 91:25, 92:4, 92:7, 92:11, 92:15, 92:20, 92:22, 92:25, 93:3, 93:5, 93:8, 93:10, 93:11, 93:14, 93:18, 93:20, 93:23, 94:1, 94:5, 94:10, 94:11, 94:16, 94:18, 95:4, 95:8, 95:19, 96:8, 96:18, 96:23, 97:1, 97:6, 97:8, 97:12, 97:15, 98:5, 98:8, 98:13, 98:18, 98:21, 98:24, 98:25, 99:8, 99:15, 99:21, 100:4, 100:15, 100:19, 100:22, 101:3, 101:8, 101:13, 101:14, 102:4, 102:4, 102:5
**MS** [13] - 2:11, 10:10, 10:12, 10:21, 84:16, 87:25, 88:2, 88:13, 89:20, 89:24, 94:4, 98:1, 101:12
**multiple** [1] - 50:15
**must** [1] - 15:5

**N**

**N-600** [15] - 28:13, 28:16, 28:18, 28:19, 58:22, 58:25, 59:12, 59:15, 59:20, 60:2, 60:4, 60:14, 60:18, 98:25, 99:1
**name** [4] - 19:7, 25:25, 34:24, 40:22
**names** [2] - 27:5, 31:14
**National** [9] - 17:22, 18:3, 18:7, 71:9, 71:16, 71:19, 72:2, 89:21, 90:3
**nationally** [1] - 15:23
**naturalization** [4] - 24:12, 24:13, 46:1, 46:9
**naturalized** [2] - 4:14, 19:21
**necessarily** [1] - 97:3
**necessary** [2] - 3:12, 86:12
**need** [7] - 33:25, 42:23, 59:15, 75:21, 95:13, 95:14, 97:2
**needed** [1] - 15:12
**needs** [1] - 95:9
**negligence** [9] - 6:5, 8:14, 11:6, 68:19, 95:23, 96:1, 99:11, 99:18, 101:4
**never** [14] - 10:18, 10:21, 24:24, 35:12, 50:25, 51:25, 52:3, 57:21, 67:10, 67:13, 67:24, 70:6, 77:12, 84:6
**NEW** [1] - 1:1
**New** [11] - 1:6, 1:18, 1:21, 24:4, 41:20, 43:3, 49:6, 49:18, 50:6, 87:22
**Nexis** [1] - 85:20
**next** [4] - 17:18, 27:16, 43:3, 50:19
**nine** [1] - 6:6
**no-fee** [1] - 32:17
**non** [3] - 6:12, 74:12, 97:4
**none** [1] - 4:3
**normal** [1] - 8:20
**Northern** [1] - 20:13
**note** [2] - 2:4, 95:20
**noted** [1] - 55:19
**nothing** [4] - 4:7, 42:15, 65:3, 94:16
**notice** [5] - 60:18, 60:21, 60:24, 61:9, 61:17
**November** [12] - 19:12, 21:4, 42:4, 49:4, 49:10, 68:3, 77:20, 78:5, 80:10, 80:16, 80:22, 94:21
**number** [10] - 15:15, 16:3, 34:10, 34:24,

56:12, 59:18, 61:10, 82:12, 90:25, 93:6

## O

**oath** [2] - 19:3, 48:10
**object** [10] - 33:20, 33:21, 33:23, 49:20, 93:2, 93:5, 93:6, 93:14, 93:18, 94:5
**objecting** [1] - 97:22
**objection** [17] - 8:19, 25:3, 30:13, 47:12, 50:11, 50:13, 57:1, 63:6, 63:12, 63:18, 64:10, 64:18, 66:8, 66:15, 66:21, 91:4, 91:14
**objections** [5] - 88:18, 88:19, 93:23, 94:7
**obligation** [1] - 12:15
**observe** [1] - 54:8
**obstacles** [1] - 64:15
**obtain** [4] - 17:20, 29:22, 61:8, 74:2
**obtained** [7] - 46:1, 46:8, 53:5, 60:21, 60:24, 69:11, 95:10
**obtaining** [2] - 65:4, 82:20
**obviously** [2] - 95:1, 95:11
**occurred** [2] - 70:20, 71:21
**October** [12] - 52:11, 72:4, 72:8, 72:12, 78:21, 78:22, 80:23, 80:24, 80:25, 83:14, 95:16, 96:22
**ODO** [1] - 83:17
**OF** [3] - 1:1, 1:13, 1:20
**offer** [1] - 38:6
**office** [3] - 77:13, 78:3, 83:16
**Office** [1] - 83:14
**officer** [2] - 16:2, 46:5
**officers** [5] - 14:23, 26:3, 26:12, 42:7, 44:18
**official** [1] - 1:23
**officials** [3] - 45:16, 45:22, 59:4
**old** [1] - 13:24
**once** [3] - 3:22, 60:18, 100:22
**one** [37] - 3:2, 3:6, 5:3, 5:4, 5:5, 5:9, 5:16, 5:17, 6:13, 13:5, 16:12, 17:5, 17:12, 26:3, 27:1, 31:4, 31:6, 31:15, 34:17, 36:10, 51:21, 54:20, 55:17, 56:5, 57:3, 57:10, 57:24, 60:9, 66:18, 70:15, 71:15, 76:19, 78:23, 81:23, 83:2, 97:1, 98:21
**ones** [2] - 93:4, 93:7
**ongoing** [1] - 43:16
**open** [1] - 10:8
**opening** [2] - 2:25, 14:16
**opinion** [4] - 13:7, 13:24, 14:18, 94:25
**oppose** [1] - 91:21
**option** [1] - 9:21
**options** [1] - 5:2
**order** [3] - 7:20, 28:11, 101:10
**ordered** [2] - 29:1, 74:25
**orders** [2] - 11:21, 11:23
**original** [1] - 76:23
**originally** [2] - 12:9, 72:17
**ORTIZ** [1] - 1:8
**otherwise** [1] - 73:24

**outside** [1] - 25:4
**overall** [1] - 69:25
**overnight** [1] - 43:1
**overruled** [2] - 93:13, 93:16
**Oversight** [1] - 83:15
**overview** [1] - 3:1
**own** [3] - 40:9, 40:11, 98:11

## P

**pack** [1] - 42:8
**page** [13] - 6:6, 32:1, 32:4, 48:17, 48:20, 48:21, 54:1, 55:19, 60:10, 61:6, 66:24, 67:1, 67:16
**PAGE** [1] - 102:2
**paper** [4] - 27:5, 42:13, 57:14, 61:19
**papers** [6] - 59:5, 73:10, 74:5, 74:7, 100:1
**paragraph** [2] - 32:12, 32:14
**parents** [1] - 43:2
**Parish** [1] - 65:11
**parole** [1] - 25:12
**part** [5] - 2:20, 79:22, 89:14, 99:4, 100:6
**particular** [1] - 76:17
**parties** [1] - 2:24
**partner** [1] - 78:2
**pass** [2] - 67:11, 67:14
**pattern** [1] - 42:10
**pay** [2] - 4:4, 31:16
**pending** [2] - 13:18, 95:20
**pens** [1] - 57:14
**people** [7] - 11:16, 34:16, 34:19, 34:20, 36:4, 87:21, 99:17
**percent** [1] - 15:22
**period** [4] - 15:4, 15:12, 22:18, 79:23
**permit** [1] - 84:14
**person** [12] - 22:24, 29:17, 70:22, 77:13, 84:11, 84:14, 84:18, 85:21, 86:6, 87:4, 100:11, 100:13
**personally** [2] - 40:10, 68:6
**personnel** [1] - 86:20
**pertaining** [13] - 25:4, 51:19, 51:21, 62:13, 66:7, 66:19, 67:22, 70:17, 71:5, 71:17, 71:20, 71:24, 96:10
**Petition** [5] - 32:19, 61:23, 62:2, 62:3, 67:24
**Petitions** [1] - 15:15
**phone** [4] - 41:18, 90:20, 97:5
**physical** [3] - 22:21, 66:9, 66:12
**picked** [1] - 100:25
**picture** [1] - 42:13
**place** [1] - 82:13
**placed** [1] - 3:23
**plaintiff** [45] - 2:5, 2:12, 6:15, 14:22, 14:23, 14:24, 15:3, 15:4, 15:7, 15:11, 15:14, 15:17, 15:22, 16:6, 16:17, 16:18, 16:20, 16:23, 16:25, 17:4, 17:9, 17:15, 17:16, 17:19, 17:20, 17:23, 18:2, 18:9, 18:14, 18:20, 25:5, 46:23, 59:20, 73:4, 73:7, 73:13, 74:3, 81:8, 81:11, 82:6, 85:4, 86:9, 86:13,

90:12
**Plaintiff** [2] - 1:5, 1:17
**Plaintiff's** [2] - 45:7, 45:12
**plaintiff's** [21] - 11:5, 14:6, 15:9, 18:12, 18:23, 73:9, 73:21, 81:17, 82:1, 82:20, 83:4, 85:12, 86:2, 90:20, 90:24, 91:3, 92:5, 94:2, 95:22, 96:5, 99:11
**plaintiffs's** [1] - 96:3
**Plaza** [1] - 1:21
**plumbing** [1] - 20:16
**plus** [1] - 53:11
**point** [20] - 9:19, 12:13, 14:4, 14:5, 14:6, 36:1, 39:18, 39:22, 40:17, 67:4, 67:20, 67:25, 71:21, 74:2, 76:9, 76:12, 77:7, 98:23, 99:20, 100:21
**politely** [2] - 42:22, 64:22
**popular** [1] - 16:12
**portions** [1] - 96:20
**position** [2] - 40:13, 45:9
**possibility** [2] - 4:11, 36:11
**possible** [1] - 30:20
**possibly** [1] - 34:10
**post** [1] - 86:21
**postponing** [1] - 73:24
**practical** [1] - 14:7
**precise** [2] - 3:20, 90:25
**preferably** [1] - 97:21
**prepared** [4] - 55:9, 84:10, 88:11, 95:3
**preparing** [1] - 60:13
**present** [2] - 2:7, 85:4
**presentation** [1] - 39:4
**presentations** [3] - 4:6, 39:6, 39:18
**presenters** [1] - 39:6
**pressing** [1] - 12:23
**presumably** [1] - 8:1
**prevail** [1] - 13:22
**prevent** [1] - 67:4
**prevented** [18] - 17:18, 17:25, 18:21, 51:21, 54:20, 55:17, 56:5, 57:3, 57:10, 64:4, 64:15, 65:3, 66:6, 66:13, 66:18, 70:6, 85:14, 86:3
**previous** [1] - 89:15
**previously** [2] - 49:5, 81:6
**print** [1] - 37:16
**printed** [3] - 17:10, 37:16
**printout** [3] - 37:13, 92:11, 92:15
**printouts** [2] - 37:12, 37:14
**prisoners** [1] - 7:12
**private** [2] - 11:5, 95:22
**pro** [3] - 27:13, 32:16, 81:23
**probable** [2] - 96:9, 96:10
**probation** [2] - 49:10, 49:15
**problem** [1] - 6:8
**procedural** [1] - 13:16
**procedurally** [1] - 13:5
**procedure** [2] - 83:22, 83:24
**Procedures** [1] - 16:11
**procedures** [1] - 69:2
**proceed** [4] - 9:6, 14:5, 14:6, 14:7
**proceeding** [15] - 9:25, 12:17, 15:16, 28:6, 29:22, 30:16, 31:12, 35:19,

38:14, 55:21, 58:21, 64:1, 65:2, 73:22, 73:23
**Proceedings** [1] - 1:25
**proceedings** [19] - 3:23, 5:4, 5:17, 12:10, 33:16, 43:7, 43:16, 44:24, 49:25, 50:9, 50:16, 58:17, 69:10, 81:7, 93:12, 99:22, 99:25, 100:17, 101:19
**process** [3] - 3:15, 4:22, 64:14
**processing** [1] - 42:12
**produced** [1] - 1:25
**profile** [1] - 18:6
**program** [13] - 16:24, 22:5, 22:6, 22:7, 25:10, 44:6, 55:4, 55:22, 75:17, 75:19, 75:21, 92:8, 92:16
**prohibited** [3] - 4:23, 38:17, 38:19
**Project** [1] - 27:22
**prolific** [1] - 15:14
**prong** [1] - 15:8
**proof** [1] - 24:9
**proposal** [1] - 6:25
**proposed** [4] - 97:24, 97:25, 98:1, 98:14
**prosecute** [1] - 99:25
**prosecuting** [1] - 99:22
**prosecution** [17] - 6:5, 8:14, 11:6, 68:19, 95:23, 96:1, 96:12, 99:12, 99:17, 99:19, 99:20, 99:21, 100:2, 100:9, 100:10, 100:21, 101:1
**protocol** [2] - 12:16, 12:18
**prove** [10] - 7:23, 15:5, 35:19, 43:6, 45:17, 45:23, 46:18, 46:20, 62:17, 75:4
**provide** [4] - 32:18, 43:9, 47:22, 84:11
**provided** [3] - 16:24, 88:21, 89:15
**provides** [2] - 16:14, 90:25
**proving** [3] - 64:1, 64:7, 64:25
**published** [1] - 16:13
**pull** [1] - 83:13
**purposes** [1] - 73:17
**pursuant** [4] - 15:18, 45:6, 50:6, 93:5
**pursue** [7] - 15:10, 17:16, 18:18, 63:16, 63:23, 69:7, 74:1
**pursuing** [4] - 15:5, 63:4, 73:11, 82:4
**pushed** [1] - 42:14
**put** [14] - 37:14, 42:13, 82:15, 84:2, 84:3, 84:8, 85:17, 86:11, 88:16, 88:20, 88:24, 89:16, 94:9
**putting** [1] - 99:22

## Q

**QUESTION** [8] - 48:24, 54:4, 54:8, 54:12, 60:13, 61:8, 61:12, 67:4
**questions** [10] - 43:19, 48:5, 48:7, 48:10, 54:3, 72:19, 72:25, 81:3, 86:23, 87:2
**quick** [1] - 90:5
**quote** [2] - 45:16, 55:21
**quoted** [1] - 94:14

## R

**ran** [1] - 94:22

**rarely** [2] - 10:10, 10:12
**reach** [1] - 75:8
**reached** [1] - 7:16
**react** [1] - 26:15
**Read** [1] - 19:13
**read** [10] - 19:14, 32:13, 53:21, 53:23, 54:10, 59:12, 75:2, 85:24, 85:25, 92:25
**readily** [1] - 90:15
**reading** [2] - 47:3, 54:20
**ready** [1] - 25:11
**real** [1] - 28:3
**realize** [1] - 95:20
**really** [5] - 5:15, 9:2, 95:6, 95:9, 99:16
**reason** [7] - 14:10, 33:3, 68:22, 68:25, 81:11, 81:14, 87:17
**reasonable** [1] - 85:22
**reasons** [3] - 73:8, 73:9, 74:5
**receipt** [1] - 81:12
**receive** [2] - 28:24, 74:7, 76:5
**received** [12] - 20:24, 29:21, 57:18, 70:3, 76:7, 77:19, 78:18, 80:4, 80:9, 80:15, 84:6, 94:20
**receiving** [2] - 21:6, 21:15
**recess** [2] - 87:24, 88:1
**Recess** [1] - 43:22
**recognize** [3] - 32:2, 34:3, 73:21
**recollection** [1] - 56:17
**recommendations** [1] - 83:10
**record** [2] - 19:7, 101:19
**recorded** [1] - 1:25
**records** [1] - 95:14
**recreation** [5] - 16:1, 30:22, 37:21, 38:1, 38:3
**redirect** [1] - 72:20
**REDIRECT** [2] - 72:21, 102:5
**reference** [2] - 89:6, 90:5
**refresh** [1] - 56:17
**regard** [1] - 58:20
**regarding** [4] - 4:6, 18:4, 82:2
**regular** [1] - 33:14
**Reid** [1] - 74:24
**reinstate** [2] - 45:9, 62:3
**reinstatement** [1] - 62:5
**reinvent** [1] - 22:22
**related** [8] - 15:16, 17:2, 18:5, 51:1, 58:13, 62:11, 62:21, 68:18
**relates** [1] - 49:22
**relating** [1] - 30:8
**relationship** [1] - 77:7
**release** [4] - 17:25, 68:17, 86:22, 100:12
**released** [29] - 5:4, 5:13, 5:14, 18:17, 23:13, 35:21, 42:1, 42:2, 42:3, 42:4, 43:15, 44:5, 47:21, 68:2, 68:7, 68:9, 68:22, 69:22, 74:6, 74:20, 75:5, 77:3, 77:8, 79:25, 99:23, 99:24, 100:17, 100:18, 100:25
**relevant** [3] - 15:4, 81:13, 82:3
**relief** [1] - 18:5
**rely** [1] - 99:4
**remaining** [1] - 95:25

**remand** [1] - 5:13
**remanded** [2] - 5:11
**remedies** [2] - 15:18, 68:14
**remember** [13] - 21:22, 25:25, 31:14, 33:8, 33:10, 35:1, 40:22, 41:9, 42:2, 61:2, 78:1, 78:13, 78:17
**removal** [23] - 3:23, 5:4, 5:17, 12:9, 12:17, 29:22, 30:15, 31:12, 32:21, 35:19, 38:14, 43:7, 43:16, 44:24, 55:20, 64:1, 65:2, 81:7, 93:11, 99:22, 99:25, 100:17
**removed** [4] - 28:11, 29:1, 29:9, 74:25
**repeat** [3] - 50:2, 67:12, 74:14
**report** [1] - 83:13
**Reporter** [1] - 1:23, 1:23, 85:25
**represent** [6] - 26:22, 27:14, 27:24, 32:16, 33:1, 39:10
**represented** [1] - 28:5
**request** [8] - 35:9, 35:13, 37:3, 37:6, 37:7, 37:9, 83:2
**requested** [2] - 37:12, 37:16
**requesting** [1] - 5:19
**requests** [7] - 56:2, 56:5, 56:8, 56:18, 56:20, 57:4, 58:7
**require** [2] - 6:13, 86:5
**research** [12] - 16:17, 17:2, 18:19, 36:5, 36:7, 38:6, 38:12, 55:4, 62:7, 68:17, 69:3
**researching** [1] - 17:6
**reserve** [3] - 96:6, 96:7, 96:16
**resided** [2] - 41:19, 42:25
**resource** [6] - 16:16, 16:21, 16:22, 54:23, 56:1, 82:24
**resources** [13] - 15:19, 16:4, 16:6, 17:15, 43:9, 52:23, 53:16, 57:13, 58:5, 58:11, 58:15, 62:10, 62:12
**respect** [10] - 4:7, 4:22, 15:8, 37:17, 83:15, 86:25, 95:5, 95:8, 95:21, 99:19
**respectfully** [1] - 18:22
**respectively** [1] - 18:4
**respond** [1] - 81:4
**rest** [3] - 92:19, 92:21, 94:17
**restate** [2] - 47:16, 63:21
**rests** [1] - 73:4
**retained** [4] - 17:22, 32:22, 69:14, 71:12
**retainer** [1] - 32:8
**retaining** [1] - 32:18
**retention** [2] - 32:17, 91:4
**returned** [2] - 6:15, 7:13
**returning** [1] - 65:1
**reversing** [1] - 8:20
**review** [8] - 3:22, 12:22, 15:15, 32:19, 45:9, 61:23, 62:2, 62:3
**Review** [2] - 16:13, 88:23
**reviewable** [1] - 12:10
**richard** [1] - 1:23
**Richard** [1] - 101:21
**Rights** [1] - 88:23
**rights** [15] - 4:6, 4:16, 15:5, 31:9, 39:3, 39:6, 39:9, 39:18, 68:21, 73:11, 74:10, 86:8, 87:5, 92:12

robbery [1] - 49:5
**ROBERT** [1] - 1:19
**Robert** [1] - 2:14
**RPR** [2] - 1:23, 101:21
**rule** [1] - 54:17
**Rules** [1] - 16:11
**rules** [1] - 16:12
**ruling** [5] - 5:15, 5:16, 77:15, 94:12, 99:1
**rulings** [1] - 98:22
**run** [4] - 3:9, 3:10, 5:10, 94:20
**rwbarrycourtreporter@gmail.com** [1] - 1:24

## S

s/Richard [1] - 101:20
**sake** [1] - 99:9
**sale** [4] - 22:12, 22:15, 49:18, 50:5
**sat** [1] - 76:19
**saw** [4] - 3:9, 23:22, 23:24, 24:3
**schedule** [3] - 34:13, 96:24, 98:11
**scheduled** [1] - 83:23
**school** [5] - 3:25, 20:4, 20:10, 20:12, 75:20
**Schrader** [8] - 16:3, 25:25, 26:2, 26:3, 26:5, 26:7, 26:15
**scope** [1] - 25:4
**Scott** [4] - 16:3, 25:25, 26:2, 26:3
**screen** [3] - 91:10, 91:25, 92:7
**se** [1] - 81:23
**search** [2] - 16:19, 69:1
**searches** [1] - 55:7, 68:14, 82:24
**second** [4] - 32:1, 32:4, 32:12, 49:5
**Second** [10] - 5:10, 5:11, 5:13, 5:15, 12:22, 31:11, 68:23, 75:23, 77:9, 81:20
**Section** [1] - 45:6
**Security** [1] - 25:2
**see** [16] - 2:11, 10:1, 23:12, 23:14, 23:16, 24:2, 25:21, 36:15, 47:20, 78:16, 86:19, 86:24, 87:8, 99:17, 99:19, 100:3
**seeing** [1] - 35:1
**seeking** [1] - 90:6
**selective** [1] - 92:8
**self** [1] - 82:6
**send** [2] - 32:7, 99:3
**SENIOR** [1] - 1:14
**sensible** [1] - 14:7
**sent** [1] - 65:14
**sentence** [1] - 22:9
**sentenced** [4] - 22:9, 49:8, 49:9, 49:13
**sentences** [1] - 32:14
**separate** [5] - 3:11, 9:1, 18:2, 89:3
**September** [12] - 19:15, 45:3, 45:12, 49:17, 50:4, 96:25, 97:3, 97:8, 98:5, 98:15, 98:16, 99:10
**serves** [1] - 15:23
**services** [2] - 32:18, 91:7
**serving** [1] - 82:6

set [5] - 32:17, 73:8, 73:10, 74:5, 96:10
**sets** [1] - 52:23
**seven** [2] - 53:23, 54:14
**several** [1] - 34:11
**SF-95** [5] - 31:1, 72:8, 72:11, 92:1, 92:4
**SF-95s** [1] - 17:11
**sheet** [4] - 4:2, 34:6, 34:23, 78:19
**Shock** [1] - 21:8
**short** [4] - 36:13, 43:20, 87:23, 92:1
**shot** [3] - 91:10, 91:25, 92:7
**show** [15] - 3:1, 14:21, 15:2, 15:7, 16:7, 16:22, 17:9, 17:14, 18:12, 18:17, 18:20, 31:21, 73:8, 93:22, 100:15
**showing** [1] - 56:14
**shown** [2] - 73:11, 73:13
**shows** [4] - 3:10, 34:6, 34:13, 78:19
**sides** [1] - 96:21
**sign** [2] - 34:23
**sign-in** [1] - 34:23
**significance** [1] - 91:16
**significant** [1] - 91:19
**significantly** [1] - 18:2
**simplify** [1] - 6:11
**simultaneously** [1] - 7:19
**situation** [3] - 42:23, 87:8
**six** [4] - 22:10, 23:25, 25:23, 72:16
**skill** [2] - 84:18, 85:21
**small** [1] - 33:10
**Smith** [2] - 22:21, 81:19
**sole** [7] - 30:15, 43:4, 43:6, 62:17, 63:25, 64:7, 64:25
**Solomon** [2] - 78:2, 78:16
**someone** [2] - 3:22, 38:1
**somewhat** [1] - 6:11
**soon** [3] - 78:25, 79:25, 100:17
**sorry** [11] - 11:2, 20:12, 21:1, 38:24, 51:13, 74:14, 80:18, 80:24, 94:6, 95:8, 98:13
**sort** [2] - 64:24, 68:25
**speaking** [1] - 57:10
**specialist** [4] - 16:1, 37:21, 38:1, 38:3
**specialists** [1] - 30:22
**specific** [2] - 34:25, 62:16
**specifically** [1] - 61:1
**spent** [1] - 15:22
**staff** [9] - 16:18, 53:8, 56:2, 56:5, 56:9, 56:18, 56:20, 57:4, 58:6
**stage** [1] - 8:18
**standard** [3] - 15:12, 72:4
**standards** [1] - 11:23
**standing** [2] - 82:20, 83:3
**started** [4] - 5:10, 75:1, 75:12, 75:24
**state** [7] - 19:7, 22:4, 22:6, 85:5, 86:7, 87:12, 93:22
**State** [1] - 42:18
**statement** [7] - 2:25, 14:16, 45:7, 45:22, 55:24, 61:1, 93:21
**STATES** [4] - 1:1, 1:9, 1:14, 1:20
**States** [31] - 1:6, 2:10, 4:13, 4:15, 4:21, 8:2, 10:19, 10:22, 19:9, 19:19, 23:10, 24:9, 26:8, 26:11, 26:14, 26:16, 30:18,

30:24, 35:20, 39:20, 39:24, 44:18, 44:21, 45:1, 46:22, 64:2, 64:8, 65:1, 77:11, 77:16, 87:14
**stating** [1] - 61:19
**station** [1] - 42:21
**statute** [10] - 3:7, 3:9, 3:20, 3:21, 5:1, 5:10, 13:10, 18:11, 94:20, 94:21
**statutes** [2] - 3:10, 4:24
**stay** [3] - 13:21, 35:6, 35:8
**stayed** [3] - 37:1, 43:1, 52:10
**staying** [1] - 9:25
**stenography** [1] - 1:25
**step** [1] - 53:15
**still** [17] - 12:23, 18:18, 68:10, 68:13, 68:23, 69:3, 69:6, 69:17, 71:4, 71:23, 74:9, 75:1, 77:8, 95:20, 96:4, 100:7
**stipulate** [2] - 83:5, 83:6
**stipulated** [6] - 27:17, 80:13, 80:14, 82:16, 84:25, 85:10
**stipulation** [12] - 82:18, 83:2, 84:23, 85:6, 85:9, 85:12, 85:19, 86:2, 86:6, 86:10, 87:18, 88:5
**stood** [3] - 15:6, 63:4, 73:14
**straight** [1] - 62:9
**strains** [1] - 18:13
**stranded** [1] - 42:23
**Street** [1] - 1:17
**strips** [1] - 3:21
**strongest** [1] - 8:18
**students** [3] - 4:5, 39:15, 39:16
**stuff** [1] - 42:8
**sub** [1] - 92:2
**sub-folder** [1] - 92:2
**subject** [1] - 18:23
**submission** [1] - 87:15
**submit** [3] - 24:17, 24:18, 84:3
**submits** [2] - 18:22, 87:14
**subsequently** [1] - 25:17
**substance** [3] - 22:12, 22:16, 48:10
**substantial** [1] - 91:14
**substantively** [1] - 89:15
**sue** [12] - 39:19, 39:24, 77:23, 77:25, 78:8, 78:9, 78:14, 79:1, 79:13, 80:19, 84:19, 94:23
**suffer** [3] - 66:6, 66:12, 72:22
**suffered** [1] - 75:15
**suffice** [1] - 84:20
**sufficient** [9] - 62:11, 62:12, 73:17, 73:20, 81:18, 81:25, 84:12, 84:14, 84:17
**suggest** [1] - 18:14
**suggested** [1] - 88:24
**suggesting** [1] - 9:24
**suit** [4] - 80:21, 85:22, 86:4, 94:25
**sum** [2] - 48:10, 67:20
**summaries** [2] - 16:14, 17:2
**summary** [5] - 10:24, 11:8, 11:14, 12:24, 96:3
**superiors** [1] - 11:18
**supervised** [1] - 100:12
**supervisory** [1] - 16:2

**supplemental** [3] - 6:6, 45:20, 73:10
**supply** [1] - 99:2
**supporting** [1] - 97:25
**suppose** [2] - 10:9, 49:22
**supposed** [1] - 47:7
**Supreme** [3] - 3:8, 49:19, 50:6
**swore** [1] - 48:9
**sworn** [1] - 2:15
**system** [3] - 60:22, 60:25, 61:14

## T

**teach** [1] - 43:8
**teacher** [1] - 89:2
**telephone** [6] - 17:12, 52:3, 57:24, 58:1, 58:8, 69:20
**ten** [1] - 54:12
**Tensas** [1] - 65:11
**terminate** [3] - 30:15, 43:7, 44:24
**terminated** [2] - 5:4, 5:17
**terminating** [2] - 64:1, 65:1
**terms** [1] - 32:17
**testified** [4] - 2:15, 53:4, 53:7, 81:6
**testify** [2] - 82:25, 88:12
**testifying** [3] - 16:1, 76:1, 82:22
**testimony** [4] - 54:15, 82:7, 82:23, 88:10
**Testimony** [1] - 19:14
**text** [2] - 33:14, 89:13
**THE** [271] - 1:14, 2:1, 2:8, 2:12, 2:17, 2:19, 2:21, 2:23, 3:2, 3:4, 5:19, 5:22, 6:1, 6:7, 6:19, 6:21, 6:23, 6:25, 7:3, 7:8, 7:17, 8:3, 8:5, 8:12, 8:19, 8:23, 8:25, 9:5, 9:7, 10:4, 10:8, 10:11, 10:20, 10:23, 11:2, 11:10, 11:16, 11:20, 12:2, 12:11, 12:23, 13:1, 13:13, 13:15, 13:24, 14:17, 18:25, 19:3, 19:5, 19:13, 20:11, 21:1, 21:2, 22:14, 22:15, 25:7, 27:16, 30:14, 33:19, 33:23, 34:1, 43:20, 43:23, 46:17, 46:20, 47:2, 47:5, 47:14, 47:25, 48:13, 48:15, 48:18, 49:22, 50:1, 51:12, 51:13, 51:14, 51:16, 51:17, 56:25, 59:18, 59:21, 59:25, 63:8, 63:19, 64:11, 64:19, 65:7, 65:9, 66:9, 66:16, 66:22, 72:20, 73:1, 73:4, 74:6, 74:8, 74:9, 74:11, 74:12, 74:14, 74:15, 74:18, 74:19, 74:21, 74:22, 74:23, 75:25, 76:2, 76:3, 76:4, 76:5, 76:7, 76:9, 76:11, 76:12, 76:15, 76:16, 76:18, 76:21, 76:22, 76:23, 76:24, 76:25, 77:1, 77:2, 77:4, 77:19, 77:21, 77:22, 77:24, 77:25, 78:1, 78:4, 78:7, 78:8, 78:10, 78:13, 78:15, 78:19, 78:22, 78:24, 78:25, 79:2, 79:3, 79:4, 79:5, 79:6, 79:7, 79:8, 79:9, 79:10, 79:12, 79:14, 79:15, 79:17, 79:18, 79:19, 79:20, 79:21, 79:22, 79:24, 79:25, 80:2, 80:4, 80:6, 80:8, 80:11, 80:13, 80:15, 80:18, 80:20, 80:21, 80:24, 81:1, 81:2, 82:12, 82:15, 83:12, 84:2, 84:4, 84:8, 84:10, 84:14, 84:18, 85:2, 85:5, 85:8, 85:16, 86:5, 86:16, 86:18, 86:19, 86:23, 87:1, 87:2, 87:11, 87:15, 87:18, 88:8, 88:11, 88:15, 88:23, 89:2, 89:5, 89:8, 89:11, 89:18, 89:23, 90:1, 90:4, 90:8, 90:13, 90:17, 90:22, 91:2, 91:5, 91:9, 91:13, 91:16, 91:20, 91:23, 92:3, 92:6, 92:10, 92:14, 92:18, 92:21, 92:24, 93:2, 93:4, 93:7, 93:9, 93:13, 93:16, 93:19, 93:21, 93:25, 94:3, 94:8, 94:13, 94:17, 94:19, 95:7, 95:17, 96:6, 96:16, 96:21, 96:25, 97:4, 97:7, 97:10, 97:14, 97:17, 98:3, 98:6, 98:9, 98:17, 98:20, 98:22, 99:3, 99:13, 99:16, 100:3, 100:5, 100:18, 100:20, 100:24, 101:6, 101:9, 101:15
**theirs** [1] - 88:19
**themselves** [1] - 40:14
**theories** [3] - 3:6, 5:20, 6:12, 6:13, 9:1
**theory** [5] - 5:19, 7:13, 10:18, 100:7, 100:14
**therefore** [2] - 14:25, 94:25
**thinking** [2] - 87:6, 96:23
**third** [3] - 16:22, 49:18, 50:5
**three** [15] - 3:15, 4:19, 12:18, 12:21, 15:24, 21:8, 30:12, 32:13, 33:11, 35:5, 53:11, 53:13, 79:10, 97:18
**throughout** [3] - 27:14, 50:10, 81:7
**Thursday** [1] - 1:8
**ticket** [1] - 43:2
**tied** [1] - 13:16
**tier** [1] - 34:13
**timely** [6] - 18:15, 25:6, 46:24, 94:25, 95:24, 96:4
**TIMOTHY** [1] - 1:9
**today** [5] - 16:1, 48:11, 66:2, 75:25, 81:7
**together** [3] - 7:1, 13:5, 88:24
**tolled** [1] - 5:2
**tolling** [14] - 2:17, 3:12, 15:4, 18:24, 49:21, 73:8, 73:18, 74:4, 81:19, 81:25, 82:5, 94:22, 94:24
**took** [5] - 23:4, 25:22, 48:11, 75:10
**tool** [2] - 16:25, 62:7
**topics** [1] - 92:8
**tops** [1] - 79:10
**Tort** [10] - 5:22, 7:9, 7:19, 7:23, 8:20, 13:2, 13:8, 13:9, 14:9, 27:18
**tort** [1] - 89:4
**torts** [1] - 16:12
**total** [1] - 16:23
**trade** [1] - 20:12
**trained** [3] - 20:15, 20:16, 22:7
**training** [6] - 4:10, 20:18, 22:22, 28:3, 40:15
**Transcript** [1] - 1:25
**TRANSCRIPT** [1] - 1:13
**transcript** [6] - 47:23, 60:11, 61:6, 93:11, 94:2, 101:18
**Transcription** [1] - 1:25
**transfer** [1] - 41:22
**transferred** [11] - 24:6, 25:19, 40:17, 40:21, 41:1, 41:3, 41:8, 41:14, 42:9, 52:6, 65:11

**transported** [2] - 44:11, 50:19
**treated** [4] - 25:15, 25:17, 86:14, 86:16
**treatises** [1] - 16:11
**treatment** [1] - 86:21
**trial** [15] - 6:19, 7:1, 7:4, 7:5, 7:18, 7:21, 9:1, 9:18, 27:18, 96:14, 97:19, 99:4, 99:10
**tricked** [2] - 67:10, 67:13
**tried** [1] - 95:16
**trouble** [1] - 17:5
**true** [1] - 95:17
**truth** [1] - 48:9
**try** [10] - 8:22, 13:4, 13:5, 27:2, 51:18, 95:3, 95:15, 96:7, 97:18, 101:9
**trying** [6] - 7:19, 8:20, 35:18, 75:1, 75:4, 85:1
**turn** [8] - 31:24, 32:1, 32:4, 33:18, 54:23, 56:1, 66:24, 67:16
**turned** [2] - 22:25, 75:18
**turning** [4] - 21:21, 48:17, 48:20, 60:10
**twelve** [1] - 55:19
**twenty** [6] - 34:18, 34:19, 34:20, 48:21, 69:21, 69:22
**twice** [1] - 53:10
**two** [19] - 3:6, 5:5, 5:7, 5:23, 8:7, 40:24, 42:7, 43:18, 48:21, 75:10, 79:7, 79:9, 79:10, 83:17, 95:21, 99:23, 100:1, 100:4, 100:5
**type** [1] - 77:18
**types** [1] - 36:11
**typewriters** [3] - 33:12, 55:2

## U

**U.S** [3] - 45:6, 45:10, 46:1
**U.S.C** [2] - 3:21, 9:9
**U.S.C.I.S** [2] - 46:12, 46:22
**ultimately** [8] - 5:17, 17:14, 42:1, 47:9, 72:15, 73:11, 73:16, 81:10
**unconstitutional** [4] - 10:14, 10:17, 10:18, 10:21
**unconstitutionally** [2] - 4:19, 30:12
**under** [10] - 3:8, 3:20, 3:21, 4:23, 9:9, 12:6, 19:3, 19:19, 21:13, 79:18
**underlining** [1] - 11:22, 62:21, 73:21
**underlying** [1] - 73:22
**understood** [1] - 81:9
**undisputed** [1] - 96:9
**unit** [3] - 34:6, 34:23, 42:7
**UNITED** [4] - 1:1, 1:9, 1:14, 1:20
**United** [31] - 1:6, 2:10, 4:13, 4:14, 4:21, 8:2, 10:19, 10:22, 19:9, 19:19, 23:10, 24:9, 26:8, 26:11, 26:14, 26:16, 30:18, 30:24, 35:20, 39:19, 39:24, 44:18, 44:21, 45:1, 46:22, 64:2, 64:7, 64:25, 77:11, 77:16, 87:14
**unjust** [1] - 4:25
**unlawful** [5] - 47:10, 47:18, 48:25, 68:10, 85:23
**unlawfully** [1] - 81:15
**unsure** [1] - 82:7

**up** [17] - 13:16, 19:17, 20:4, 22:18,
    34:18, 34:20, 35:18, 42:8, 46:12,
    46:24, 67:20, 76:12, 77:7, 83:19,
    86:15, 99:22, 100:25
**upset** [2] - 68:10, 68:13
**useful** [1] - 16:14

**V**

**van** [1] - 44:11
**variety** [1] - 17:15
**various** [3] - 5:2, 5:8
**verdict** [2] - 6:14, 7:13
**verify** [1] - 46:2
**versus** [3] - 2:3, 32:19, 87:14
**via** [2] - 62:6, 69:20
**viable** [1] - 97:10
**view** [5] - 10:4, 12:14, 14:4, 14:5, 14:6
**violated** [2] - 4:16, 31:9
**violation** [2] - 6:2, 49:14
**violations** [1] - 11:21
**virtue** [1] - 4:13
**visit** [3] - 33:5, 34:22, 35:3
**visitors** [1] - 17:13
**volumes** [2] - 16:9, 16:10
**Volunteer** [1] - 27:22
**volunteer** [1] - 28:2

**W**

**walked** [1] - 42:21
**wall** [1] - 59:8
**warrant** [3] - 23:7, 81:18, 81:25
**Watson** [37] - 2:3, 2:7, 3:14, 3:24, 4:9,
    4:12, 5:13, 12:9, 16:4, 19:2, 19:8,
    19:9, 32:19, 43:25, 44:2, 47:6, 47:9,
    48:2, 48:20, 49:4, 50:18, 54:15, 56:12,
    56:15, 57:3, 57:7, 60:1, 60:10, 61:5,
    62:19, 63:16, 65:3, 67:19, 71:8, 72:22,
    93:22, 95:11
**WATSON** [4] - 1:4, 2:13, 2:15, 102:3
**ways** [1] - 69:2
**weatherization** [2] - 20:10, 20:13
**week** [8] - 35:3, 40:24, 41:17, 53:10,
    53:14, 97:6, 97:13
**weeks** [2] - 23:25, 25:23
**WEINSTEIN** [1] - 1:14
**West** [1] - 1:17
**whatsoever** [1] - 11:17
**wide** [1] - 17:15
**win** [1] - 9:5
**wins** [1] - 9:17
**wish** [3] - 2:21, 96:21, 101:11
**withdrawn** [1] - 94:6
**WITNESS** [45] - 21:2, 22:15, 51:13,
    51:16, 65:9, 74:8, 74:11, 74:14, 74:18,
    74:21, 74:23, 76:2, 76:4, 76:7, 76:11,
    76:15, 76:18, 76:22, 76:24, 77:1, 77:4,
    77:21, 77:24, 78:1, 78:7, 78:10, 78:15,
    78:24, 79:2, 79:4, 79:6, 79:8, 79:10,
    79:14, 79:17, 79:19, 79:21, 79:24,
    80:2, 80:6, 80:20, 81:1, 86:18, 87:1,

102:2
**witness** [6] - 2:23, 19:3, 47:24, 73:2,
    91:20, 98:18
**witnesses** [14] - 16:3, 19:1, 82:12,
    82:22, 85:17, 86:11, 87:20, 88:10,
    88:11, 88:13, 95:14, 97:2, 97:20
**women** [1] - 22:8
**won** [2] - 9:13, 75:22
**wondering** [1] - 7:22
**words** [1] - 75:2
**writ** [1] - 67:24
**write** [1] - 59:12
**written** [1] - 81:7
**wrongfully** [2] - 73:23, 82:10

**Y**

**year** [4] - 20:5, 27:14, 76:8, 80:11
**years** [22] - 3:15, 4:20, 5:5, 5:7, 12:18,
    12:21, 13:18, 14:1, 18:10, 30:12,
    43:18, 49:9, 53:11, 72:16, 75:10,
    75:18, 88:24, 90:12, 99:23, 100:1,
    100:4, 100:5
**YORK** [1] - 1:1
**York** [11] - 1:6, 1:18, 1:21, 24:4, 41:20,
    43:3, 49:6, 49:19, 50:6, 87:22
**yourself** [4] - 28:5, 29:13, 62:20, 74:7