**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

**DAVINO WATSON,**

     **Plaintiff,**

  **v.**

**THE UNITED STATES OF AMERICA,**

    **Defendant.**

**MEMORANDUM, ORDER &**
**JUDGMENT**

14-CV-6459

**Parties**

**Davino Watson**

**Appearances**

Mark A. Flessner
Laura E. Atherstone
Lisa M. Brown
Trisha M. Rich
Holland & Knight LLP
131 S. Dearborn St., 30th Floor
Chicago, IL 60603
(312) 263-3600
mark.flessner@hklaw.com
laura.atherstone@hklaw.com
lisa.brown@hklaw.com
trisha.rich@hklaw.com

Christopher G. Kelly
Robert J. Burns
Tiana M. Stephens
Holland & Knight LLP
31 West 52nd Street
New York, NY 10019
(212) 513-3200
ckelly@hklaw.com
robert.burns@hklaw.com
tiana.stephens@hklaw.com

Mark Fleming
National Immigrant Justice Center
208 S. Lasalle Street
Suite 1300

                                            Chicago, IL 60604
                                            (312) 660-1628
                                            mflemming@heartlandalliance.org


**United States of America**            Joseph Anthony Marutollo
                                            James R. Cho
                                            Elliot M. Schachner
                                            United States Attorney's Office, EDNY
                                            271 Cadman Plaza East
                                            Brooklyn, NY 11201
                                            (718) 254-7000
                                            joseph.marutollo@usdoj.gov
                                            james.cho@usdoj.gov
                                            elliot.schachner@usdoj.gov

**JACK B. WEINSTEIN, Senior United States District Judge:**

## Table of Contents

I.      Introduction ................................................................................................4

II.     Procedural Facts ..........................................................................................5

III.    Operative Facts ...........................................................................................8

    A.      Relevant Immigration Laws .............................................................8

    B.      Factual Background ........................................................................11

IV.     Law ............................................................................................................26

    A.      FTCA .............................................................................................27

        1.      Background ........................................................................ 27

        2.      Exceptions ......................................................................... 28

            a) Due Care Exception ........................................... 29

            b) Discretionary Function Exception ....................... 30

            c) Intentional Tort Exception .................................. 33

    B.      Elements under New York Law ......................................................33

        1.      False Arrest – Imprisonment .............................................. 33

        2.      Negligence ........................................................................ 34

    C.      Government liable for false arrest and false imprisonment for 27 days ...............35

        1.      May 8, 2008 – June 4, 2008 .............................................. 35

        2.      June 4, 2008 – November 2, 2011 ..................................... 36

        3.      November 3, 2011 – December 3, 2013 ............................. 37

V.      Damages .....................................................................................................38

    A.      Considerations ...............................................................................38

    B.      Value of Constitutional Rights *Simpliciter* ..................................40

    C.      Comparable Cases .........................................................................43

    D.      Application.........................................................................................................45

           1.      False Arrest ............................................................................. 45

           2.      False Imprisonment.................................................................. 46

           3.      Alternative Damages Award.................................................... 49

VI.   Conclusion .....................................................................................................49

I.      **Introduction**

        This arcane case involves a combination of critical negligent factual errors by government officials and rare reversals in the interpretation of applicable substantive citizenship law. An American citizen was wrongly arrested and held as an alien for 1,273 days while being subjected to removal proceedings as if he were a non-citizen. Yet, curiously, he is entitled to relatively negligible damages for only four weeks of his much longer detention, and none for the withholding of a certificate of citizenship after his release from incarceration.

        The legal problem arises because of the inherent inefficiency in the justice system which requires time for processing of disputes. "The mills of justice grind slowly." *Vineberg v. Bissonnette*, 548 F.3d 50, 59 (1st Cir. 2008) (from a translation by Henry Wadsworth Longfellow of German writer Friedrich von Logau). There is a clear, unmet need for counsel in immigration cases. Had an attorney been available to him at the outset, plaintiff probably promptly would have been declared a citizen and released almost immediately after he was arrested, if he were arrested at all.

        The relevant facts are undisputed. On May 8, 2008, by virtue of his father's citizenship, plaintiff Davino Watson, a 23-year-old, was a United States citizen. He had an eleventh grade education. He had been sentenced by a New York State Court for a drug-related conviction. Upon his release from the New York State Prison Shock Incarceration Program, he was taken

into custody by government immigration officials who believed that he was not a citizen. He was detained by the government until November 2, 2011, 1,273 days later. During this time he was subjected to deportation proceedings. These proceedings continued until January 24, 2013. It then took until November 26, 2013, for the government to give plaintiff a certificate of citizenship. He should have been released as an American citizen on or about May 10, 2008.

Although these facts on their face appear to present a relatively simple damages case, a combination of factors, including plaintiff's lack of an attorney, the government's repeated carelessness in investigating plaintiff's claim of citizenship, and intervening changes in the interpretation of American and Jamaican laws by administrative officials and a court, created a complex Federal Torts Claims Act conundrum.

After a bench trial under the Federal Tort Claims Act, the government is found liable to plaintiff for falsely arresting him on May 8, 2008, and for falsely imprisoning him from that date until June 4, 2008. Plaintiff is granted an award of damages in the amount of $82,500.

Plaintiff was badly treated by government employees. He deserves a letter of apology from the United States in addition to damages. But the court is not empowered to order this courtesy. *See Birnbaum v. U.S.*, 588 F.2d 319, 335 (2d Cir. 1978) ("With regard to the Judge's order that the Government send a letter of apology to each plaintiff, though such letters might some day achieve monetary value as collectors' items, we do not view them as 'money damages,' the only form of relief provided in the Act.").

Following are the required findings of fact and law. *See* Fed. R. Civ. P. 52.

II.      **Procedural Facts**

On October 31, 2014, plaintiff brought claims under the Federal Tort Claims Act against the United States for malicious prosecution, false arrest, false imprisonment, and negligence. He also asserted claims for violations of his Fourth and Fifth Amendment rights against the

individual government officials involved in his arrest and detention.  *See* Compl., filed Oct. 31, 2014, ECF No. 1, at ¶¶ 80-104.

On April 29, 2015, the government moved to dismiss for lack of subject matter jurisdiction and failure to state a claim, and for summary judgment.  *See* Mot. to Dismiss, or in the Alternative, for Summ. J., Apr. 29, 2015, ECF No. 18.  Argument was heard on June 29, 2015.  *See* Minute Entry, June 29, 2015, ECF No. 32.

Supplemental briefing and an evidentiary hearing were ordered on whether equitable tolling applies.  *See* Scheduling Order, June 30, 2015, ECF No. 30; Hr'g Tr., June 29, 2015, at 27:9-29:12.  The hearing on equitable tolling was conducted on August 20, 2015.  *See* Minute Entry, Aug. 20, 2015, ECF No. 57; Hr'g Tr., Aug. 20, 2015 ("Aug. 20 Hr'g Tr.").  The parties stipulated that all evidence presented at the hearing could be used at trial.  Aug. 20 Hr'g Tr. at 27:16-21.

At the hearing, the court dismissed the causes of action for violations of plaintiff's Fourth and Fifth Amendment rights against individual defendants Juan Estrada, Michael Ortiz, Timothy Gunther, and John Does 1-8.  *See Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971); Aug. 20 Hr'g Tr. at 13:1-14:10; Scheduling Order, Sept. 8, 2015, ECF No. 59.

On September 29, 2015 the court granted in part and denied in part the government's motions to dismiss and for summary judgment.  *Watson v. United States*, No. 14-CV-6459, --- F. Supp. 3d ----, 2015 WL 5695860 (E.D.N.Y. Sept. 29, 2015).  Based on the holding of *Heck v. Humphrey*, 512 U.S. 477 (1994), it denied the government's motion to dismiss the complaint as time barred.  *Id.* at *17-19.  Alternatively, the court held that plaintiff became entitled to equitable tolling until July 31, 2014, when he learned he had a right to sue the United States.  *Id.*

6

at *19-20.  Granted was the government's motion to dismiss plaintiff's malicious prosecution claim, finding it barred by 28 U.S.C. § 2680(h).  *Id.* at *20-21.

Plaintiff's remaining claims – false arrest, false imprisonment and negligence – were tried in a bifurcated bench trial.  Following the conclusion of the liability portion of the trial, a tentative ruling of limited liability was issued and the damages phase went forward.  Mem. & Order, Oct. 2, 2015, ECF No. 82.

It was held that the government is liable to plaintiff (i) for falsely arresting, and then imprisoning him from May 8, 2008 until November 2, 2011, and (ii) for negligence, during this same period of time, in refusing to recognize him as a citizen of the United States.  *Id.*  A trial to determine damages to plaintiff was ordered.

On November 16, 2015, the court ruled that

> [p]laintiff is entitled to damages for 27 days of false imprisonment.
> . . .
>
> The rule of law is: a person claiming United States citizenship is entitled to a prompt and full investigation by the government of that claim [of United States citizenship], unless it is plainly frivolous.  In the instant case, a negligent failure to properly investigate plaintiff's claim of citizenship led to his initial detention by immigration officials.  Repeated and routine approval of the initial investigation by public officials without checking the facts was grossly negligent.  It led to plaintiff's wrongful detention for 27 days.
>
> Plaintiff was a young person who had no lawyer, was ill-educated, and was forced by circumstances to rely on the government to validate his claim.  Those charged with investigating plaintiff's claim to United States citizenship stumbled badly.  Had they not been negligent, plaintiff would not have been incarcerated.
>
> The plaintiff was held beyond 27 days for an additional 1,246 days, but a change in the prevailing law made reasonable the government's conclusion—which was made 27 days after plaintiff's initial detention—that plaintiff was not a citizen.  *See Matter of Hines*, 24 I. & N. Dec. 544 (BIA 2008).  Another change

in the law [some years later] ultimately validated his citizenship,
and he was promptly released. . . .

After plaintiff was released from detention, he claims that he was
not promptly issued a certificate of citizenship, causing him further
harm.  There is no showing of liability for any delay in the
issuance of citizenship documentation. . . . [D]amages for 27 days
of false imprisonment [only is allowed].

*Watson v. United States,* No. 14-CV-6459, 2015 WL 7281637, at *1 (E.D.N.Y. Nov. 16, 2015).

## III.      Operative Facts

### A.      Relevant Immigration Laws

The complexities of the United States immigration and legitimation laws involved, their

amendments and changing interpretations by federal authorities, and the impact of sometimes

unclear state and foreign laws that affect enforcement of United States immigration provisions,

demonstrate why, without an attorney for plaintiff, a miscarriage of justice was apt to occur.

Relevant are the United States' statutes declaring the requirements for a child's derivation of

citizenship from a naturalized parent and defining the term "child," New York's and Jamaica's

statutes setting forth their requirements for the legitimation of a child, and the decisions of the

Board of Immigration Appeals ("BIA") interpreting the interplay of these laws.

Prior to February 27, 2001, by virtue of an American statute,

[a] child born outside of the United States of alien parents . . .
bec[a]me a citizen of the United States upon fulfillment of the
following conditions:

(1) The naturalization of both parents; or

(2) The naturalization of the surviving parent if one of the parents
is deceased; or

(3) The naturalization of the parent having legal custody of the
child when there has been a legal separation of the parents or the
naturalization of the mother if the child was born out of wedlock
and the paternity of the child has not been established by
legitimation; and if

(4) Such naturalization takes place while such child is under the age of eighteen years; and

(5) Such child is residing in the United States pursuant to a lawful admission for permanent residence at the time of the naturalization of the parent last naturalized under clause (1) of this subsection, or the parent naturalized under clause (2) or (3) of this subsection, or thereafter begins to reside permanently in the United States while under the age of eighteen years.

8 U.S.C. § 1432 (1994), *repealed by* Pub. L. 106-395, Title I, § 103(a), 114 Stat. 1632 (2000).

Between February 27, 2001 and January 16, 2014, the relevant time period for this case,

[a] *child* born outside of the United States automatically bec[a]me a citizen of the United States when all of the following conditions [were] fulfilled:

(1) At least one parent of the child is a citizen of the United States, whether by birth or naturalization.

(2) The child is under the age of eighteen years.

(3) The child is residing in the United States in the legal and physical custody of the citizen parent pursuant to a lawful admission for permanent residence.

8 U.S.C. § 1431(a) (2000) (emphasis added). For purposes of this law, a "child" was

an unmarried person under twenty-one years of age who is . . . *a child legitimated under the law of the child's residence or domicile*, or under the law of the father's residence or domicile, whether in or outside the United States, if such legitimation takes place before the child reaches the age of eighteen years and the child is in the legal custody of the legitimating parent or parents at the time of such legitimation.

8 U.S.C. § 1101(b)(1)(C) (2000) (emphasis added).

Whether or not plaintiff was legitimated is a question of Jamaican law and New York law, the places where plaintiff lived. In 1981, the BIA decided *Matter of Clahar*, which interpreted the requirements for legitimation under Jamaican law. The Board held

9

that a child within the scope of the Jamaican Status of Children Act
may be included within the definition of a *legitimate* or *legitimated*
*'child'* set forth in section 101(b)(1) of the Immigration and
Nationality Act [codified at 8 U.S.C. § 1101(b)] *so long as the*
*familial tie or ties are established* by the requisite degree of proof
and the status arose within the time requirements set forth in
section 1010(b)(1).

*Matter of Clahar*, 18 I. & N. Dec. 1, 3 (BIA 1981) (emphasis added).

Under New York law, legitimation occurred either through the marriage of the child's

parents, the execution of an acknowledgement of paternity, or through a court declaration. *See*

N.Y. Dom. Rel. L. § 24; N.Y. Fam. Ct. Act §§ 516-a & 522.

Considering the interplay of the American law, Jamaican law, New York law, and case

law in effect at the time of plaintiff's father's naturalization on September 17, 2002, in order for

plaintiff to derive citizenship three elements had to be established: (i) plaintiff's father was a

citizen of the United States; (ii) plaintiff was legally residing in the United States in the legal and

physical custody of his father; and (iii) either the existence of "familial ties" between plaintiff

and his father were demonstrated, or an acknowledgement of paternity by his father. The term

"familial ties" is not defined, but can be assumed for the purpose of this memorandum as those in

which the father acknowledged the son as his progeny and had some kind of father-son

relationship in fact. At the time of plaintiff's arrest, these elements existed and could have been

established with a simple exercise in fact finding. The first element is conceded to have been

true, and the second and third elements could have been shown by testimony of the available

father, the son, or both.

On June 4, 2008, while the plaintiff was being held as a non-citizen by ICE, the BIA

changed its understanding of what was required for "legitimation" under Jamaican law, expressly

overruling *Matter of Clahar*. In *Matter of Hines*, the Board held,

> for purposes of both preference allocation and derivative
> citizenship, we will *hereafter deem a child born out of wedlock in
> Jamaica to be the "legitimated" child* of his biological father *only
> upon proof that the petitioner was married to the child's biological
> mother at some point after the child's birth.*

*Matter of Hines*, 24 I. & N. Dec. 544, 548 (BIA 2008) (emphasis added).  Under this revised

interpretation of Jamaican law, in order for plaintiff to derive citizenship three requirements had

to be met: (i) plaintiff's father was a citizen of the United States; (ii) plaintiff was legally

residing in the United States in the legal and physical custody of his father; and (iii) either

plaintiff's father and biological mother must have been married at some point after his birth or

plaintiff's father executed an acknowledgement of paternity.  Plaintiff could not have satisfied

(iii) since it is undisputed that his father and biological mother were never married and no such

acknowledgement was ever executed.

### B.  Factual Background

Because of the significance of dates, relevant facts are outlined chronologically below.

*November 17, 1984*: Plaintiff was born in Kingston, Jamaica, to Hopeton Watson and

Dorette McFarlane.  Stipulations of Fact, Sept. 23, 2015, ECF No. 65 ("Stipulations of Fact"), at

¶ 1.  His biological parents, both of whom were born in Jamaica, were not married at the time of

plaintiff's birth; they never married.  *Id.* at ¶¶ 2-3, 47.

*April 19, 1991*: Hopeton Watson signed plaintiff's Jamaican birth certificate; he indicated

that he was plaintiff's father.  *Id.* at ¶ 5.

*March 17, 1998*: Hopeton Watson petitioned for a visa for his son, plaintiff, to enter the

United States and submitted an affidavit in support under Section 213A of the Immigration and

Naturalization Act to the Immigration and Naturalization Service.  *Id.* at ¶ 6.

*August 4, 1998*: Plaintiff entered the United States as a lawful permanent resident.  *Id.* at

¶ 7.

*September 17, 2002*: Plaintiff's father became a United States citizen. At the time, plaintiff was seventeen years old and lived with his father in the United States. *Id.* at ¶¶ 8-9.

*November 23, 2004*: Plaintiff was convicted of attempted robbery in the second degree in Kings County, New York. He was sentenced to 30 days in jail and five years' probation. *Id.* at ¶ 10-11.

*February 22, 2006*: Plaintiff was sentenced to an additional eight months' incarceration for violation of probation. *Id.* at ¶ 12.

*September 18, 2007*: Plaintiff was convicted of attempted criminal sale of cocaine in the third degree in New York County, New York. *Id.* at ¶ 13. He was sentenced to a term of three and one half years imprisonment. *Id.* at ¶ 14. While incarcerated in New York, he entered New York State's Shock Incarceration Program, a military-style boot camp designed to rehabilitate young, non-violent offenders and to shorten their sentences. Hr'g Tr., Sept. 28, 2015, at 62:11-64:8. Plaintiff was scheduled to complete the program and be released on May 8, 2008. Stipulations of Fact, at ¶ 14.

*October 9, 2007*: While plaintiff was in custody for his September 18, 2007 conviction, Immigration and Customs Enforcement ("ICE") Deportation Officer Erik Andren investigated plaintiff's citizenship status and deportability. Hr'g Tr., Sept. 28, 2015, at 135:22-136:10. As part of this investigation, Officer Andren interviewed plaintiff at New York's Downstate Correctional Facility where plaintiff was incarcerated. Stipulations of Fact, at ¶ 15. Plaintiff told Officer Andren that he was a United States citizen. Hr'g Tr., Sept. 28, 2015, at 65:4-11. To support his claim, plaintiff provided Officer Andren with the correct names of his biological father, Hopeton Watson, and his step-mother, Claire Watson, as well as his father's correct phone number. *Id.* at 137:21-138:11. Prior to interviewing plaintiff, Officer Andren received a

packet of information from the New York State Department of Corrections. Included in this packet of information was a "New York City Department of Probation Pre-Sentence Investigation Face Sheet" that listed the same names and phone number of plaintiff's father and step-mother and stated that plaintiff was a United States citizen. *Id.* at 136:11-17; Pl.'s Tr. Ex. 101.

Officer Andren testified that based on his normal practice he would have tried to call the phone number he had been given, but the lack of notation on the Pre-Sentence Investigation Face Sheet indicates that he never made a successful attempt to reach anyone at the phone number. Hr'g Tr., Sept. 28, 2015, at 144:6-20, 153:3-154:2. Officer Andren is not credible on this point that he tried to contact plaintiff's citizen father. He ignored the notation on the Pre-Sentence Investigation Face Sheet that plaintiff was claiming United States citizenship. He testified at trial that he does not recall whether plaintiff repeated his claim during the October 7 interview.

When pressed on the stand about the lack of information in his report, Officer Andren testified that it is normal for individuals in the criminal justice system to not have information on their parents. *Id.* at 155:1-156:21. Critically, however, in this case the plaintiff had repeatedly provided his father's and step-mother's names, as well as their correct phone number, indicating the father's parental relationship with him. *See, e.g.*, Pl.'s Tr. Exs. 73, 101. The court finds that plaintiff would have provided supporting decisive information about his father's relationship had Officer Andren asked. As explained further below, it is Officer Andren's negligent investigation which started this peregrination towards injustice and the government's liability for the false arrest and imprisonment of plaintiff.

At the conclusion of Officer Andren's investigation, he placed an order for plaintiff's alien file, as well as the alien files for two individuals who he believed to be plaintiff's father and

step-mother. According to Officer Andren, if plaintiff or his parents had a certificate of naturalization, it would be in their respective alien files. Before receiving the alien files, however, Officer Andren submitted his paperwork – and conclusion that plaintiff was a deportable alien – up the chain of command for approval. Officer Andren himself never reviewed the alien files that he ordered. Hr'g Tr., Sept. 28, 2015, 141:25-142:9, 144:21-24.

*November 1, 2007*: Plaintiff's alien file, which had been ordered by Officer Andren, was received by ICE officials. Stipulations of Fact, at ¶ 19.

*March 27, 2008*: The alien files for the individuals who Officer Andren thought were plaintiff's father and step-mother were received by ICE officials. Stipulations of Fact, at ¶ 20; Hr'g Tr., Sept. 28, 2015, 141:8-142:9. The files were for a *Hopeton Livingston Watson* and a *Calrie Dale Watson* – obviously not plaintiff's parents properly described to the government by the plaintiff. *See* Def.'s Tr. Exs. ZZ & AAA. The government concedes that the files were not the correct files. *See* Def. United States of America's Post-Tr. Mem. of Law, Nov. 6, 2015, ECF No. 94, at 14.

A reasonable person exercising even a modest amount of care would have recognized that these files did not – could not – belong to plaintiff's father or step-mother. The file for Hopeton Livingston Watson indicated that he lived Connecticut and was not married; plaintiff told Officer Andren that his father lived in New York and was married. It also indicated that Hopeton Livingston Watson became a permanent resident of the United States on April 14, 2001, three years after plaintiff came to the United States as a permanent resident. And none of the children listed just a few pages into the file were named Davino Watson, or were listed as living in the United States. *See* Def.'s Tr. Ex. ZZ. Each of these facts should have indicated that this was not the correct file. Additionally, this clearly incorrect file states that Hopeton Livingston

Watson's ex-wife was a United States citizen. *See id.* If Officer Andren had waited until the file arrived and carefully read it before deciding that plaintiff was a deportable alien, this last notation should have led him to investigate the issue of citizenship through derivation.

It is obvious that the file for Calrie Dale Watson is not the correct file. In addition to the incorrect first name, this file shows that Calrie Dale Watson was married to a Gabriel Miller, not Hopeton Watson. The file indicates that the Watson name came from this individual's first husband, Rowan Eric Watson, who died in 1983. *See* Def.'s Tr. Ex. AAA.

These facts would have led a reasonable person to conduct further searches for the correct files, or to go back to plaintiff and request additional information so that the correct files could be located. Neither Officer Andren – who did not even wait for the files to arrive before making his decision – nor any other ICE official took reasonable steps to investigate plaintiff's well founded claim of United States citizenship. Officer Andren's carelessness led to his incorrect conclusion about plaintiff's citizenship status. But for this easily avoidable error, plaintiff would have been spared the three and a half years of detention that followed.

Instead, Officer Andren summarized his findings that plaintiff was a legal permanent resident, and that plaintiff's father was a legal permanent resident, not citizen, preventing any possible derivation of citizenship. Pl.'s Tr. Ex. 52.

Officer Andren then passed plaintiff's file onto his supervisor. At some point the file was reviewed by ICE Deportation Officer Juan Estrada.

*April 7, 2008*: Officer Estrada was charged with "writing the case," which means issuing the charging documents that would put plaintiff into removal proceedings. Hr'g Tr., Sept. 30, 2015, at 179:9-15; *see also* Stipulations of Fact, at ¶¶ 21-22. Aside from reviewing the documents he was given, Officer Estrada did not conduct any investigation. He did not speak

with plaintiff, speak with plaintiff's father, or perform any independent investigation of plaintiff's citizenship status. He relied solely on the file with which he had been provided by another government worker, which included the obviously incorrect Hopeton Watson and Calrie Watson alien files. Hr'g Tr., Sept. 30, 2015, at 179:22-180:5, 184:1-4, 199:20-201:11, 203:2-7.

After reviewing the wrong files, Officer Estrada concluded that plaintiff was a deportable alien. *Id.* at 180:24-181:7. Officer Estrada testified that even if he had been aware of plaintiff's claim of citizenship – which he should had through the material before him – he would have found plaintiff to be deportable due to the lack of a certificate of citizenship. *Id.* at 181:9-182:6. In sum, Officer Estrada rubber-stamped the incorrect conclusions of Officer Andren without the investigation or evaluation that in the file clearly indicated was needed.

On April 7, 2008, Officer Estrada filled out several immigration forms. *See* Stipulations of Fact, at ¶¶ 21-23. First, he completed a Form I-213 "Record of Deportable/Inadmissible Alien." Pl.'s Tr. Ex. 70. Officer Estrada testified that the purpose of the form is to provide a narrative of the purported alien's case to the attorneys, the officer's supervisor, and the immigration judge. Hr'g Tr., Sept. 30, 2015, at 183:13-16. In completing the form, Officer Estrada wrote "[t]he subject is a national and citizen of Jamaica and a Lawful Permanent Resident of the United States. *His parents are nationals and citizens of Jamaica who have not naturalized.* No issue of derivation applies." Stipulations of Fact, at ¶ 23 (emphasis supplied). This emphasized conclusion was flatly wrong.

Second, Officer Estrada completed a Form I-265 "Notice to Appear, Bond, and Custody Processing Sheet." This document included the incorrect factual allegations that plaintiff was not a citizen of the United States but of Jamaica. Def.'s Tr. Ex. WW.

Officer Estrada testified that an attorney reviewed this form to determine whether there was enough legal sufficiency to warrant plaintiff's removal proceedings. The attorney did not conduct any further investigation into the allegations contained on the forms he had been provided. Hr'g Tr., Sept. 30, 2015, at 184:7-187:12, 222:15-224:5. This level of review was effectively a mindless failure.

Once Officer Estrada received the attorney's approval, he prepared several additional forms that were to be forwarded with plaintiff's file to his supervisor, ICE Supervisory Deportation Officer Michael Ortiz. The forms included a Form I-247 "Immigration Detainer-Notice of Action" to Lakeview Correctional Center, directing the Lakeview Correctional facility to detain plaintiff until the Department of Homeland Security could take plaintiff into custody. Pl.'s Tr. Ex. 54. On the I-247 form, Officer Estrada checked the box: "Investigation has been initiated to determine whether this person is subject to removal from the United States." *Id.*; Stipulation of Facts, at ¶¶ 21-22.

Based upon his patently insufficient investigation, Officer Estrada also prepared a Form I-862 "Notice to Appear"; included was the allegations that plaintiff was "not a citizen or national of the United States" but "a citizen of Jamaica." Def's Tr. Ex. X; Stipulation of Facts, at ¶ 24. A Form I-200 "Warrant for Arrest of Alien" and Form I-286 "Notice of Custody Determination" were also created. Pl.'s Tr. Exs. 33 & 71. The Form I-286 stated that plaintiff was to be detained in the custody of the Department of Homeland Security and that he "may not request a review of this determination by an immigration judge because *the Immigration and Nationality Act prohibits [his] release from custody.*" Pl.'s Tr. Ex. 33 (emphasis added).

*April 10, 2008*: ICE Supervisory Deportation Officer Michael Ortiz reviewed the forms Officer Estrada had prepared, along with plaintiff's alien file and the incorrect Hopeton and

Claire Watson alien files. It does not appear that he performed any independent investigation of the statements concerning plaintiff's citizenship or analysis of the problem; he merely signed off on the obvious errors already committed. Hr'g Tr., Oct. 1, 2015, at 328:11-329:20, 338:17-25. This was a shirking of duty.

On April 10, 2008, Officer Ortiz mindlessly signed the Form I-200 "Warrant for Arrest of Alien," the Form I-862 "Notice to Appear," and the Form I-286 "Notice of Custody Determination." Def.'s Tr. Ex. X; Pl.'s Tr. Exs. 33 & 71. The forms and files were then forwarded to ICE's Buffalo office.

*May 8, 2008*: Upon completing his sentence with the New York State Department of Correctional Services, plaintiff was immediately taken into ICE custody and brought to the Allegany County Jail. Hr'g Tr., Sept. 28, 2015, at 64:18-24, 68:15-17. Plaintiff was personally served with the Notice to Appear and Notice of Custody Determination on this date. Def.'s Tr. Ex. X; Pl.'s Tr. Ex. 33.

The ICE officers who arrested plaintiff told him that they had reason be believe that he was an alien. In response, plaintiff claimed that he was a United States citizen. The ICE officers informed plaintiff that he would see a judge within twenty-four hours for the resolution of his citizenship claim. Hr'g Tr., Sept. 28, 2015, at 66:5-21.

Plaintiff repeatedly asserted his claim and facts supporting United States citizenship to the officials at the Allegheny County Jail. *Id.* at 69:15-19.

*May 27, 2008*: A Notice to Appear was filed with the Executive Office for Immigration Review ("EOIR") Immigration Court. Def.'s Tr. Ex. X.

*June 4, 2008*: The BIA published *Matter of Hines*, 24 I & N Dec. 544 (BIA 2008), expressly overruling *Matter of Clahar*. Under *Clahar*, in force when plaintiff was arrested by

ICE, the facts made plaintiff a citizen.  Under the newly minted *Hines*, announced 27 days after his arrest, he was a non-citizen.  *See supra* Part III.A.

*June 23, 2008*: Plaintiff was transferred to the Buffalo Federal Detention Facility. Stipulations of Fact, at ¶ 31.

*June 25, 2008*: Plaintiff appeared, *pro se*, before an immigration judge.  This was the first time plaintiff saw an immigration judge.  *Id.* at ¶¶ 32, 34.  The immigration judge informed plaintiff of the charges against him, and adjourned the hearing so that he could try to obtain a lawyer.  Plaintiff asserted his claim of citizenship to the immigration judge.  In response, the immigration judge directed the government to provide plaintiff with a Form N-600, used to request a certificate of citizenship.  Pl.'s Tr. Ex. 1.

*July 10, 2008*: Plaintiff appeared for the second time in front of the immigration judge. He was still *pro se*.  His hearing was adjourned in order to give plaintiff more time to obtain a lawyer and pursue his claim of United States citizenship.  Stipulation of Facts, at ¶ 38.

*July 14, 2008*: Plaintiff sent Deportation Officer Timothy Gunther a handwritten letter stating "I would like you to send these documents [including father's certificate of naturalization] with the N600 [requesting a certificate of citizenship] or send them to wherever you sent the N600 Form [b]ecause I think that it can help my argument about being a citizen . . . ."  Stipulation of Facts, at ¶ 37.  Plaintiff attached to his letter a copy of his father's certificate of naturalization.  Pl.'s Tr. Ex. 39.

*July 15, 2008*: Plaintiff's N-600 application for United States citizenship was filed by the government.  Stipulation of Facts, at ¶ 39.

*July 31, 2008*: Plaintiff appeared for a third time before an immigration judge. *Id.* at ¶ 40. He was still *pro se*. The hearing was adjourned again in order to give plaintiff more time to obtain a lawyer and pursue his claim of United States citizenship. Pl.'s Tr. Ex. 1.

*August 4, 2008*: The United States Citizenship and Immigration Services ("USCIS") denied plaintiffs N-600 application. Relying on *Matter of Hines*, the USCIS concluded that there was no evidence that plaintiff was legitimated under New York or Jamaican law, and, thus, plaintiff did "not meet the definition of 'child' as described in Section 101(c)(l) of the INA for purposes of derivative United States citizenship." Pl.'s Tr. Ex. 37; Stipulation of Facts, at ¶ 41.

*August 14, 2008*: Plaintiff appeared, *pro se*, for a conference before the immigration judge. Stipulation of Facts, at ¶ 43. At this conference plaintiff informed the immigration judge that he had been unable to obtain a lawyer because he had no money, and that his application for a certificate of citizenship had been denied. The immigration judge adjourned the hearing for two more weeks so that he could review plaintiff's N-600 application and USCIS's denial of the application. Pl.'s Tr. Ex. 1.

*August 21, 2008*: Plaintiff, acting *pro se*, by letter, appealed USCIS's denial of his N-600 application. Pl.'s Tr. Ex. 6.

*September 2, 2008*: Plaintiff appeared, *pro se*, before an immigration judge and informed the judge that he would not be filing an asylum application (an admission, in effect, that he was a non-citizen). Stipulations of Fact, at ¶ 44; Pl.'s Tr. Ex. 1.

*September 9, 2008*: Plaintiff appeared, *pro se*, before an immigration judge. The judge explained to plaintiff that his N-600 application "was denied because [plaintiff's] father never showed or because there was no showing that [plaintiff was] ever legitimated by [his] father." Stipulations of Fact, at ¶ 46. The immigration judge adjourned the hearing for two more weeks

so that plaintiff could develop his opposition to the USCIS's denial and collect evidence to support an argument that the USCIS was wrong.  Pl.'s Tr. Ex. 1.

*September 17, 2008*: The USCIS's Administrative Appeals Office ("AAO") dismissed plaintiff's administrative appeal of his N-600 denial, relying on *Hines*.  The AAO concluded that:

> The applicant has neither claimed nor submitted evidence to establish that his natural parents were married at the time of his birth.  As a child born out of wedlock, he must, therefore, demonstrate that he was legitimated by Mr. Watson in Jamaica or the State of New York, Mr. Watson's domicile, if he is to be deemed a child for the purposes of section 320(a) of the Act.  Pursuant to Article 3, section 24 of New York domestic relations law, *the parents of a child born out of wedlock must marry in order to legitimate that child* . . . .  The record, however, contains no evidence to prove that the applicant's parents ever married and a review of related Citizenship and Immigration Services (CIS) records indicates that Mr. Watson's September 12, 1986 marriage to his current spouse, Eunice Sonia Clare Watson, is his only marriage.  Accordingly, the record does not establish that the applicant has been legitimated under the laws of New York.  The record also fails to prove that he has been legitimated under Jamaican law.  In *Matter of Shawn Theodore Hines*, 24 I&N Dec. 544 (BIA 2008), the Board of Immigration Appeals held that the sole means of legitimating a child born out of wedlock in Jamaica is the marriage of that child's natural parents.  The BIA's decision in *Hines* overruled *Matter of Clahar*, 18 I&N Dec. J (BIA 1981) under which a child subject to the 1976 Jamaican Status of Children Act (SCA) was determined to be legitimate.  The AAO is bound by the BIA's recent precedent and must conclude that the applicant, whose parents never married, has not been legitimated under Jamaican law and, therefore, may not be classified as a child under section 101 (c)(l) of the Act.

Stipulation of Facts, at ¶ 47 (emphasis added).  Under the *Clahar* rule, in effect upon plaintiff's arrest, since his father was a citizen and had a parental relationship with him as a minor, he would have been deemed a citizen.

*September 23, 2008*: Plaintiff appeared, *pro se*, for a conference before the immigration judge. The government introduced in evidence "a photostatic copy of the front page of [plaintiff's] immigrant visa, the Form I-213, which is an investigative report, a record of deportable/inadmissible alien," plaintiff's alien registration face sheet, and plaintiff's certificates of disposition indicating his convictions of felonies." Plaintiff, *pro se*, filed a motion to terminate the removal proceedings. Pl.'s Tr. Ex. 1. The immigration judge adjourned the hearing until October 9, 2008 so that the government could submit a written response to plaintiff's motion. *Id.*

*October 6, 2008*: ICE filed its response opposing plaintiff's motion to terminate removal proceedings. Stipulation of Facts, at ¶ 50.

*October 9, 2008*: Plaintiff, *pro se*, filed his reply papers in support of his motion to terminate removal proceedings. *Id.* at ¶ 51.

*November 13, 2008*: Plaintiff appeared, *pro se*, before the immigration judge. The immigration judge explained that he had adjourned the October 9, 2008 date so that he could do some research into the legal issue that had been raised. He then issued an *oral decision* holding that "*the BIA's most recent decision in* Matter of Hines *is controlling and that [plaintiff is] not a U.S. citizen.*" Pl.'s Tr. Ex. 1 (emphasis supplied).

*November 26, 2008*: Plaintiff filed a notice of appeal, *pro se*, from the immigration judge's decision. Stipulation of Facts, at ¶ 54.

*December 24, 2008*: Plaintiff filed an appellate brief, *pro se*, with the Board of Immigration Appeals. *Id.* at ¶ 55.

*January 5, 2009*: ICE filed its brief in opposition to plaintiff's appeal. *Id.* at ¶ 56.

*February 5, 2009*: The Board of Immigration Appeals affirmed the immigration judge's decision. The BIA held that, under *Matter of Hines*, plaintiff did not qualify as a "child" of a naturalized citizen because he was never legitimated through the marriage of his biological parents. Additionally, the BIA explained that even if *Matter of Hines* did not control, plaintiff had failed to present evidence that his father had "legal custody" over him when his father naturalized. *Id.* at ¶ 57; Pl.'s Tr. Ex. 11.

*February 14, 2009*: Plaintiff, *pro se*, filed a Petition for Review with the Court of Appeals for the Second Circuit. Pl.'s Tr. Ex. 13.

*April 30, 2009*: ICE conducted a Post-Order Custody Review of plaintiff. Stipulation of Facts, at ¶ 59.

*May 7, 2009*: Relying on the pending appeal to the Court of Appeals for the Second Circuit, ICE issued its "Decision to Continue Detention" of plaintiff, stating:

> A request for a travel document was sent on February 20, 2009 to the Jamaican Consulate in New York City, NY. *Because of your current pending litigation with the 2nd Circuit of Appeals*, the Jamaican Consulate will not issue a travel document until that litigation is resolved. Based on your criminal history, you pose a threat to the community, and are a flight risk. You are facing a life bar from the United States, if you are removed. Based on the above, you are to remain in ICE custody pending your removal from the United States . . . .

*Id.* at ¶ 60 (emphasis supplied).

*May 11, 2009*: ICE issued a letter indicating that plaintiff would not be released by ICE at that time. *Id.* at ¶ 61.

*July 9, 2009*: The Court of Appeals for the Second Circuit dismissed plaintiff's petition for review of his citizenship status. *Id.* at ¶ 62. The court did not rule on the merits of plaintiff's argument that he was the legitimated son of his biological father. Instead, the court held that

plaintiff "failed to raise an arguable basis in law or fact for challenging the BIA's alternative ruling that *[he] would not be entitled to derivative citizenship – even if legitimated – in light of his failure to adduce evidence showing that his biological father had legal custody of him* after his admission as a lawful permanent resident." Pl.'s Tr. Ex. 19 (emphasis supplied).

*September 25, 2009*: Plaintiff, *pro se*, filed in the Court of Appeals for the Second Circuit a motion to reinstate his Petition for Review, explaining that the Court of Appeals' reliance on the BIA's ruling was in error. Stipulation of Facts, at ¶ 63.

*October 8, 2009*: Apparently because it had not fully plumbed the legal and factual issues, the Court of Appeals for the Second Circuit recalled its mandate, reinstated the petition for review, and stayed plaintiff's removal pending its further order. Pl.'s Tr. Ex. 17.

*January 20, 2010*: The Court of Appeals for the Second Circuit ordered that plaintiff be appointed counsel from the court's Pro Bono Panel to assist him with his appeal. Pl.'s Tr. Ex. 19.

*May 27, 2010*: Plaintiff was informed by ICE that it intended to continue detaining him. Stipulation of Facts, at ¶ 65.

*July 27, 2010*: Pro bono counsel was appointed by the Court of Appeals for the Second Circuit to assist plaintiff with his appeal. Pl.'s Tr. Ex. 18.

*February 15, 2011*: The government filed its brief with the Court of Appeals for the Second Circuit. It argued that plaintiff was not a United States citizen. Stipulations of Fact, at ¶ 66.

*May 31, 2011*: The Court of Appeals for the Second Circuit published a decision, remanding plaintiff's case to the BIA for the BIA to clarify its interpretation of the concept of "legitimation" under Jamaican law. *See Watson v. Holder*, 643 F.3d 367, 369-70 (2d Cir. 2011).

The court instructed the BIA to "(1) clarify precisely how it interprets the concept of 'legitimation' as it is used in § 1101(c)(1), and (2) justify how it arrived at that particular interpretation. Once that is accomplished, the BIA should again analyze and explain how its understanding of 'legitimation' applies to Jamaican law and the facts of this case." *Id.* at 370. The court suggested that the "BIA may wish to explore whether Watson was 'in the legal custody' of his father at any time during Watson's stay in Jamaica." *Id.*

*August 23, 2011*: ICE served Plaintiff with a new "Notice of Custody Determination." Stipulation of Facts, at ¶ 68.

*October 24, 2011*: Plaintiff was transferred from the Buffalo Federal Detention Facility to the Tensas Parish Detention Center in Louisiana. *Id.* at ¶ 71.

*October 25, 2011*: Plaintiff was transferred from the Tensas Parish Detention Center to the Etowah County Jail in Alabama. *Id.* at ¶ 72.

*November 1, 2011*: Finally recognizing the problem, a memorandum from ICE Chief Counsel and a Field Office Director to the Director of Legal Operations and Assistant Director for Field Operations recommended that plaintiff be released from ICE custody. *Id.* at ¶ 73.

*November 2, 2011*: Plaintiff was released from ICE custody in Alabama on his own recognizance. *Id.* at ¶ 74. He was not told why he was being let out of jail. He was put out on the street, a stranger in a small town, with no money. Hr'g Tr., Sept. 28, 2015, 94:5-95:5. He had been detained for a total of 1,273 days.

*November 25, 2011*: ICE filed a supplemental brief with the BIA arguing that *Matter of Hines* applied prospectively, and therefore, did not control plaintiff's situation. Stipulation of Facts, at ¶ 76.

*August 20, 2012*: Plaintiff obtained a New York State Temporary Visitor identification card.  *Id.* at ¶ 77.

*January 24, 2013*: BIA issued an unpublished decision terminating removal proceedings against plaintiff.  *Id.* at ¶ 79; Pl.'s Tr. Ex. 50.

*February 20, 2013*: Plaintiff filed a motion to reopen his N-600 application.  Stipulation of Facts, at ¶ 80.

*March 11, 2013*: Plaintiff received a letter from USCIS indicating that he was required to pay a fee in connection with his motion to re-open his N-600 application.  *Id.* at ¶ 81.

*May 28, 2013*: Plaintiff filed a letter regarding expedited processing of his N-600 application.  *Id.* at ¶ 82.

*August 22, 2013*: USCIS's Administrative Appeals Office ("AAO") granted Plaintiff's motion to reopen and ruled: "The Field Office Director, Buffalo, New York decision, dated August 4, 2008, and the AAO decision, dated September 17, 2008, will be withdrawn.  The Form N-600 application will be approved.  The matter is returned to the Buffalo, New York Field Office for issuance of a certificate of citizenship."  *Id.* at ¶¶ 78, 83.

*October 30, 2013*: Plaintiff filed his claim of administrative tort ("SF-95").  *Id.* at ¶ 84.

*November 26, 2013*: Plaintiff's certificate of United States citizenship was issued by USCIS.  It was delivered to him on December 3, 2013, 755 days after he had been released from detention.  *Id.* at ¶ 85.

IV.     **Law**

"In a civil case, the plaintiff bears the burden of proving the elements of his claim by a preponderance of the evidence.  To establish a fact by a preponderance of the evidence means to prove that the fact is more likely true than not true."  *Brown v. Lindsay*, Nos. 08-CV-351, 08-CV-2182, 2010 WL 1049571, at *12 (E.D.N.Y. Mar. 19, 2010) (citations omitted).

> Because the [ICE and USCIS] agents were acting within the scope of their employment . . . only two substantial questions must be answered. First, has the government consented to such suits under the provisions of the [Federal Tort Claims] Act? Second, under the relevant state law – that of New York – was the behavior of the government agents tortious and, therefore, compensable?

*Birnbaum v. U.S.*, 436 F. Supp. 967, 972 (E.D.N.Y. 1977), *aff'd in part, rev'd in part*, *Birnbaum v. U.S.*, 588 F.2d 319 (2d Cir. 1978).

### A.     FTCA

#### 1.     Background

The court has jurisdiction over this matter pursuant to the Federal Tort Claims Act ("FTCA"). 28 U.S.C. § 1346(b)(1). Each provision of the FTCA which could divest the court of jurisdiction must be separately considered. The applicability of the exceptions control the court's jurisdiction; the reasoning applicable to one exception need not be consistent with the reasoning applicable to another one.

In evaluating each codified exception, it is important to keep in mind what Congress was attempting to do by enacting the FTCA. The Act replaced independent statutory decisions on each tort claim in which sovereign immunity needed to be waived. It removed the burden from Congress of dealing with an increasing load of tort claims against the government on a case-by-case basis. It provided a systematic automatic waiver of sovereign immunity for the cases it otherwise would have had to consider and vote on one at a time. *See Feres v. United States*, 340 U.S. 135, 139-40 (1950) (discussing purpose of FTCA to relieve burden of private relief bills on Congress); *Birnbaum*, 588 F. 2d at 322 (Gurfein, Circuit J.) ("The purpose of the Act was generally to waive the sovereign immunity of the United States for torts of its employees committed within the scope of their employment . . . ."); 1 Jayson & Longstreth, Handling Federal Tort, § 3.01 (Matthew Bender).

There can be little doubt that Congress, had it heard this case before the enactment of the FTCA, if it properly investigated (as it is assumed it would have), would have granted plaintiff's claim for compensation by a private bill. Interpretation of the FTCA and its exceptions should be approached with congressional equitable considerations in mind. *See Feres*, 340 U.S. at 139 (FTCA "should be construed to fit . . . into the entire statutory system of remedies against the Government to make a workable, consistent and *equitable whole*.") (emphasis added).

### 2. Exceptions

28 U.S.C. § 2680(a) contains two exceptions to the government's waiver of liability under the FTCA. The first, the "due care exception," applies to "[a]ny claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid . . . ." 28 U.S.C. § 2680(a). The second, the "discretionary function exception," applies to any claim "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." *Id.*

28 U.S.C. § 2680(h) contains a third exception, the "intentional tort exception." It bars "[a]ny claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights." 28 U.S.C. § 2680(h). The exception does not apply to claims arising out of the acts or omissions of "investigative or law enforcement officers," defined as "any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law." *Id.* The false arrest exception does not apply to the officers who took and held plaintiff in custody; they were empowered to seize evidence and make arrests.

### a) Due Care Exception

The due care exception "is part of the statutory scheme which is intended to assure that 'the legality of a rule or regulation should (not) be tested through the medium of a damage suit for tort.'" *Myers & Myers, Inc. v. U. S. Postal Serv.*, 527 F.2d 1252, 1261 (2d Cir. 1975) (quoting H.R. Rep. No. 1287, 79th Cong., 1st Sess. 6 (1945)). In contrast to the discretionary function exception, described below, the due care exception applies to situations where a statute or regulation *requires* an action to be taken. In such a situation, where the government official acts in a reasonable way, *i.e.*, not negligently, in carrying out the requirements of a statute or regulation, sovereign immunity lies. *See Nwozuzu v. U.S.*, No. 14-CV-8589, 2015 WL 4865772, at *5 (S.D.N.Y. Aug. 12, 2015) (citing *Crumpton v. Stone*, 59 F.3d 1400, 1403 (D.C. Cir. 1995), and *Welch v. U.S.*, 409 F.3d 646, 652 (4th Cir. 2005)); *but see Stewart v. United States*, 486 F. Supp. 178, 181-82 (C.D. Ill. 1980) (explaining that the exception was not intended to immunize the government simply because a government official acted in accordance with a statute or regulation with "due care," and that such an interpretation of the exception would render the FTCA moot "since liability is predicated only on negligence or wrongful acts. An exception for acts done with due care would be unnecessary and redundant.").

The government contends that "[t]he 'due care' exception acts as a jurisdictional bar to plaintiff's claims because the government acted reasonably in following the mandates of 8 U.S.C. §§ 1226(c) and 1227(a) in taking plaintiff into ICE custody and subjecting him to removal proceedings." United States' Post-Trial Findings of Fact and Conclusions of Law, Nov. 6, 2015, ECF 93, at ¶ 186; *see also* Def. United States of America's Post-Trial Mem. of Law, Nov. 6, 2015, ECF No. 94, at 6 ("[T]he United States' actions in the present case were reasonable because immigration officials followed the mandates of 8 U.S.C. §§ 1226(c) and 1227(a) in taking plaintiff into ICE custody and subjecting him to removal proceedings.").

The problem with the government's argument is that the due care exception only applies where a government official is acting in accordance with a statute or regulation. *See* 28 U.S.C. § 2680 ("The provisions of this chapter and section 1346(b) of this title shall not apply to -- (a) Any claim based upon an act or omission of an employee of the Government, exercising due care, *in the execution of a statute or regulation . . . .*") (emphasis added). The statutes upon which the government relies – 8 U.S.C. §§ 1226(c) and 1227(a) – apply only to aliens, not to citizens. *See* 8 U.S.C. § 1226(c) ("The Attorney General shall take into custody any *alien* who . . . .") (emphasis added); 8 U.S.C. § 1227(a) ("Any *alien* (including an alien crewman) in and admitted to the United States shall, upon the order of the Attorney General, be removed if the *alien* is within one or more of the following classes of deportable *aliens . . . .*") (emphasis added).

Because plaintiff was a citizen at the time of his arrest and initial detention by ICE officials, the government cannot claim the protection of statutes pertaining solely to the treatment of aliens. ICE officials were not acting pursuant to the requirements of 8 U.S.C. §§ 1226(c) and 1227(a) because they arrested and detained a citizen, not an alien. Whether they acted reasonably in carrying out the arrest and by detaining plaintiff in an appropriate facility is irrelevant to this issue of jurisdiction under the FTCA.

### b)      Discretionary Function Exception

The discretionary function exception "covers only acts that are discretionary in nature, acts that involv[e] an element of judgment or choice; and it is the nature of the conduct, rather than the status of the actor that governs whether the exception applies." *United States v. Gaubert*, 499 U.S. 315, 322 (1991) (citations omitted).

> [E]ven assuming the challenged conduct involves an element of judgment, it remains to be decided whether that judgment is of the kind that the discretionary function exception was designed to

shield.  Because the purpose of the exception is to prevent judicial
'second-guessing' of legislative and administrative decisions
grounded in social, economic, and political policy through the
medium of an action in tort, when properly construed, *the
exception protects only governmental actions and decisions based
on considerations of public policy.*

*Gaubert*, 499 at 322-23 (citations omitted) (emphasis added).  The discretionary function

exception "bars suit only if two conditions are met: (1) the acts alleged to be negligent must be

discretionary, in that they involve an 'element of judgment or choice' and are not compelled by

statute or regulation and (2) the judgment or choice in question must be grounded in

'considerations of public policy' or susceptible to policy analysis."  *Molchatsky v. United States*,

713 F.3d 159, 162 (2d Cir. 2013); *see also Coulthurst v. United States*, 214 F.3d 106, 109-10 (2d

Cir. 2000) (explaining two part test and emphasizing that "to obtain dismissal of the suit, *the

United States must also establish that the decision in question was grounded in considerations of

public policy*") (emphasis added).

The government argues that claims related to ICE's initial investigation of plaintiff's

citizenship and subsequent detention are barred by the discretionary function exception.  *See*

Def. United States of America's Post-Trial Mem. of Law, Nov. 6, 2015, ECF No. 94, at 24-32;

United States' Post-Trial Findings of Fact and Conclusions of Law, Nov. 6, 2015, ECF 93, at ¶

187 ("The government exercised its discretionary duty in its investigation of plaintiff's

citizenship status, from October 9, 2007 to May 8, 2008, and in its initial detention of plaintiff in

ICE custody, from May 8, 2008 to June 4, 2008.  It contends that the government's actions

between October 9, 2007 and June 4, 2008 involved discretionary judgments not compelled by

any statute, regulation or directive; and further, the decisions at issue were grounded in

considerations of public policy.").  The government is wrong.

The relevant question is not whether ICE's initial investigation of plaintiff's citizenship status falls within the discretionary function exception, but whether its arrest and detention pending removal do. *See Watson*, 2015 WL 5695860, at *22 (dismissing negligence claim for investigation due to lack of private analogue).

ICE's arrest and initial detention of plaintiff do not fall within the discretionary function exception. ICE officials were not acting within their discretionary authority by arresting and detaining plaintiff because plaintiff was a citizen, not an alien. As noted above, the statutes upon which the government relies pertain only to the arrest and detention of aliens, not citizens. "It is, of course, a tautology that a federal official cannot have discretion to behave unconstitutionally or outside the scope of his delegated authority." *Myers & Myers, Inc.*, 527 F.2d at 1261 (citing *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 170-71 (1803)); *see also Birnbaum v. U.S.*, 436 F. Supp. at 972-74, *and on appeal at* 458 F.2d 319, 329-30 (2d Cir. 1978) (discretionary function exception does not apply to violation of right to privacy in unconstitutional mail opening by government). ICE officials were not acting in accordance with any statutorily-derived discretion by detaining plaintiff, a citizen, when he was arrested.

Alternatively, if 8 U.S.C. §§ 1226(c) and 1227(a) did apply, then the discretionary function exception would not bar plaintiff's claims because those statutes leave no discretion in the hands of ICE officials – they command the precise action to be taken. *See* 8 U.S.C. § 1226(c) ("The Attorney General *shall* take into custody any alien who . . .") (emphasis added); 8 U.S.C. § 1227(a) ("Any alien (including an alien crewman) in and admitted to the United States *shall*, upon the order of the Attorney General, be removed if the alien is within one or more of the following classes of deportable aliens . . .) (emphasis added).

Even if the decision to arrest and detain plaintiff was a legitimate exercise of discretion – which it was not – it was not one susceptible of policy analysis. *See Caban v. United States*, 671 F.2d 1230, 1233 (2d Cir. 1982) ("the activities of the INS agents who detained appellant do not fall within the purview of [the discretionary function exception] because the activities are not the kind that involve weighing important policy choices"); *Birnbaum*, 436 F. Supp. at 973-74 (there is no discretion to violate a constitutional right).

Plaintiff's citizenship claim depended upon ascertainable facts and law, not discretion.

### c)      Intentional Tort Exception

The government contends that the intentional tort exception bars plaintiff's false imprisonment claim. This argument was addressed and rejected in the September 29, 2015 memorandum and order. *See Watson*, 2015 WL 5695860, at *21. There is no evidence of malice or intent to harm plaintiff. The harm was caused by a series of negligent acts by government officials.

### B.      Elements under New York Law

There are two causes of action remaining: first, false arrest and imprisonment; and, second, negligence for failing to deliver a certificate of citizenship for 755 days following plaintiff's release from ICE custody. *See Watson*, 2015 WL 5695860, at *23.

### 1.      False Arrest – Imprisonment

Under New York law, to successfully establish a claim for false arrest or imprisonment a plaintiff must prove "'(1) the defendant intended to confine him, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged.'" *Willey v. Kirkpatrick*, 801 F.3d 51, 70-71 (2d Cir. 2015) (quoting *Broughton v. State of New York*, 37 N.Y.2d 451, 456 (1975)). "[W]hether the ICE agents' actions here were 'otherwise privileged' is determined by consulting federal privileges

applicable to federal immigration officers." *Liranzo v. U.S.*, 690 F.3d 78, 95 (2d Cir. 2012) (citing *Caban v. United States*, 728 F.2d 68, 71 (2d Cir. 1984)). "To be privileged, the actions of the immigration officer must be reasonable and the detention must be conducted in accordance with federal standards." *Polanco v. United States*, No. 10 CV 1705 SJ RLM, 2014 WL 795659, at *4 (E.D.N.Y. Feb. 27, 2014); *see also Liranzo v. United States*, No. CV 08-2940 ARL, 2013 WL 1811338, at *4 (E.D.N.Y. Apr. 29, 2013) (immigration official's acts were privileged where they "were reasonable and conducted in accordance with federal standards").

### 2.     Negligence

"The FTCA allows plaintiffs to recover damages for an injury caused by the negligence of government employees acting within the scope of their employment." *Taylor v. United States*, 121 F.3d 86, 89 (2d Cir. 1997). Under the FTCA, the liability of the United States to a plaintiff for negligence is determined "in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1); *Molzof v. United States*, 502 U.S. 301, 305 (1992). The parties agree that New York law applies.

In New York negligence is defined as acting unreasonably or failing to act reasonably under the circumstances:

> *Negligence is lack of ordinary care*. It is a failure to use that degree of care that a reasonably prudent person would have used under the same circumstances; negligence may arise from doing an act that a reasonably prudent person would not have done under the same circumstances, or from failing to do an act that a reasonably prudent person would have done under the same circumstances.

*Silva v. United States*, No. 08-CV-4114, 2010 WL 3731172, at *4 (E.D.N.Y. Sept. 20, 2010) (citing New York Pattern Jury Instructions 3d ed. ("N.Y.P.J.I.") 2:10 *et seq.* (2010)) (emphasis added).

"To prevail on a claim of negligence under New York law, a plaintiff must establish: '(1) that a duty of care was owed by the defendant to the plaintiff; (2) that the defendant breached that duty; (3) that the defendant's breach was a proximate cause of the plaintiff's injuries; and (4) that plaintiff was damaged.'" *Brown v. Lindsay*, Nos. 08-CV-351, 08-CV-2182, 2010 WL 1049571, at *13 (E.D.N.Y. Mar. 19, 2010) (quoting *Crews v. Cty. of Nassau*, 612 F. Supp. 2d 199, 205 (E.D.N.Y. 2009)).

### C.     Government liable for false arrest and false imprisonment for 27 days

Plaintiff asserts that the government is liable for false arrest and imprisonment.  There is no dispute that plaintiff was arrested and detained by ICE officials, that he was aware of his arrest and detention, and that he did not consent.  The only dispute is whether plaintiff's arrest and detention was privileged.  Although the arrest and initial detention of plaintiff was not legally privileged, the detention became privileged following a change in the interpretation of law while plaintiff was being detained and as a result of the normal time delay inherent in bureaucratic processes.

### 1.     May 8, 2008 – June 4, 2008

The government contends that plaintiff's initial arrest and detention was privileged "because the government – relying on the information available to it at the time of [plaintiff's] detention – reasonably believed that plaintiff's parents were not U.S. citizens."  United States' Post-Trial Findings of Fact and Conclusions of Law, Nov. 6, 2015, ECF No. 93, at ¶ 191.  Officer Andren's initial determination that plaintiff was not – and could not be – a citizen was negligent.  He ignored the Pre-Sentence Investigation Face Sheet that indicated plaintiff was claiming citizenship.  He failed to collect easily obtainable information about plaintiff's father and step-mother and of the father's relationship to his son – neglecting to even try to speak with plaintiff's father, the critical witness.  And he failed to wait for the arrival of alien files that

35

would have, according to him, contained important documentation regarding citizenship.  *See supra* Part III.  The subsequent repeated blind approval of Officer Andren's conclusion by officials failing to do their own duty of investigation was not reasonable.  No adequate factual investigation was ever conducted, no review of the files upon which Officer Andren relied was ever attempted, and no adequate review of the alien files – which were plainly for the wrong individuals – was ever attempted.

Because ICE did not act reasonably when it concluded that plaintiff was not a citizen, its arrest and initial detention of him was not privileged.  The government is liable for falsely arresting and detaining plaintiff.

### 2.      June 4, 2008 – November 2, 2011

Under the law in effect at the time plaintiff was taken into custody and the facts readily ascertainable if reasonable care had been taken, plaintiff should have been declared a citizen – based on his father's citizenship and family ties with him – before he completed the New York State Shock Incarceration Program.  Upon plaintiff's completion of that program, he should have been released without incarceration by ICE.

On June 4, 2008, while plaintiff was in ICE custody, the BIA decided *Matter of Hines*, changing the Board's interpretation of the law as it related to legitimation of Jamaican-born individuals.  *See supra* Part III.A.  Under *Hines*, because plaintiff's father never married plaintiff's biological mother, plaintiff could not derive citizenship through his father's naturalization.  *Hines*, 24 I. & N. Dec. at 548.

Whether *Hines* was improperly applied retroactively to plaintiff's situation is not the appropriate question.  Rather, the issue is whether it was "reasonable" for immigration officials to conclude that *Hines*, once issued, did apply to plaintiff so that plaintiff was not a citizen and

could be held for deportation. *Polanco*, 2014 WL 795659, at \*4; *Liranzo*, 2013 WL 1811338, at \*4.

The substantive law in effect at the time an appeal is heard (whether by a court or administrative board) generally applies, even if it is different from the one in effect when the lower court or administrator properly followed what was then acknowledged to be the law. *See Bradley v. Sch. Bd. of City of Richmond*, 416 U.S. 696, 711-16 (1974) (discussing "general rule that a court is to apply a law in effect at the time it renders its decision"). Since government employees were bound to follow the BIA's ruling, and there was no question that *Hines* precluded a finding of citizenship for plaintiff, the government officers reasonably concluded, after *Hines*, that plaintiff was not a citizen and was subject to detention and removal.

The law does not require in this situation that government officials reach the correct legal conclusion; it only requires that they act reasonably. An immigration judge, the BIA, and a panel of the Second Circuit Court of Appeals all reached the same conclusion that plaintiff failed to show he was a citizen and that his detention was proper. Even though this conclusion was later found to be erroneous as a matter of law, these decisions demonstrate that the issue was not clear-cut. It was reasonable for government officials to conclude, as judges repeatedly did, that *Hines* did apply to plaintiff. It was also reasonable for the government to rely on the decisions of the immigration judge, the Board of Immigration Appeals, and the Second Circuit Court of Appeals. As a result, as of June 4, 2008, plaintiff's detention was no longer unlawful.

### 3. November 3, 2011 – December 3, 2013

Plaintiff contends that the government was negligent in failing to provide a certificate of citizenship to him for 755 days following his release from ICE custody. Negligence has not been proved by plaintiff. A certificate of citizenship could not be issued, it was reasonable of administrators to conclude, until removal proceedings were terminated and an order to issue a

certificate was made. The normal bureaucratic process takes time. *See Vineberg*, 548 F.3d at 59. Following the required process before a certificate was issued did not violate any duty of care owed to plaintiff. Had plaintiff had counsel, no doubt the certificate would have been issued almost immediately after his release in Alabama. The delay was essentially due to lack of counsel – the basic reason for this whole legal disaster.

Even if a duty of care was violated by the time it took to issue a certificate of citizenship, plaintiff failed to satisfy his burden of establishing damages caused by the breach. Plaintiff conceded that he is not seeking any damages for lost income. The evidence shows that his inability to secure work was a result of his criminal history, drug use, and general lassitude, not his immigration status. Hr'g Tr., Jan. 14, 2016, at 205:17-211:4, 213:19-217:1. There is no credible evidence that plaintiff's post-release depression was caused by the government's failure to provide a certificate of citizenship earlier than it did. Plaintiff's contrary testimony at trial on this issue was found not credible based on the record and its own observations. Hr'g Tr., Jan. 14, 2016, 224:20-225:17; *Birnbaum*, 588 F.2d at 335 ("We give 'due regard . . . to the opportunity of the trial court to judge of the credibility of the witnesses.'") (quoting Fed. R. Civ. P. 52(a)).

## V.      Damages

### A.      Considerations

It is not possible to establish precisely the appropriate level of damages in a case such as this. Nonetheless, it has long been the law that "[d]amages are not rendered uncertain because they cannot be calculated with absolute exactness. It is sufficient if a reasonable basis of computation is afforded, although the result be only approximate." *Eastman Kodak Co. of New York v. S. Photo Materials Co.*, 273 U.S. 359, 379 (1927) (citations omitted). Some leeway for the trier's judgment must be allowed. *See id.* ("the question as to the amount of the plaintiff's damages having been properly submitted to the jury, its determination as to this matter is

conclusive"); *Ismail v. Cohen*, 899 F.2d 183, 186 (2d Cir. 1990) ("It is well settled that calculation of damages is the province of the jury."); *Blue Cross & Blue Shield of New Jersey, Inc. v. Philip Morris, Inc.*, 36 F. Supp. 2d 560, 585 (E.D.N.Y. 1999) *disapproved of on other grounds by Int'l Bhd. of Teamsters, Local 734 Health & Welfare Tr. Fund v. Philip Morris Inc.*, 196 F.3d 818 (7th Cir. 1999) ("once the other elements of a cause of action have been proven, considerable leeway and flexibility in establishing damages is permitted"); *cf. Stolberg v. Members of Bd. of Tr. for State Colls. of State of Conn.*, 474 F.2d 485, 489 (2d Cir. 1973) (in context of punitive damages, recognizing that amount of damages "are of necessity within the discretion of the trier of the fact") (citation omitted). The court in a FTCA case has the same powers as a jury in fixing damages.

"Damages in FTCA actions are determined by the law of the state in which the tort occurred. Generally, under New York law a plaintiff may recover his loss of earnings, medical expenses, and mental and physical pain and suffering." *Ulrich v. Veterans Admin. Hosp.*, 853 F.2d 1078, 1081-82 (2d Cir. 1988) (citing N.Y. Jur. 2d Damages § 57, at 102-03 (1984)).

In false imprisonment cases, the following overlapping elements should be considered in computing damages:

First: The value of the violated constitutional right *simpliciter*, as guaranteed by Section 1 of Amendment XIV of the Constitution to "citizens of the United States." *See infra* Part V.B.

Second: The *per diem* value in money based on loss of income, lack of intimate contacts outside of jail, and the psychological pain in being forcibly removed from society, including the actual or perceived effect on a citizen of that deliberate deprivation of a particular constitutional right in the particular case (some rights may be more prized

and have more of an effect on the plaintiff than others – compare the differing feelings by different citizens about the rights protected by the First and Second Amendments to the Constitution). Bitterness that goes with knowing you have been railroaded by a corrupt justice system and its minions may warrant a greater award than an incarceration based on a mistake. *See, e.g.*, Bryan Stevenson, *Just Mercy: A Story of Justice and Redemption* 93 (Spiegel & Grau 2014) ("I feel like they done put me on death row, too. What do we tell these children about how to stay out of harm's way when you can be at your own house, minding your own business, surrounded by your entire family, and they still put some murder on you that you ain't do and send you to death row?").

Third: The conditions of confinement.

Fourth: The impact the arrest and imprisonment had on plaintiff's life at the time it occurred.

Fifth: The continuing post-incarceration impact on the plaintiff as a result of the illegal arrest and detention.

## B.    Value of Constitutional Rights *Simpliciter*

It is well established in the jurisprudence of the Second Circuit Court of Appeals and the Supreme Court that a violation of a constitutional right is compensable through an award of "nominal damages" in the absence of actual damages. *Carey v. Piphus*, 435 U.S. 247, 266 (1978) ("Common-law courts traditionally have vindicated deprivations of certain 'absolute' rights that are not shown to have caused actual injury through the award of a nominal sum of money."); *Matusick v. Erie Cty. Water Auth.*, 757 F.3d 31, 64 (2d Cir. 2014) ("It is well established that an award of nominal damages is not discretionary where a substantive constitutional right has been violated.") (citation omitted); *Gibeau v. Nellis*, 18 F.3d 107, 110-11 (2d Cir. 1994) (same); *Smith v. Coughlin*, 748 F.2d 783, 789 (2d Cir. 1984) ("even when a

litigant fails to prove actual compensable injury, he is entitled to an award of nominal damages upon proof of violation of a substantive constitutional right"); *Birnbaum*, 436 F. Supp. at 987, *aff'd in part, rev'd in part*, 588 F.2d at 333-35 (recognizing that violation of privacy right, even without objective harm, is still compensable).

> By making the deprivation of such rights actionable for nominal damages without proof of actual injury, the law recognizes the importance to organized society that those rights be scrupulously observed; but at the same time, it remains true to the principle that substantial damages should be awarded only to compensate actual injury or, in the case of exemplary or punitive damages, to deter or punish malicious deprivations of rights.

*Carey*, 435 U.S. at 266.

The FTCA's waiver of sovereign immunity is limited to damages "for injury or loss of property, or personal injury or death." 28 U.S.C. § 1346(b)(1). In situations where Congress has limited the ability of plaintiffs to collect damages due to governmental wrongs – such as the FTCA – courts have recognized that such a statutory limitation does not preclude the award of nominal damages for a violation of a constitutional right. *See, e.g.*, *Bush v. St. Tammany Par.*, 754 F.2d 1132, 1133 (5th Cir. 1984) (affirming award of nominal damages for FTCA violation); *Allah v. Al-Hafeez*, 226 F.3d 247, 251 (3d Cir. 2000) (recognizing availability of nominal damages for violations of constitutional rights notwithstanding statutory bar in Prison Litigation Reform Act, 42 U.S.C. § 1997e(e)); *Perkins v. Kansas Dep't of Corr.*, 165 F.3d 803, 808 (10th Cir. 1999) (same); *Wright v. Miller*, 973 F. Supp. 390, 396-97 (S.D.N.Y. 1997), *amended* (Aug. 22, 1997) (same); *cf. Ass'n of Am. R.R.s v. U.S. Dep't of Transp.*, 721 F.3d 666, 676 (D.C. Cir. 2013) *vacated and remanded on other grounds sub nom. Dep't of Transp. v. Ass'n of Am. R.R.s*, 135 S. Ct. 1225 (2015) ("Congress has the power to waive certain governmental privileges, like sovereign immunity, that are within its legislative control; but it cannot circumvent the Bill of

Rights by simply dubbing something private."); *Juda v. United States*, 6 Cl. Ct. 441, 456 (1984) ("The Bill of Rights, of course, is a fundamental safeguard against arbitrary government action and, with respect to citizens of the United States, is applicable to the United States government wherever it acts.").

Damages for the violation of a constitutional right alone is appropriate here. Permitting the government to hide behind the pre-colonial, British based, regal shield of sovereign immunity to immunize itself from the consequences of its violation of a citizen's constitutional rights would be antithetical to the spirit of the Constitution and leave the Bill of Rights an empty shell. *See* Patrick Henry, Speech at the Convention of the Commonwealth of Virginia on the Adoption of the Federal Constitution (June 14, 1788), in 3 The Debates in the Several State Conventions of the Adoption of the Federal Constitution 445-49 (J. Elliot ed., J.B. Lippincott Co. 1891) (1836) (discussing purpose of Bill of Rights to restrain the federal government and protect individual rights).

In *Birnbaum*, a case concerning the improper intercepting, opening and copying of first-class mail letters by the Central Intelligence Agency, members of an advisory jury found awards ranging from $2,500 to $10,000 to be appropriate even though no contemporary harm was suffered. *See Birnbaum*, 436 F. Supp. at 988. The court determined that an award of $1,000 per plaintiff to be appropriate. *Id.* at 989. The Court of Appeals for the Second Circuit approved that award. *See Birnbaum*, 588 F.2d at 335. Adjusted for inflation, a $1,000 award is today equivalent to $3,911.17. Bureau of Labor Statistics, CPI Inflation Calculator, http://data.bls.gov/cgi-bin/cpicalc.pl.

Where significant compensatory damages are awarded, the nominal damage award attributable to the violation of a constitutional right *simpliciter* is generally folded into the larger

award.  As explained *infra*, because plaintiff is entitled to significant compensatory damages, a separate award for the violation of his constitutional rights *simpliciter* is not being made or included in damages awarded.

### C.    Comparable Cases

While other awards and settlements may not explicitly address each of the above factors, they all should be melded in a gestalt.  *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 425 (1996); *Velasquez v. United States Postal Serv.*, No. 14-CV-1397, --- F. Supp. 3d ----, 2016 WL 93279, at *7-10 (E.D.N.Y. Jan. 7, 2016) (considering comparable cases).

The parties submitted examples of awards from comparable cases; award amounts have been adjusted where appropriate to present-day values using the Bureau of Labor Statistics' CPI Inflation Calculator.  Plaintiff's examples included:

False Arrest and No or *De Minimis* Detention

- *Graham v. City of N.Y.*, No. 08-CV-3518, --- F. Supp. 3d ----, 2015 WL 5258741 (E.D.N.Y. Sept. 10, 2015) (jury award of $150,000 for false arrest, detention of 30 minutes, emotional distress and minor physical injuries);

- *Mason v. City of N.Y.*, 949 F. Supp. 1068, 1075 (S.D.N.Y. 1996) (approximately $15,000 for two hours of detention that did not result in physical injury or significant humiliation);

- *Haynes v. City of N.Y.*, 29 A.D.3d 521 (2d Dep't 2006) ($377,656.15 for false arrest);

- *Hallenback v. City of Albany*, 99 A.D.2d 639 (3d Dep't 1984) (award of approximately $22,800 for false arrest and three hours of unlawful detention);

- *Kelly v. Kane*, 98 A.D.2d 861 (3d Dep't. 1983) (jury award of approximately $12,000 in 2015 dollars for unlawful imprisonment of 75 minutes); and

- *Woodard v. City of Albany*, 81 A.D.2d 947 (3d Dep't 1981) (approximately $19,555 for false arrest and five hours of unlawful detention).

<u>Detention of more than one day</u>

- *Crews v. Cty. of Nassau*, No. 06-CV-2610, --- F. Supp. 3d ----, 2015 WL 9164110 (E.D.N.Y. Dec. 16, 2015) (award of $175,000 for 125 days imprisonment, or $1,400 per day);

- *Hyatt v. U.S.*, 968 F. Supp. 96 (E.D.N.Y. 1997) (award under Illinois law in FTCA case of $438,600 for 99 days of false imprisonment, or $4,430.30 per day);

- *Marion v. LaFargue*, No. 00 Civ. 0840, 2004 WL 330239, at *12 (S.D.N.Y. Feb. 23, 2004) (award of approximately $188,000 for six days of unlawful involuntary commitment to psychiatric hospital, or $31,333 per day); and

- *Bravo v. Giblin*, No. BC105876, 2002 WL 31547001 (Cal. Ct. App. Nov. 18, 2002) (award of approximately $4,660,000 for 1,179 days imprisonment, or $3,952.50 per day).

The government's examples included:

- *Sanabria v. State of N.Y.*, 908 N.Y.S.2d 527 (N.Y. Ct. Cl. 2010) (award of approximately $21,740 for 91 days of imprisonment resulting from state department's miscalculation of release date, or $238.90 per day);

- *Nicchio v. State of N.Y.*, 1999 Jury Verdicts LEXIS 59134 (N.Y. Ct. Cl., Oct. 29, 1999) (approximately $4,270 for 30 days of unlawful detention following legally-mandated release date form prison, or $142.33 per day);

- *Johnson v. State of N.Y.*, 588 N.Y.S.2d 722 (N.Y. Ct. Cl. 1992) (award of approximately $67,575 for 747 days of imprisonment where plaintiff had prior criminal record and knew he was guilty of crime other than one he had been convicted of, or $90.46 per day); and

- *Lynch v. Cnty. of Nassau*, 278 A.D.2d 205 (2d Dep't 2000) (award of $34,400 for emotional damages for false arrest without imprisonment).

Also considered were the state and national laws providing damages to individuals who are incarcerated following a wrongful conviction. *See, e.g.*, 28 U.S.C. § 2513 ("The amount of damages awarded shall not exceed $100,000 for each 12-month period of incarceration for any plaintiff who was unjustly sentenced to death and $50,000 for each 12-month period of incarceration for any other plaintiff."); *Wrongful conviction compensation statutes*, CNN.com, http://www.cnn.com/interactive/2012/03/us/table.wrongful.convictions (last visited February 25,

2016); *see also* Consolidated Appropriations Act, 2016, Pub. L. 114-113, § 404(c)(2) (2015) (awarding individuals taken hostage at the United States embassy in Tehran in 1979-1981 $10,000 per day).

### D.     Application

#### 1.     False Arrest

As explained above, because ICE did not act reasonably when it initially arrested plaintiff, it is liable for damages for false arrest.  *See supra* Part IV.C.  Relying on *Graham v. City of N.Y.*, No. 08-CV-3518, --- F. Supp. 3d ----, 2015 WL 5258741 (E.D.N.Y. Sept. 10, 2015), plaintiff argues that he should receive $150,000 for false arrest.  Pl.'s Post-Damages Trial Findings of Fact & Conclusions of Law, Feb. 5, 2016, ECF No. 137, at 15-17.  The government argues that any damages for false arrest should be subsumed in the damages awarded for plaintiff's false imprisonment.  United States of America's Findings of Fact & Conclusions of Law on the Issue of Damages, Feb. 5, 2016, ECF No. 135, at 30.

"An individual subjected to a false arrest is entitled to two types of compensatory damages: (1) for loss of liberty and (2) for physical and emotional distress."  *Alla v. Verkay*, 979 F. Supp. 2d 349, 371 (E.D.N.Y. 2013) (citation omitted).  "False arrest awards vary widely. When adjusted to 2005 dollars, they have generally ranged between $10,000 and $300,000." *Martinez v. Port Auth. of N.Y. & N.J.*, No. 01-CV-721, 2005 WL 2143333, at *20 (S.D.N.Y. Sept. 2, 2005), *aff'd sub nom. Martinez v. The Port Auth. of New York & New Jersey*, 445 F.3d 158 (2d Cir. 2006) (collecting cases).  In present value, the range of awards is approximately $15,000 to $364,000 for the false arrest alone.

Plaintiff's reliance on the *Graham* court's holding of $150,000 for the false arrest alone is not persuasive.  The plaintiff in *Graham* was arrested in public in front of his young child and his child's day care provider, leading to substantial emotional injury.  *Graham*, 2015 WL 5258741,

at *26.  There is no evidence in the instant case that plaintiff's arrest was in public or caused any significant emotional or physical injury.

Since there were no aggravating factors such as physical abuse, public humiliation, or malice, an award for plaintiff's false arrest should be on the lower end of the range found in comparable cases.  Plaintiff is entitled to an award of $15,000 for the government's false arrest of him on May 8, 2008.

### 2.        False Imprisonment

The government's detention of plaintiff from May 8, 2008 to June 4, 2008 was not reasonable.  Plaintiff is entitled to damages for being falsely imprisoned for 27 days.

In New York, damages for false imprisonment can be either general or special.  General damages include loss of liberty and humiliation or mental suffering, while special damages include physical discomfort, injury to health, lost employment opportunities, and injury to reputation.  *Kerman v. City of N.Y*, 374 F.3d 93, 125 (2d Cir. 2004); *see also supra* Part V.A (listing overlapping factors).  The parties focus their analysis on general damages.  Evidence presented at trial did not establish plaintiff's entitlement to any special damages, including lost income and employment opportunities.

Plaintiff submits that he should be compensated at a rate of $4,430.22 per day for his loss of liberty.  Pl.'s Post-Damages Trial Findings of Fact & Conclusions of Law, Feb. 5, 2016, ECF No. 137, at 22-23.  He derives this number from *Hyatt v. United States*, 968 F. Supp. 96 (E.D.N.Y. 1997), a FTCA case in which an immigrant was wrongly held and subjected to criminal prosecution for 99 days.  Although *Hyatt* does present several similarities to the instant case, it was decided under Illinois law and cost of living, not New York's.  It is therefore of limited value in assessing an appropriate damages award under New York law.

Plaintiff claims that he should be compensated at a rate of $2,272.66 to $2,591.66 per day for emotional injuries for his first 27 days of unlawful imprisonment.  He arrives at this range by subtracting what he argues is a fair value for loss of liberty from two cases that present a single total award for loss of liberty and emotional harm.  Pl.'s Post-Damages Trial Findings of Fact & Conclusions of Law, Feb. 5, 2016, ECF No. 137, at 26-27.  For future emotional injury, plaintiff argues that he should be awarded at least $550,000.  *Id.* at 33.

The government argues that plaintiff should be awarded $239 per day for his loss of liberty, and nothing for emotional injury at the time of his imprisonment or in the future.  United States of America's Findings of Fact & Conclusions of Law on the Issue of Damages, Feb. 5, 2016, ECF No. 135, at 30-36.  This per day amount comes from *Sanbria v. State*, 29 Misc. 3d 988 (N.Y. Ct. Cl. 2010), a case in which an inmate was wrongfully held for 91 days past his release date due to an administrative error.  *Sanabria* is distinguishable from the instant case because in that case the plaintiff was lawfully "arrested and incarcerated in the first instance." *Sanabria*, 29 Misc. 3d at 995-96.

In the instant case, plaintiff's false imprisonment prevented him from exercising the liberty he was preparing to enjoy following his successful completion of the New York Shock Incarceration Program.  He testified that he was about to begin a new chapter in his life following his success in the Program, but was prevented from doing so by his unlawful detention.  This detention, he testified, left him "angry, panicked, despondent . . . [and] depressed."  *See* Hr'g Tr., Jan. 13, 2016, at 125:1-126:16; 130:13-131:21.  This testimony is deemed credible.

Although the deprivation of this liberty was improper and should be fairly compensated, the conditions in which plaintiff was held were not severe.  During the 27 days for which

plaintiff is entitled to damages, he was held at the Allegheny County Jail.  The jail is a modern

facility with recreation rooms, a law library, and multipurpose rooms with televisions.  At the

time plaintiff was housed there, the jail offered a high school equivalency program and computer

classes.  A registered nurse and mental health worker were on staff.  Each detainee had his own

cell, which he was permitted to go in and out of at his leisure, as well as access to a telephone

and mail.  *See* Hr'g Tr., Jan. 14, 2016, at 201:13-202:1, 275:2-22, 278:6-282:23.

The Buffalo Federal Detention Facility, where plaintiff was held from June 23, 2008 until

October 24, 2011, was also a well-kept facility with a library, in-door and out-door recreation

facilities, movie nights, regular meals created by a registered dietician, medical facilities,

religious services, and the ability to have family visitors and to make phone calls.  *See* Hr'g Tr.,

Jan. 21, 2016, at 375:13-393:20.

Considering the factors outlined above, *see supra* Part V.A., and the comparable

exemplars presented by the parties, it is found that, for loss of liberty, plaintiff is entitled to an

award of $2,000 per day for 27 days, or $54,000.  Because this significant sum is provided, a

separate nominal award representing the value of the violation of plaintiff's constitutional rights

*simpliciter* is not appropriate.

Plaintiff is entitled to an award of $500 per day for emotional injury incurred during this

period.  Although the testimony at trial did not reveal a clear connection between this period of

incarceration and plaintiff's emotional injuries, it is reasonable to conclude that false

imprisonment by his own government would be stressful to the young person the court observed

during trial.

Plaintiff is not entitled to an award for future pain and suffering resulting from the 27

days of imprisonment.  His testimony on the alleged impacts of this short period of incarceration

is not found to be credible. Hr'g Tr., Jan. 14, 2016, at 224:20-225:17; *Birnbaum*, 588 F.2d at 335 ("opportunity of the trial court to judge of the credibility of the witnesses") (quoting Fed. R. Civ. P. 52(a)).

### 3. Alternative Damages Award

In the interests of judicial efficiency, in the event that the Court of Appeals concludes this court erred in limiting damages to false arrest and 27 days of false imprisonment, the following additional findings are made:

If plaintiff is entitled to damages for the remaining 1,273 days he was incarcerated, he would be entitled to $2,000 per day for loss of liberty and $500 per day for emotional injuries.

If plaintiff is entitled to damages for the period between his release from ICE custody and his receipt of a certificate of citizenship, he would be entitled to $1,000 per day for what amounts to a constructive limitation on his liberty, and an additional $250 per day for the emotional injury caused by the government's failure to timely provide the certificate.

It would not be held that plaintiff is entitled to an award of damages for future pain and suffering under either of these hypotheticals. He suffered no such damages.

## VI. Conclusion

As noted in the introduction, the regrettable failures of the government in this case are largely due to the fact that there was no counsel available at the outset to plaintiff, despite a clear need for an attorney. Until individuals – citizens and aliens alike – are afforded a right to qualified counsel in immigration cases, it is likely that the system will continue to fail many of those it was designed to protect. *See, e.g.*, Luke Mogelson, *The Deported*, N.Y. Times Sunday Magazine, Dec. 13, 2015, at MM96; Rachel Aviv, *The Refugee Dilemma*, The New Yorker, Dec. 7, 2015, at 46-55; *see also* Liz Robbins, *Court Sets Limit on Holding Immigrants in Criminal Cases*, N.Y. Times, Oct. 31, 2015, at A20.

Based on the evidence, plaintiff has met his burden of proof with respect to his false arrest and imprisonment claim. A judgment in favor of the plaintiff shall be entered on those claims for the total amount of $82,500. It includes $2,000 per day for 27 days for loss of liberty, $500 per day for 27 days for emotional injury, and $15,000 for false arrest.

Judgment shall be entered by the Clerk of the court in the amount of $82,500.

Costs and disbursements are awarded to the plaintiff.

SO ORDERED.

Jack B. Weinstein
Senior United States District Judge

Dated: February 25, 2016
Brooklyn, New York